IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
IN AND FOR SEMINOLE COUNTY, FLORIDA

BIG ELK FUNDING, LLC, a Delaware limited
liability company,

       Plaintiff,

v.

                                                             CASE NO: 2019-CA-002536

TOTAL MARKETING CONCEPTS, INC.,
FLORIDA COMMUNITY BANK, N.A., XEROX
FINANCIAL SERVICES, LLC, QUEEN
FUNDING, LLC, BUSINESS ADVANCE, LLC,
CORPORATION SERVICE COMPANY, AS
REPRESENTATIVE, AFFILIATED FUNDING
CORPORATION, CAPSTONE CREDIT, LLC,
DISCOUNT LONG DISTANCE, LLC,
SOUTHERN NEVADA FINANCE, LLC,
INTERNAL REVENUE SERVICE,
BROADBAND DYNAMICS, LLC, STATE OF
FLORIDA DEPARTMENT OF REVENUE, GTR
SOURCE, LLC,

       Defendants.

_____/

## DIRECT ENERGY, LP'S MOTION TO INTERVENE AND CANCEL THE FORECLOSURE SALE

       Interested Party, Direct Energy, LP, respectfully requests that it be permitted to intervene

pursuant to Fla. R. Civ. P. 1.230, and asks that the Court cancel the foreclosure sale set for July

14, 2020 at 11:00 a.m.

       The Court previously stopped this foreclosure sale in January 2020 after Direct Energy

filed an injunction request in the Southern District of Texas to preserve Direct Energy records

and other documents possessed by Total Marketing Concepts, Inc. ("TMC") that relate to two

ongoing lawsuits. In response, TMC then turned over some of the records to Direct Energy. In

addition, TMC, the receiver, and Big Elk represented to this Court (and the Southern District of

Texas) that they would sign a Limited Assumption and Assignment Agreement (the "Assumption Agreement") under which they would continue to preserve TMC records after the foreclosure sale. Based on those representations, the Court reset the sale. TMC and Big Elk, however, have since reneged on their promise to execute the Agreement. Because the Assumption Agreement was a prerequisite to the foreclosure sale, the sale should not proceed.

TMC is a defendant in two federal court actions involving alleged violations of the Telephone Consumer Protection Act ("TCPA"): *Matthew Dickson, et al. v. Direct Energy, L.P., et al.*, No. 5:18-cv-182, In the United States District Court for the Northern District of Ohio and *Burk v. Direct Energy LP*, Case No. 4:19-cv-663, pending in the United States District Court for the Southern District of Texas, Houston Division. Both *Burk* and *Dickson* concern TMC's use of telemarketing calls, texts, and ringless voicemails about Direct Energy services. In connection with these cases, Direct Energy has requested documents and information from TMC for well over a year—key documents that TMC is obligated to provide under a Teleservices Agreement (and related Statements of Work) with Direct Energy. These records are critical to Direct Energy's defense in *Burk* and *Dickson*, and to Direct Energy's ability to continue to respond to consumer, utility, and regulatory inquiries in the regular course of its business.

Direct Energy has gone to great efforts to collect documents and information from TMC, as summarized below and outlined in Direct Energy's motion for preliminary injunction and status updates filed in *Burk. See* Direct Energy, LP's Notice of Filing its Verified Motion for Preliminary Injunction, filed in this Court on December 31, 2019, and Direct Energy, LP's Verified Motion for Preliminary Injunction attached hereto as **Exhibit A**. After learning of the receivership, Direct Energy engaged the previous (and first) court-appointed receiver, Kelly P. McKenna, who requested that Direct Energy identify the specific documents sought. Direct

Energy complied, but Mr. McKenna never responded. Instead, TMC consented to and aided in the foreclosure sale of its own assets, while ignoring Direct Energy.

As a result, Direct Energy filed a motion for preliminary injunction in *Burk* to enjoin the foreclosure sale. *See* **Ex. A**. Judge Melanie Chase promptly canceled the foreclosure until the parties could work out an arrangement to preserve TMC documents. TMC agreed to permit Direct Energy's counsel physical access to TMC's office to collect certain documents. While Direct Energy has collected emails from several key custodians, other necessary documents were not retrieved, and TMC promised to locate and produce those documents. To permit the foreclosure sale to go forward in the meantime, TMC and other interested parties jointly drafted the Assumption Agreement, where Big Elk, TMC, former receiver Jeremiah Foster, and Big Elk's principal, Bill Eckholm agreed to preserve all documents following the foreclosure sale (among other things). On January 30, 2020, the parties presented the unexecuted Assumption Agreement to this Court. The Court entered an order that same day incorporating the Assumption Agreement and resetting the foreclosure sale—**conditioned upon compliance with the Assumption Agreement**. *See* Order Granting Big Elk Funding LLC's Expedited Motion to Amend Order Appointing Receiver and Limited Assumption and Assignment Agreement attached hereto as **Exhibit B**.

On February 20, 2020, this Court entered an Order Granting Expedited Motion for Rehearing and Resetting Foreclosure Sale, which included the requirement that the Order entered on January 30, 2020 is incorporated and made a part of the Order. *See* Order Granting Expedited Motion for Rehearing and Resetting Foreclosure Sale attached hereto as **Exhibit C**. So, here again, the Court expressly conditioned the foreclosure on compliance with the ongoing preservation obligations stated in the Assumption Agreement and any additional preservations

ordered by this Court or the Honorable George C. Hanks, Jr. in the United States District Court for the Southern District of Texas. Those conditions have not been met.

Instead, after the Court agreed to reset the foreclosure, Big Elk, TMC, Mr. Foster and Mr. Eckholm never executed the Assumption Agreement—despite their representations to this Court and the *Burk* Court that they would. They have ignored Direct Energy's repeated demands to sign the Assumption Agreement,[1] provide all responsive documents, or otherwise comply with TMC's discovery obligations.

Undeterred by its own non-performance, on April 21, 2020, Plaintiff Big Elk, filed a motion to reschedule the foreclosure sale. *See* Plaintiff's Motion to Reschedule Foreclosure Sale attached hereto as **Exhibit D**. Then, on June 10, 2020, Big Elk submitted a letter to this Court stating that no party objects to the motion and provided a proposed Order granting the same (the "Order"). *See* Big Elk's Letter to Judge Chase and Order Granting Plaintiff's Motion to Reschedule Foreclosure Sale attached hereto as **Exhibit E**. **Big Elk's letter was inaccurate because Direct Energy was never consulted**. Additionally, Big Elk's Order failed to reference or include the prior January 30th and February 20th Orders incorporating and conditioning the foreclosure sale upon the Assumption Agreement. And on June 15, 2020, because Big Elk expressly stated in its letter to this Court requesting entry of the Order that "[n]o party objects to the entry of [Big Elk's Motion to Reschedule Foreclosure Sale]," which may have indicated to the Court that the federal issues with Direct Energy had been resolved and that the Assumption Agreement is no longer required, this Court executed the Order scheduling the foreclosure for

---

[1] Direct Energy understands that Mr. Foster cannot execute as receiver, given his request to withdraw due to his understanding that TMC is using the Court's foreclosure proceeding to execute a fraud on TMC's creditors.

July 14, 2020. *See* executed Order Granting Plaintiff's Motion to Reschedule Foreclosure Sale attached hereto as **Exhibit F**.

The sale cannot proceed because TMC, Big Elk, Mr. Eckholm, and the receiver have not signed the Assumption Agreement and are not complying with its terms as required by the January 30th and February 20th Orders. Those Orders establish that their agreement and compliance are prerequisites to the foreclosure sale. Due to these parties' lack of cooperation, failure to comply with the federal court orders, and failure to produce documents TMC is contractually obligated to produce, Direct Energy objects to the foreclosure sale, which will jeopardize documents and information that may be destroyed or lost that are relevant to the *Dickson* and *Burk* cases and are the subject of Direct Energy's motion for preliminary injunction in *Burk*. Therefore, Direct Energy requests to intervene and that the Court void its Order Granting Plaintiff's Motion to Reschedule Foreclosure Sale and cancel the pending foreclosure sale.

WHEREFORE, Interested Party, Direct Energy, respectfully requests that this Honorable Court grant this Motion to Intervene and Cancel the Foreclosure Sale and order TMC and the parties to comply with the Agreement and produce the requested documents and information, and for any and all further relief as this Court deems just and appropriate.

[CERTIFICATE OF SERVICE ON FOLLOWING PAGE]

CASE NO: 2019-CA-002536

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed and served via the E-Filing Portal, this 7th day of July, 2020, to the parties set forth on the attached Service List.

MCDOWELL HETHERINGTON LLP
*Attorneys for Interested Party Direct Energy, LP*
2385 N.W. Executive Center Drive, Suite 400
Boca Raton, FL 33431
Telephone:     (561) 994-4311
Facsimile:      (561) 982-8985

By:     /s/ Miriam J. Rosenblatt
        MIRIAM J. ROSENBLATT
        Fla. Bar No. 111736

CASE NO: 2019-CA-002536

**SERVICE LIST**

Via E-Filing Portal

Justin M. Luna, Esq.
Latham, Luna, Eden & Beaudine, LLP
*Attorneys for Big Elk Funding, LLC*
111 N. Orange Avenue, Suite 1400
Orlando, FL 32801
E-Service: jluna@lseblaw.com; bknotice@lseblaw.com

Patrick Crocker, Esq.
Crocker & Crocker
*Attorneys for Total Marketing Concepts, Inc.*
The Kalamazoo Building
107 W. Michigan Avenue, 4th Floor
Kalamazoo, Michigan 49007
E-Service: patrick@crockerlawfirm.com

Jack M. Brennan, Esq.
GrayRobinson, P.A.
*Attorneys for Discount Long Distance, LLC*
301 E. Pine Street, Suite 1400
Orlando, Florida 32801
E-Service: jack.brennan@gray-robinson.com

Bradley J. Anderson, Esq.
Kevin P. Robinson, Esq.
Zimmerman, Kiser & Sutcliffe, P.A.
*Attorneys for Southern Nevada Finance*
315 E. Robinson Street, Suite 600 (32801)
P.O. Box 3000
Orlando, Florida 32802
E-Service: banderson@akslawfirm.com; krobinson@zkslawfirm.com; service@zkslawfirm.com

Lara R. Fernandez, Esq.
Trenam Law
*Attorneys for Synovous Bank*
101 East Kennedy Boulevard, Suite 2700
Tampa, Florida 33602
E-Service: lfernandez@trenam.com

CASE NO: 2019-CA-002536

<u>Via U.S. Mail</u>

Total Marketing Concepts, Inc.
Attention: Andrew Dorko, Jr.
4395 St. Johns Parkway
Sanford, Florida 32771

Lara R. Fernandez, Esq.
Florida Community Bank, N.A.
2500 Weston Road, Suite 300
Weston, Florida 33331
And
369 N. New York Avenue
Winter Park, Florida 32789

Xerox Financial Services, LLC
c/o Corporation Service Company
1201 Hays Street
Tallahassee, Florida 32301

Queen Funding, LLC
c/o Israel Gross
2221 NE 164th Street
Miami Beach. Florida 33160

Business Advance, LLC
c/o USACORP, Inc.
325 Division Avenue, Suite 201
Brooklyn, New York 10019

Internal Revenue Service (IRS)
U.S. Department of Justice
950 Pennsylvania Avenue. NW, Room 2242
Washington, DC 20530-0001

Broadband Dynamics, LLC
c/o Corporation Service Company
1201 Hays Street
Tallahassee, Florida 32301-2525

GTR SOURCE LLC
1006 Monmouth Avenue
Lakewood, New Jersey 08701

CASE NO: 2019-CA-002536

State of Florida
Department of Revenue
2450 Shumard Oaks Blvd.
Tallahassee, Florida 32399

Affiliated Funding Corp.
P.O. Box 711537
Salt Lake City, UT 84171

Capstone Credit LLC
810 7th Avenue, Floor 27
New York, New York 10019

9

# EXHIBIT A

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
IN AND FOR SEMINOLE COUNTY, FLORIDA

BIG ELK FUNDING, LLC, a Delaware limited
liability company,

      Plaintiff,

v.                               CASE NO: 2019-CA-002536

TOTAL MARKETING CONCEPTS, INC.,
FLORIDA COMMUNITY BANK, N.A., XEROX
FINANCIAL SERVICES, LLC, QUEEN
FUNDING, LLC, BUSINESS ADVANCE, LLC,
CORPORATION SERVICE COMPANY, AS
REPRESENTATIVE, AFFILIATED FUNDING
CORPORATION, CAPSTONE CREDIT, LLC,
DISCOUNT LONG DISTANCE, LLC,
SOUTHERN NEVADA FINANCE, LLC,
INTERNAL REVENUE SERVICE,
BROADBAND DYNAMICS, LLC, STATE OF
FLORIDA DEPARTMENT OF REVENUE, GTR
SOURCE, LLC,

      Defendants.
_____/

### DIRECT ENERGY, LP'S NOTICE OF FILING ITS VERIFIED MOTION FOR PRELIMINARY INJUNCTION

Interested Party; Direct Energy, LP; hereby gives notice of filing the attached Verified

Motion for Preliminary Injunction filed on December 27, 2019 in the United States District

Court for the Southern District of Texas.

[CERTIFICATE OF SERVICE ON FOLLOWING PAGE]

CASE NO: 2019-CA-002536

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed and served via the E-Filing Portal or via U.S. Mail, this 31st day of December, 2019, to the parties set forth on the attached Service List.



MCDOWELL HETHERINGTON LLP
*Attorneys for Interested Party Direct Energy, LP*
2101 N.W. Corporate Blvd., Suite 316
Boca Raton, FL 33431
Telephone:    (561) 994-4311
Facsimile:    (561) 982-8985

By:    /s/ Miriam J. Rosenblatt
       MIRIAM J. ROSENBLATT
       Fla. Bar No. 111736

CASE NO: 2019-CA-002536

## SERVICE LIST

<u>Via E-Filing Portal</u>

Justin M. Luna, Esq.
Latham, Luna, Eden & Beaudine, LLP
*Attorneys for Big Elk Funding, LLC*
111 N. Orange Avenue, Suite 1400
Orlando, FL 32801
E-Service: jluna@lseblaw.com; bknotice@lseblaw.com

Patrick Crocker, Esq.
Crocker & Crocker
*Attorneys for Total Marketing Concepts, Inc.*
The Kalamazoo Building
107 W. Michigan Avenue, 4th Floor
Kalamazoo, Michigan 49007
E-Service: patrick@crockerlawfirm.com

Jack M. Brennan, Esq.
GrayRobinson, P.A.
*Attorneys for Discount Long Distance, LLC*
301 E. Pine Street, Suite 1400
Orlando, Florida 32801
E-Service: jack.brennan@gray-robinson.com

Bradley J. Anderson, Esq.
Kevin P. Robinson, Esq.
Zimmerman, Kiser & Sutcliffe, P.A.
*Attorneys for Southern Nevada Finance*
315 E. Robinson Street, Suite 600 (32801)
P.O. Box 3000
Orlando, Florida 32802
E-Service: banderson@zkslawfirm.com; krobinson@zkslawfirm.com; service@zkslawfirm.com

Lara R. Fernandez, Esq.
Trenam Law
*Attorneys for Synovous Bank*
101 East Kennedy Boulevard, Suite 2700
Tampa, Florida 33602
E-Service: lfernandez@trenam.com

CASE NO: 2019-CA-002536

<u>Via U.S. Mail</u>

Total Marketing Concepts, Inc.
Attention: Andrew Dorko, Jr.
4395 St. Johns Parkway
Sanford, Florida 32771

Lara R. Fernandez, Esq.
Florida Community Bank, N.A.
2500 Weston Road, Suite 300
Weston, Florida 33331
And
369 N. New York Avenue
Winter Park, Florida 32789

Xerox Financial Services, LLC
c/o Corporation Service Company
1201 Hays Street
Tallahassee, Florida 32301

Queen Funding, LLC
c/o Israel Gross
2221 NE 164th Street
Miami Beach. Florida 33160

Business Advance, LLC
c/o USACORP, Inc.
325 Division Avenue, Suite 201
Brooklyn, New York 10019

Internal Revenue Service (IRS)
U.S. Department of Justice
950 Pennsylvania Avenue. NW, Room 2242
Washington, DC 20530-0001

Broadband Dynamics, LLC
c/o Corporation Service Company
1201 Hays Street
Tallahassee, Florida 32301-2525

GTR SOURCE LLC
1006 Monmouth Avenue
Lakewood, New Jersey 08701

CASE NO: 2019-CA-002536

State of Florida
Department of Revenue
2450 Shumard Oaks Blvd.
Tallahassee, Florida 32399

Affiliated Funding Corp.
P.O. Box 711537
Salt Lake City, UT 84171

Capstone Credit LLC
810 7th Avenue, Floor 27
New York, New York 10019

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**



| | |
|---|---|
| **BRITTANY BURK; on behalf herself and all others similarly situated,** § § § § | |
| *Plaintiff,* § § | |
| **v.** § § | |
| **DIRECT ENERGY, LP,** § § | **CASE NO. 4:19-cv-663** |
| *Defendant/Counter-Plaintiff* § § | |
| **v.** § § | |
| **TOTAL MARKETING CONCEPTS, INC.** § § | |
| *Counter-Defendant* § | |

## DIRECT ENERGY, LP'S VERIFIED MOTION FOR PRELIMINARY INJUNCTION

A preliminary injunction is necessary to prevent the destruction of key records of telephone calls placed to Plaintiff and other putative class members about Direct Energy services. Contrary to Plaintiff's initial allegations, Direct Energy did not place those calls. Rather, Direct Energy's vendor—Total Marketing Concepts, Inc. ("TMC")—placed the calls at issue after first obtaining valid opt-in call consent from persons like Plaintiff. Those records, including opt-in information, call logs, and recordings are in TMC's possession—not Direct Energy's. While TMC initially produced some records as to Plaintiff which show consent, TMC has not produced all requested records, despite Direct Energy's repeated demands. TMC is in apparent turmoil. Because of TMC's non-payment on a promissory note, Big Elk Resources, LLC—a non-party and TMC creditor—requested and received a Florida state court-order

appointing a receiver over TMC. But the TMC receiver has not produced the requested documents in response to Direct Energy's demands either. Further, Big Elk recently obtained a judgment permitting TMC's receiver to dispose of TMC's personal property—including TMC's computers and servers housing the data, documents, and key records at issue here—through a foreclosure sale scheduled for January 16, 2020. Direct Energy seeks an injunction to prevent Big Elk, TMC, and TMC's receiver from proceeding with the foreclosure or otherwise selling or disposing of any TMC assets until all records of TMC's telemarketing calls regarding Direct Energy services can be transmitted to Direct Energy.

Despite Direct Energy's diligent efforts to obtain data, documents, and all other records associated with telemarketing calls for Direct Energy services, TMC, Big Elk, and the TMC receivers have declined to provide them, even though Direct Energy has a contractual right to obtain those records. If the Court does not enjoin Big Elk, TMC, and TMC's receiver from disposing of TMC's computers and servers through a foreclosure sale, key evidence will almost certainly be destroyed, lost, or highly costly to reacquire—if at all possible. Accordingly, an injunction is necessary to preserve this Court's ability to fairly and properly adjudicate this case.

## BACKGROUND

Plaintiff Brittany Burk filed her lawsuit alleging that Direct Energy engaged in unlawful telemarketing practices by contacting Plaintiff's cell phone without her consent. *See* ECF Dkt # 1. Plaintiff also seeks to certify a class action based on her allegations of unlawful telemarketing calls. *Id.* Direct Energy denies the allegations and disputes that class certification is warranted. *See* ECF Dkt. # 14. As noted, Direct Energy did not actually contact Plaintiff. *See* ECF Dkt. # 24 ¶11. Rather, Direct Energy contracted with TMC to place lawful telemarketing calls, and TMC contacted Plaintiff after she expressly opted-in to receive calls about Direct Energy services. *See id.* at ¶¶ 7, 8, 12. While TMC provided Direct Energy some of the records

2

associated with the calls to Plaintiff—records demonstrating that Plaintiff opted-in to receive calls—Plaintiff disputes the veracity of those records. Accordingly, the parties have sought additional production of documents from TMC.

### DIRECT ENERGY AND PLAINTIFF SEEK PRODUCTION OF TMC RECORDS.

In response to Plaintiff's discovery requests, Direct Energy repeatedly demanded additional documents from TMC, TMC is contractually obligated to provide to Direct Energy. Pursuant to Direct Energy's and TMC's various agreements, Direct Energy mandated that TMC preserve all records, documents, data, and recordings for its marketing calls selling Direct Energy services. Specifically, under a Statement of Work (Opt-in Leads), TMC represented that each opt-in would be accompanied with a TrustedForm Certificate that would "provide independent proof of consent of the opt-in by the consumer . . ." *See* Statement of Work, attached as Ex. 1, at Section 3. TMC also warranted: "Records of such 'opt-in' consumers will be maintained and retained by TMC . . . Such records will be made available to Direct Energy upon request." *Id.* at Section 5. Additionally, pursuant to a Teleservices Agreement, TMC warranted that it would "retain on record during the Term of the SOW or Agreement (whichever is longer) plus an additional five (5) years all information related to leads, sources, leads identities . . . and any third party consents . . . Vendor shall make such information available to Direct Energy within one (1) business day of Direct Energy's request." Teleservices Agreement, attached as Ex. 2 at Schedule A. TMC has failed to do so—and has now put the information at risk of being lost or destroyed.

On July 10, 2019, Direct Energy terminated TMC's services and one week later, Direct Energy demanded that TMC provide Direct Energy with all materials associated with all telemarketing calls for Direct Energy services, as authorized under the Teleservices agreement and the Statement of Work. *See* Ex. 1 at Section 5; Ex. 2 at Section 8.5.1 and Schedule A Section

3

5. This request covers the documents responsive to Plaintiff's discovery requests. Specifically, Direct Energy invoked its rights under Section 8.5.1 of the March 4, 2015 Teleservices Agreement, which provides:

> Vendor shall promptly deliver to Direct Energy all original and copies of Deliverables and Direct Energy Marketing Materials, and all memoranda, notes, records, drawings, manuals, disks, documents, media, equipment, papers or other information pertaining to the Services, Deliverables or to Direct Energy's business, or otherwise obtained by Vendor from Direct Energy.

*See* Teleservices Agreement, attached as Ex. 2. TMC, however, refused to comply and did not respond. Then, on August 2, Direct Energy sent TMC a separate letter identifying those specific documents it needed to produce to directly respond to Plaintiff's discovery requests to Direct Energy. *See* Direct Energy Aug. 2 Ltr., attached as Ex. 3. Again, TMC did not comply and did not respond. Due to Direct Energy's inability to compel documents from TMC, Plaintiff issued and served a subpoena seeking production from TMC. *See* Plaintiff Subpoena Duces Tecum to TMC, attached as Ex. 4. TMC ignored the subpoena too. On September 9, Direct Energy sent follow-up correspondence to TMC's attorney, demanding production of documents. *See* Direct Energy Sep. 9 Ltr, attached as Ex. 5. That correspondence was likewise ignored.

Due to the allegations against Direct Energy concerning TMC's conduct and TMC's non-compliance with Direct Energy's document requests as well as Plaintiff's subpoena duces tecum, Direct Energy filed a third-party complaint against TMC. *See* ECF. Dkt. No. 24. TMC, however, has not answered or otherwise moved to dismiss.

### DIRECT ENERGY SEEKS DOCUMENTS FROM BIG ELK AND TMC'S RECEIVER.

While Direct Energy and Plaintiff engaged in the above-mentioned efforts, TMC was the subject of additional litigation by at least one of its creditors—Big Elk. On August 12, 2019, Big

4

Elk sued TMC[1] for breach of its promissory note and foreclosure of the security interest. *See* Big Elk Petition, attached as Ex. 6. The next day, Big Elk filed an emergency motion for appointment of a receiver asserting, among other things, that TMC has admitted it is unable to pay its debts. *See* Big Elk's Verified Emergency Motion, attached as Ex. 7. TMC consented to the receivership. *See id.* The Court granted the emergency motion and appointed Kelly P. McKenna and Capstone Leadership Group, LLC as receivers, authorizing them to take control of TMC. *See* Appointment Order, attached as Ex. 8.

On or around September 5, counsel for Direct Energy first learned that TMC was operating under a receivership and contacted the receiver, Mr. McKenna, who stated he would instruct TMC to provide records but requested correspondence from Direct Energy stating the specific documents sought. Direct Energy did just that, but Mr. McKenna never responded. *See* Direct Energy Nov. 6 Ltr., attached as Ex. 9. Following several repeat demands for documents— including a demand for an in-person meeting at TMC's facilities at which time Direct Energy would bring personnel and equipment who could take possession of its records—Mr. McKenna stated without explanation that Big Elk would seek to appoint a new receiver. On November 27, the Court granted Big Elk's motion for substitute receiver, appointing Jeremiah Foster as the new receiver, and at the same time entered Big Elk's unopposed request for final judgment to permit a foreclosure sale of TMC's personal property on January 16, 2020. *See* Order Appointing Substitute Trustee, attached as Ex. 10; Motion to for Final Judgment, attached as Ex 11; and Final Judgment, attached as Ex. 12. TMC—well aware of Direct Energy's contractual demand for documents and Plaintiff's subpoena—consented to the foreclosure sale. *See* Ex. 11.

In short, despite multiple efforts to obtain the relevant records, TMC, Big Elk, and TMC's court-appointed receivers have consistently ignored Direct Energy's demands as well as

---

[1] Big Elk appeared also filed suit against other creditors with liens.

5

Plaintiff's subpoena duces tecum. Instead, TMC's receivers—while knowingly avoiding TMC's contractual obligations to Direct Energy, Plaintiff's subpoena, and Direct Energy's pending third-party complaint—sought to wind-down TMC through a foreclosure sale, avoid all obligations in this pending action, and have failed to take steps to preserve key records.

## ARGUMENT

Under the All Writs Act, a federal court "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Particularly in class actions, as here, a federal court "has the power to enjoin proceedings in other jurisdictions that threaten to disrupt the orderly resolution of th[e] litigation." *Prudential Ins. Co. of Am. v. Nelson*, 11 F. Supp. 2d 572, 580 (D.N.J. 1998) (collecting cases); *see also United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977) (noting "the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders"). "The Fifth Circuit has noted that a district court may rely on the All Writs Act to control actions or conduct that would inhibit its ability to resolve or manage a case before it." *Cinel v. Connick*, 792 F. Supp. 492, 497 (E.D. La. 1992) (citing *Williams v. McKeithen*, 939 F.2d 1100, 1104–05 (5th Cir. 1991)). Issuing writs under the All Writs Act to preserve evidence is often critical because "[t]he destruction of evidence can lead to manifest unfairness and injustice, for it increases the risk of an erroneous decision on the merits of the underlying cause of action and can increase the costs of litigation as parties attempt to reconstruct the destroyed evidence or to develop other evidence that may be less persuasive, less accessible or both." *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 137 (2004) (quoting *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, (E.D. Va. 2001)). To preserve such evidence, "[e]ven non-parties may be enjoined from taking certain kinds of action that could inhibit a court's ability to correctly manage the case." *Cinel v. Connick*, 792 F.

6

Supp. 492, 497 (E.D. La. 1992); *see also Solar Connect, LLC v. Endicott*, 2:17-CV-1235, 2018

WL 2386066, at *1 (D. Utah Apr. 6, 2018) ("[P]ursuant to this Court's inherent authority and the

All Writs Act, 28 U.S.C. § 1651, third parties Dropbox Inc. and Google, Inc. are hereby ordered

to copy and preserve, during the pendency of this action or until further order of this Court, all

digital files and data respectively within the Dropbox and Google accounts of any of the

Defendant.").

      "[T]o obtain an All Writs Act injunction—[a party] must simply point to some ongoing

proceeding . . . the integrity of which is being threatened by someone else's action or behavior."

*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004). "The requirements for a

traditional injunction do not apply to injunctions under the All Writs Act because a court's

traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate

concerns." *Id.* (collecting cases). Here, an injunction is necessary, as the pending foreclosure

threatens to destroy documents critical for both Plaintiff and Defendant and thereby threaten the

integrity of this Court's proceedings. *See Klay*, 376 F.3d at 1100.[2]

      While Direct Energy need not satisfy the traditional four elements for an injunction,

Direct Energy has likewise demonstrated entitlement, including "(1) a likelihood of success on

the merits; (2) that [the parties] will suffer irreparable harm if the injunction is denied; (3) that

granting preliminary relief will not result in even greater harm to the nonmoving party; and (4)

that the public interest favors such relief," all weigh in favor of an injunction here. *See Wallace

v. Powell*, CIV.A.3:09-CV-0291, 2010 WL 2367672, at *4 (M.D. Pa. June 9, 2010) (citation

---

    [2] While this matter involves a state-court ordered foreclosure sale, the Anti-Injunction
Act is not triggered, as courts have held that the All Writs Act and the Anti-Injunction Act, "in
concert permit a district court . . . to issue an injunction to safeguard a pre-trial ruling like [a]
discovery order[.]" *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1202 (7th Cir. 1996). Indeed,
courts have held that "granting an injunction to effectuate an earlier discovery order does not
violate the [Anti-Injunction Act]." *Wallace*, 2010 WL 2367672, at *2 (citation omitted).

omitted). Direct Energy has "shown a likelihood that . . . these records need to be preserved for use in [its] defense, [as well as a contractual right to obtain the records] and [has] demonstrated irreparable harm to [its] defense if these records are expunged at this time." *See id.* Big Elk and TMC's receiver "will not suffer greater harm by delaying the expungement of [Direct Energy's] records . . ." *See id.* In other words, the foreclosure can freely proceed following transmittal of TMC records to Direct Energy. Lastly, the "public interest weighs in favor of permitting this Court to control a balanced and fair litigation" and prevent the sale and destruction of records vital to this case. *See id.* Thus, all four elements weigh in favor of the requested injunction here. In accordance with Rule 65 of the Federal Rules of Civil Procedure, notice was given to the adverse party regarding the preliminary injunction requested through this motion. *See* FED. R. CIV. P. 65(a). In addition, Direct Energy is willing to post a reasonable bond as determined by the Court. *See* FED. R. CIV. P. 65(c).

## CONCLUSION

Direct Energy has diligently sought the production of documents from TMC and its recievers but has otherwise been unsuccessful, and the Parties agree these are the key documents necessary for the court to fairly adjudicate on its merits. Given that that key evidence in this case is potentially subject to destruction or loss through a foreclosure, Direct Energy requests that the Court enjoin Big Elk, TMC, TMC's receiver, and the Clerk of Court for Seminole County, Florida from proceeding with the foreclosure or otherwise selling or disposing of any TMC assets until all records of TMC's telemarketing calls regarding Direct Energy services can be transmitted to Direct Energy. Additionally, Direct Energy requests that the Court order Big Elk, TMC, and TMC's receiver to take all necessary acts to preserve these records, whether they are possessed by TMC or its subcontractors or vendors.

Dated: December 27, 2019

Respectfully submitted,

McDowell Hetherington LLP

/s/ Michael D. Matthews, Jr.
Michael D. Matthews, Jr.
Texas Bar No. 24051009
William B. Thomas
Texas Bar No. 24083965
1001 Fannin Street, Suite 2700
Houston, Texas 77002
T: (713) 337-5580
F: (713) 337-8850
matt.matthews@mhllp.com
william.thomas@mhllp.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on the 27th day of December, 2019 via CM/ECF on all counsel of record. In addition, this motion has been served on the following non-parties via email and federal express overnight delivery:

Patrick Crocker
Crocker & Crocker
107 W. Michigan Ave., 4th Floor
Kalamazoo, Michigan 49007
patrick@crockerlawfirm.com
*Attorney for Total Marketing Concepts, Inc.*

Justin M. Luna
Latham, Luna, Eden & Beaudine, LLP
111 N. Magnolia Ave., #1400
Orlando, Florida 32801
jluna@lathamluna.com
*Attorney for Big Elk Funding, LLC*

Jeremiah Foster
Resolute Commercial
7201 E. Camelback Rd., Suite 250
Scottsdate, Arizona 85251
jfoster@resolutecommercial.com
*Receiver for Total Marketing Concepts, Inc.*

9

Grant Maloy
Clerk of the Circuit Court for Seminole County, Florida
Post Office Box 8099
Sanford, Florida 32772
clerk@seminoleclerk.org

_/s/ Michael D. Matthews, Jr._
Michael D. Matthews, Jr.
Attorney for Direct Energy, LP

## CERTIFICATE OF CONFERENCE

I hereby certify that I have conferred with counsel for all parties of record regarding the relief sought through this Motion. Plaintiff is unopposed to the requested relief.

_/s/ Michael D. Matthews, Jr._
Michael D. Matthews, Jr.
Attorney for Direct Energy, LP

## VERIFICATION

STATE OF TEXAS         §
                                  §

COUNTY OF HARRIS     §

        BEFORE ME, the undersigned authority, on this day personally appeared Michael D. Matthews, Jr. a person read the above motion, and that the factual statements contained in it are within his personal knowledge and are true and correct.

                                  Michael D. Matthews, Jr

SWORN AND SUBSCRIBED before me on this 27th day of December, 2019.

                                  Notary Public, State of Texas

PATRICIA FLORES
Notary Public, State of Texas
Comm. Expires 10-03-2021
Notary ID 129524317

# EXHIBIT 1

### STATEMENT OF WORK (OPT-IN LEADS)

#### to Teleservices Agreement between Total Marketing Concepts, Inc. and Direct Energy Services, LLC

This Statement of Work for Opt-In Leads ("SOW") between **Direct Energy, LP** and its U.S. Affiliates (collectively "Direct Energy") and **Total Marketing Concepts, Inc.** ("TMC") dated March 14, 2016 ("Effective Date") incorporates and is subject to the terms and conditions of the Teleservices Agreement between Direct Energy Services, LLC, an affiliate of Direct Energy, and TMC dated March 4, 2015 (the "Agreement"). All capitalized terms not defined herein shall have the meaning specified in the Agreement. To the extent of any conflict between the Agreement and this SOW (Opt-In Leads), this SOW (Opt-In Leads) controls. TMC and Direct Energy may each be referred to herein as a "Party" or, collectively, as "Parties."

1. **Term:** The Parties agree to a 30 calendar-day trial period beginning on the date upon which Services commence, as mutually determined by the Parties. ("Trial Period"). During the Trial Period, either Party may terminate this SOW for any reason upon forty-eight (48) hours' written notice to the other Party. The Parties will negotiate in good faith and determine if the Services will continue past the Trial Period upon execution of a written agreement between the Parties reflecting mutually agreeable commercial terms for performance of the Services. If this SOW continues in effect beyond the Trial Period, either Party may terminate this SOW upon 30 days' written notice to the other Party, without penalty.

2. <u>Territories:</u> TMC shall provide Services (defined below) in the State of Texas, and the US North Region (Connecticut, Delaware, District of Columbia, Illinois, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Ohio, Pennsylvania)

3. <u>Services:</u>

   **Program Name:** Test Campaign with DMI Partners for Co-Registration (Co-Reg) Opt-in Leads

   <u>Program Offering:</u>
   - TMC named sub-contractor DMI Partners will conduct a test with TMC to provide opt-in leads for the purpose of selling Direct Energy products and services <u>in the State of Texas and the US North Region.</u>
   - DMI will provide co-registration leads for potential customers who have opted-in through an online advertisement to receive a call regarding the specific offers determined by Direct Energy for the market in question.
   - TrustedForm certificates will provide independent proof of consent of the opt-in by the consumer for compliance purposes.
   - Anticipated initial volume will be 1000 leads per calendar day, additional volume to be

1

**Confidential Information - Subject to Protective Order**

**Direct Energy 000091**

determined based on the sales performance and final cost per acquisition ("CPA").

**Payment:**
TMC will invoice Direct Energy for the leads and will pay DMI Partners directly.

Leads are priced at ▓▓▓ plus the Trusted Form Fee based on volume shown in the Table below.  We are anticipating falling between ▓▓▓▓▓▓▓▓ per lead based on the chart below.

| Monthly Tier | Included Volume (Total monthly claims) | Overage Rate (per claim) |
|---|---|---|
| $500.00 | 2,500 | |
| $750.00 | 5,000 | |
| $1,000.00 | 10,000 | |
| $1,500.00 | 20,000 | |
| $3,000.00 | 50,000 | |
| $4,000.00 | 100,000 | |
| $7,500.00 | 500,000 | |

**Total Marketing Concepts, Inc. (TMC)**

By: _____

Name: __Tyson Chavarie__

**Direct Energy, LP on behalf of Itself and its U.S. Affiliates**

By: _____

Name: __STEPHEN HAND__

**Confidential Information - Subject to Protective Order**            **Direct Energy 000092**

Examples of the opt-in ad and permission language, as it can appear on various websites, are attached to this SOW as "Exhibit A" for Tier 1 content providing websites, and "Exhibit B" for Tier 2 consumer survey websites (Note that owing to design and layout differences amongst websites, the look and placement of the opt-in ad and permission language may vary, but the content will remain as stated in the paragraph above and as shown in Exhibits A and B.)

Records of such "opt-in" consumers will be maintained and retained by TMC and/or its sub-contractor DMI Partners in accordance with Federal and State laws regarding such permissions and records, and in compliance with the U.S. Federal E-Sign Act. At a minimum, the records will include: First and last name of opt-in party, phone number of opt-in party, zip code of residence of opt-in party, IP address of computer used by opt-in party, date/time stamp of opt-in, confirmation that the opt-in party is age 21 years or older.  Such records will be made available to  Direct Energy upon request.

No outbound sales calls will be made by TMC or DMI Partners under this program to cellular phones, or phones on the FCC wireless/wireline ported list, to consumers indicating by zip code that they reside in the states of New Jersey, Arizona, or Wyoming, as per the laws in those states.

No outbound sales calls will be made by TMC or DMI Partners under this program to cellular phones, or phones on the FCC wireless/wireline ported list, using automated dialer equipment, or systems capable of storing telephone numbers and dialing those numbers, unless prior written consent has been provided by a party who is age 21 years or older.

TMC or DMI Partners shall arrange and maintain exclusive toll-free numbers for this program (program-specific numbers), or some other mechanism, to facilitate tracking and reporting of call results to Direct Energy.

It is the opt-in permission that permits a subsequent outbound telesales call that is the essential service being provided by TMC or DMI Partners to Direct Energy under this SOW.



**Confidential Information - Subject to Protective Order**

4. <u>Enrollments</u>:  Completed consumer enrollments and applicable third-party verifications shall be defined in and governed by the terms and conditions of the Agreement.

5. <u>Record Keeping</u>:   TMC and/or its sub-contractor DMI Partners will retain on record for no less than five (5) years all statute-required information related to leads sources, leads identities, enrollments, and applicable opt-in information related to that lead and its subsequent inbound or outbound telesales call. TMC or DMI Partners shall make such information available to Direct Energy upon request. Except as provided by law, and within the terms and conditions of the agreement, Direct Energy shall use such information solely in support of Services rendered by TMC and/or TMC sub-contractor DMI Partners, or in response to complaints or enrollment issues raised by that consumer (lead) or Direct Energy.

TMC, in conjunction with its sub-contractor DMI Partners, will provide to Direct Energy any opt-out record for consumers contacted or solicited via this program so Direct Energy can maintain its own internal do-not-call or do-not-email lists. Likewise, Direct Energy will provide to TMC any do-not-contact requests from consumers who contact Direct Energy directly. TMC in turn will inform its sub-contractor DMI Partners of any do-not-contact requests from opt-in consumers under this program that are received by TMC and/or Direct Energy.

6. <u>Reporting</u>:  Unless otherwise noted standard reporting per the  Agreement.

7. <u>Adjustments, Modifications, and Amendments:</u>

The intent of the Services under this SOW's Test Campaign  is to create and build an effective opt-in campaign whereby TMC can increase energy telesales for Direct Energy, within a viable framework for all Parties.

As the Test Campaign proceeds, it may require adjustments in marketing volumes, schedules, geographics, and compensation in order to meet the viability and sales goals envisioned, which is in keeping with the nature of test programs.

Any adjustments, modifications or amendments to this Test Campaign shall be conducted in writing and shall not affect the remaining terms of this SOW or the Agreement.

**Confidential Information - Subject to Protective Order**                    **Direct Energy 000094**

8. Copyrights, Trademarks, and Properties:

Direct Energy hereby grants to TMC and its sub-contractor DMI Partners a non-exclusive, non-transferable, right, during the term of this SOW, and solely for the purposes of fulfillment of the terms of this SOW, to display the Direct Energy company name (attached as "Exhibit A") in online advertising to solicit opt-in consumers. TMC affirms and acknowledges that Direct Energy owns and retains all use and distribution rights, titles, interest, and ownership of the Direct Energy name.

Confidential Information - Subject to Protective Order

Direct Energy 000095

EXHIBIT "A"



## lifescriptadvantage



STEP 1 OF 2

It only takes a few minutes,
Quick & Easy!



### Please fill out the form

First Name
Last Name
Street Address
City
State
Zip
Gender          ·Female   Male
Date of Birth
Email
Do you have medicare?
    Yes
Check all that apply to you or a loved one
    Pregnancy · New Mother
    Diabetes
    Arthritis





Confidential Information - Subject to Protective Order                    Direct Energy 000098

Case 4:19-cv-00663   Document 33-1   Filed on 12/27/19 in TXSD   Page 10 of 12

EXHIBIT "B"



Confidential Information - Subject to Protective Order

Direct Energy 000099





# EXHIBIT 2

 Direct Energy.

### TELESERVICES AGREEMENT

THIS TELESERVICES AGREEMENT (as it may be amended from time-to-time, the "Agreement") is made as of March 4, 2015 ("Effective Date"), by and between DIRECT ENERGY SERVICES, LLC, a Delaware limited liability company with its principal office at 1001 Liberty Ave. 12th Floor, Pittsburgh, Pennsylvania 15222 ("Direct Energy"), and TOTAL MARKETING CONCEPTS, INC., a Florida corporation, with its principal office at 4395 St Johns Pkwy, Sanford, FL 32771 (the "Vendor"). This Agreement will include the attached Terms and Conditions, all attached Schedule(s) and Statements of Work ("SOWs"), and any and all attached or referenced and incorporated Direct Energy policies, all of which are hereby incorporated by reference and made a part hereof in the manner set forth herein. In the event of a conflict among a term set forth in the Agreement, the attached Terms and Conditions, a term set forth in a Schedule, and/or an SOW, and a term set forth in an attached or incorporated policy or other document, the following order of precedence will control: (a) the SOW(s); (b) the Agreement; (c) the Schedule(s); and (d) any attached or incorporated Direct Energy policy or other document, if any.

EACH OF THE PARTIES HEREBY AGREES TO ALL TERMS AND CONDITIONS OF THIS AGREEMENT.

DIRECT ENERGY SERVICES, LLC,
a Delaware limited liability company
By: _____

Name: Brian Cain

Title: Operations Category Manager

TOTAL MARKETING CONCEPTS, INC.

By: _____

George Lonabaugh

Its: President

Confidential Information - Subject to Protective Order

 Direct Energy.

## TERMS AND CONDITIONS

1.    SERVICES.   Vendor shall provide to Direct Energy the services set forth in Sections 1.1 and 1.2 below, and more fully described in one or more separately executed, sequentially numbered SOWs to be attached to, and made subject to the terms set forth in, this Agreement (the "Services"), all in accordance with the following:

1.1.    Outbound/Inbound Customer Telesales. Vendor shall manage one or more outbound, and when specifically requested by Direct Energy, inbound customer telesales campaigns for Direct Energy in various North American territories with respect to one or more Direct Energy customer segments, as detailed in individual sequentially numbered SOWs to be attached to, and made subject to the terms set forth in this Agreement.   Vendor shall monitor and manage the teleservices campaigns with the goal of maximizing performance of each campaign and achieving Direct Energy's desired results, as set forth in each SOW.

1.2.    Additional Services.   From time-to-time, including during and/or at the conclusion of each campaign, Direct Energy and Vendor may agree upon additional services to be performed by Vendor for Direct Energy, or may agree upon modifications to a campaign.  The terms of any such additional services or modifications shall be set forth in additional individual SOWs.

1.3.    Ancillary Functions. Vendor shall perform all set-up and ancillary functions associated with the Services described in the particular SOW, which may include the following: (a) as required by Direct Energy on a campaign-by-campaign basis, Vendor shall, at its expense, develop, or acquire and implement, all computer systems, software applications and other programs required for performance of the Services and any future enhancements or modifications thereto; and (b) Vendor shall properly screen, select and train

representatives to perform the Services in accordance with each SOW and general teleservices industry standards and practices, using only Direct Energy Marketing Materials (as defined herein).

1.4.    Direct Energy Marketing Materials.   As required by Direct Energy, Vendor shall, at its expense, cooperate and collaborate with Direct Energy to create Direct Energy Marketing Materials for each of Direct Energy's offerings, and coordinate the management and implementation of Direct Energy Marketing Materials at Vendor's teleservices call center(s).   Vendor shall not make any change to any of the terms of Direct Energy's offerings, or to any Direct Energy Marketing Materials, without prior written consent of Direct Energy signed by the Program Manager of Direct Energy, which consent may be withheld arbitrarily.

1.5.    Certain Definitions.   For purposes of this Agreement, these definitions shall apply.  The term "Deliverables" means all ideas, concepts, customer acquisition strategies, scripts, lists, offering design, offering information, creative material, works of authorship, information, data and other materials supplied, conceived, originated, prepared, generated or required to be used by Vendor under this Agreement. The term "Documentation" means all written materials and documentation relating to the Services and/or the Deliverables including, without limitation, training information and customer call lists, as well as any written proposals and marketing materials submitted by one party to the other hereunder.    The term "Direct Energy Marketing Materials" means all such Documentation and Deliverables.

1.6.    SOWs. All SOWs, if any, attached to this Agreement on the date hereof, or subsequently entered into pursuant hereto, must reference this Agreement. Any SOW entered into pursuant hereto, may be entered into by Direct Energy or a Direct

Confidential Information - Subject to Protective Order

Direct Energy 000035

**Direct Energy.**

Energy affiliate, who may enforce the terms of the SOW and the terms of this Agreement, as if the Direct Energy affiliate was a party hereto and thereafter Vendor may enforce the terms of this Agreement against such Direct Energy affiliate. All SOWs executed by the parties are hereby incorporated by reference into this Agreement. Each SOW will specify, to the extent applicable: (a) the specific objective and goals of the Services to be furnished by Vendor; (b) a description of each of the quantitative and qualitative performance requirements of the Services, as applicable; (c) the time schedule relating to the Services; (d) the applicable fees, and reimbursable costs and expenses for the Services, if any; and (e) any other applicable terms and conditions. In each SOW, each party will designate a "Program Manager" who will be the principal point of contact between the parties for all matters relating to the Services to be provided under such SOW.

1.7.    SOW Change Order Procedure. If Direct Energy believes that a change in an SOW (whether in time frames, costs Services or any Deliverable) is necessary or desirable, Direct Energy will submit a written change request to the Vendor (a "Change Request"). Vendor will factor into Vendor's estimated time to provide any such Services or Deliverables adequate contingencies for de minimis Change Requests, and such de minimis Change Requests will not impact the hours to be provided under any SOW. In the event of such a Change Request, Vendor will, within two (2) business days, provide Direct Energy with a written quote describing in detail: (a) any modifications to the Services or Deliverables that will be required as a result of the Change Request; (b) the effect, if any, on overall Services or Deliverables performance and Direct Energy requirements; and (c) the effect, if any, of the Change Request on any applicable performance milestones. Changes to an SOW will not become effective unless a new SOW or an amendment to an existing SOW is executed by both parties. Absent the execution of such an SOW or such an amendment, the parties will proceed to fulfill their obligations under the then current SOW.

1.8.    SOW Responsibilities. References to Direct Energy's responsibilities in an SOW (other than Direct Energy's promise to make payments due hereunder) are intended solely for purposes of indicating what is not Vendor's responsibility is. Vendor shall, within one (1) business day, notify the Direct Energy Program Manager in writing if Vendor fails to receive any assistance from Direct Energy, as detailed in the applicable SOW that may impact the timelines for any Services and/or Deliverables hereunder.

1.9.    No Additional Terms. No additional terms contained in any invoice, order acknowledgment, other correspondence, or written or oral communication between the parties will be valid and such additional or conflicting terms are deemed rejected by the parties unless such terms are contained in an SOW, an amendment to this Agreement or an SOW, or another written agreement executed by authorized representatives of both parties.

1.10.    Vendor Meetings. Vendor will participate in Service review meetings, whether in-person or via video-conference or teleconference with Direct Energy, as reasonably requested by Direct Energy.

1.11.    Ownership Rights. Direct Energy will own all right, title, and interest in and to: (a) the Direct Energy Marketing Materials; and (b) all data and information collected from, obtained via or otherwise relating or attributable to the Services or Deliverables including, without limitation, data relating to users of any Direct Energy website, PII (as defined below) and any click stream data (collectively, the items under this Subsection (b) are "Direct Energy Data"). Direct Energy Data will be treated as Confidential Information of Direct Energy.

1.12.    Releases and Rights Clearances. Subject to the prior written approval of, and the payment of any related, previously approved amounts due to a third party by, Direct Energy in each instance (which third-party amounts, for the avoidance of doubt, Vendor will be responsible for paying in the first instance and then pass-through to Direct Energy without markup),

2

**Direct Energy.**
Simple. Friendly. Direct.

Vendor will be responsible for obtaining all third-party rights, clearances, authorizations, permissions and releases (collectively, "Releases") necessary or required in order for Vendor to produce, and for Direct Energy to use, the Deliverables as set forth in any SOW or in the Documentation, including those Releases necessary to furnish the Services, to obtain images, names, likenesses, marks, music, footage or any other work of authorship used in the Deliverables, and to use all creative elements, appearances, and all third-party materials comprising, appearing in, or otherwise displayed via the Deliverables (including, without limitation, stock footage, visual arts, music, trademarks, service marks, rights of publicity and indicia of identity, literary materials and other works of authorship).

1.13.   Distribution of Marketing Materials. Vendor will not use or disseminate (or cause or permit the use or dissemination of) any Direct Energy Marketing Materials pursuant to this Agreement without, in each instance, obtaining prior written consent from Direct Energy's Program Manager, which consent may be withheld arbitrarily.

1.14.   Vendor Third Party Support.   Except as otherwise instructed in writing by Direct Energy, to the extent Vendor receives services (such as telephony or computer services) or products (such as software) used to support Vendor's provision of Services or Deliverables to Direct Energy (or Direct Energy's use or exploitation of a Service or Deliverable), ("Vendor Third Party Agreement(s)"), Vendor will enter into such Vendor Third Party Agreements on its own behalf and its own expense, and will have no right to bind, nor will it represent that it has any authority to bind, Direct Energy to any such Vendor Third-Party Agreements or any other obligations. Vendor agrees and acknowledges that any Vendor Third Party Agreement will not affect the agreed-upon fees for Services as set forth in an applicable SOW. If any such third party vendor is providing Services or Deliverables directly to Direct Energy on behalf of Vendor, Vendor agrees to pass through the cost for such Services or Deliverables without mark-up to Direct Energy. Vendor is solely responsible for the work product of each such third

party vendors, if any. Vendor shall inspect the work product of such third parties and promptly correct any deficiencies and maintain proper performance by such parties.

1.15.   Standards of Performance.   Vendor shall, at all times, perform the Services on behalf of Direct Energy and will cause all of its employees and contractor agents to perform the Services on behalf of Direct Energy: (a) in accordance with the terms and conditions of each SOW, including any service level agreements; and (b) in a professional and business-like manner, consistent with standards and practices of the teleservices industry with respect to performance, timeliness and accuracy; and (c) in accordance in all material respects with the applicable portions of the corporate responsibility policy outlined in Schedule A to this Agreement ("CR Policy"); and (d) in compliance in all material respects the applicable portions of Direct Energy's Abbreviated Information Security Policy attached in Schedule B, as they may be updated from time-to-time in writing. Without limiting the foregoing, Vendor will at all times comply with and will cause all of its employees and contractor agents to comply with all Direct Energy's policies and procedures (the "Direct Energy Policies and Procedures") and business rules in effect from time-to-time, including data privacy and security regulations, policies and requirements applicable to the Services and provided in writing to Vendor. Direct Energy shall be responsible for reasonable costs incurred by Vendor associated with Vendor's compliance with new or updated Direct Energy Policies and Procedures. Vendor shall obtain Direct Energy's written consent prior to Vendor incurring said costs of compliance with the new or updated Direct Energy Policies and Procedures. In addition to any review rights herein, the Vendor shall allow Direct Energy reasonable access to Vendor's premises and personnel during normal business hours as may be reasonably required in order to review the Vendor's compliance with the CR Policy.

1.16.   Conduct of Vendor Personnel. Vendor agrees that each of its, and its wholly owned subsidiaries' employees, including officers (collectively, "Vendor

3

 Direct Energy.

Personnel") performing Services under this Agreement will at all times carry out the Services courteously, respectfully and in a nondiscriminatory manner.

1.17. Additional Terms and Conditions for Promoter of Direct Energy Services. The Additional Terms and Conditions for Promoter of Direct Energy Services, attached as Schedule C, are incorporated herein by reference.

2. DATA PRIVACY.

2.1. PII. Vendor will collect and/or use personally identifiable information relating to customers or prospective customers of Direct Energy, a Direct Energy Affiliate and/or users of Direct Energy-offered products and services ("PII"). Except as provided herein or in an SOW, Vendor agrees that no such PII will be collected or stored by Vendor unless authorized by Direct Energy, and any PII collected by Vendor will be considered Direct Energy's proprietary and Confidential Information. Vendor will only use such PII for the sole and exclusive purpose of fulfilling its obligations under this Agreement and may not use or permit the use of such PII for any other purpose whatsoever. PII will include, but will not be limited to: names, addresses, telephone numbers, e-mail addresses, energy usage information and/or deposit balances. Except as required by law, Vendor will not provide any PII to any third party for any purpose, without: (a) the prior written consent of Direct Energy in each instance, which consent may be withheld arbitrarily; and (b) entering into an agreement with such third party that includes the following: (i) terms governing such third party's collection, storage and use of such PII that are substantially similar, in all material respects, and no less protective of such PII or Direct Energy, than the corresponding terms set forth in this Agreement; (ii) terms causing Direct Energy to be named as a third-party beneficiary of any such agreement; and (iii) terms requiring such third party to (A) obtain insurance coverage identical to that set forth in Section 12 of this Agreement, (B) maintain that insurance during the term of this Agreement plus two (2) years after the end of the term, and (C) require Direct

Energy to be named as an additional insured with a waiver of subrogation on all such policies.

2.2. Non-PII. PII excludes demographic or behavioral information or data collected or compiled on an anonymous basis (i.e., without identification of, or correlation to, any individual). Such information will be considered Direct Energy's proprietary and Confidential Information. Vendor may not collect, compile or use any such anonymous information for any purpose without the prior written consent of Direct Energy's Program Manager in each instance, which consent may be withheld arbitrarily.

2.3. Maintenance of PII. Vendor will remain in compliance with all applicable federal, state and other applicable statutes, regulations, ordinances, and orders with respect to privacy and data security relative to PII and will implement and, at all times during the Term, maintain an effective information security program to protect PII, which program includes administrative, technical, and physical safeguards sufficient to: (a) ensure the security and confidentiality of PII; (b) protect against any reasonably anticipated threats or hazards to the security or integrity of such PII; and (c) protect against unauthorized access to or use of PII that could result in harm or inconvenience to Direct Energy or any of its users, customers or vendors. Vendor shall provide a copy of the information security program to Direct Energy prior to Services being conducted by Vendor under this Agreement. In the event that Vendor is in material breach of this Section 2, it will immediately advise Direct Energy and take steps to remedy such breach including, but not limited to, protecting Direct Energy and its users, customers and vendors against the consequences of any disclosure or use of PII in violation of this Agreement. Direct Energy reserves the right to terminate this Agreement immediately upon written notice to Vendor should a breach of this Section 2 occur and to pursue any and all remedies available to Direct Energy, whether under this Agreement, at law, or in equity. Notwithstanding anything to the contrary in this Agreement and in addition to Direct Energy's rights herein, Vendor will also immediately indemnify Direct Energy and Direct Energy Affiliates from and against any costs (including without limitation any

4

![Direct Energy logo]

costs incurred by any of the foregoing entities in order to comply with federal and/or state security breach notification laws), claims, losses, demands, actions, allegations or liabilities, including reasonable attorneys' fees and costs of investigation, incurred by any of the foregoing as a result of an unauthorized disclosure of any PII.

3.    SECURITY

3.1    Security. In providing the Services, Vendor shall implement, adhere to, maintain and enforce at all times reasonable security standards and procedures, in accordance with industry practices and standards, including establishing and maintaining reasonable physical and electronic safeguards against the disclosure, destruction, loss, theft or alteration of Direct Energy Data, Direct Energy materials and the software, hardware and other technology or other applications or materials used in providing the Services, including the Direct Energy hosted applications and other software and systems of Direct Energy.

3.2.    Storage of Direct Energy Data. Vendor will store all Direct Energy Data, computer storable Direct Energy Marketing Materials or other computer storable applications or materials of Direct Energy processed or used at Vendor's facilities in a physically secure Vendor location/facility located within the United States. Vendor will restrict access of third parties to that area and provide physical locks for all physical entries to that area reasonable to prevent unauthorized entry. Vendor will electronically segregate Direct Energy Data and Direct Energy Confidential Information used to provide the Services from all other customers of Vendor.

3.3.    Security Manager. Vendor will designate a member of Vendor's management team for the Services as Vendor's Security Manager, with responsibility for Vendor's compliance with its security obligations hereunder.

3.4.    Notification of Security Breach. Vendor shall promptly notify Direct Energy of any breach of

security, including, any loss, theft, and unauthorized access, or any improper disclosure, copying, use or modification of Direct Energy Data, Direct Energy materials and the software, hardware and other technology or other applications or materials used in providing the Services.

4.    SERVICE LEVEL AGREEMENT FOR DATA HOSTING. If an SOW requires Vendor to serve, host or otherwise maintain, or provide for the serving, hosting or other maintenance of, any Direct Energy Data, which includes PII (collectively, "Vendor-Hosted Data"), the terms of this Section 4 shall apply.

4.1.    Performance. Vendor will provide hosting, support and maintenance of the Vendor-Hosted Data in a manner that provides the following response times, regardless of the number of concurrent users of any Vendor-Hosted Data: (a) the maximum response time to access the Vendor-Hosted Data will not exceed more than three (3) seconds; and (b) the average response time to access the Vendor-Hosted Data during any consecutive sixty (60) minutes will not exceed one and a half (1 1/2) seconds. These response times are to be measured from the time the Vendor-Hosted Data receives a request or query from a user, to the time the response is transmitted back to the requesting server, not including response transmission time.

4.2.    Hosting. Vendor will provide for the hosting of the Vendor-Hosted Data in a manner that provides ninety-nine and nine-tenths percent (99.9%) Uptime during the Term. "Uptime" means the absence of "Downtime," which is defined as any interruption, for fifteen (15) seconds or more, in the availability of the Vendor-Hosted Data, other than scheduled maintenance conducted between the hours of 2:00 a.m. CT and 5:00 a.m. CT, of which Vendor provides Direct Energy with at least forty-eight (48) hours prior written notice ("Scheduled Downtime"). Any other planned downtime will be conducted only with Direct Energy's prior written approval and with at least seventy-two (72) hours prior written notice. Vendor will respond (or cause its vendor to respond)

5

**Direct Energy.**

to any Downtime (other than Scheduled Downtime or planned downtime in accordance with the preceding sentence) in accordance with a process to be reasonably specified by Direct Energy.

4.3.   Hardware.  The Vendor-Hosted Data will at all times be maintained on servers and other hardware (the "Primary Hardware") maintained by or on behalf of Vendor that will be located in a data center ("Data Center") that employs industry-leading security measures, with regard to both physical security (e.g., restricted access to servers, etc.) and electronic security (e.g., firewalls).  Vendor will also provide for redundant servers and other hardware ("Redundant Hardware") at such Data Center so that, if the Primary Hardware malfunctions, the Redundant Hardware will immediately host the Vendor-Hosted Data according to the specifications set forth in this Agreement.  Vendor will also provide for additional servers and other hardware (the "Hot Backup Hardware") at a secure location (the "Hot Backup Center") other than the Data Center.  The Hot Backup Hardware will contemporaneously mirror the Vendor-Hosted Data and will be available to host the Vendor-Hosted Data in the event the Primary Hardware and Backup Hardware at the Data Center become unavailable.

4.4.   Back-up.  Without limiting the terms of this Section 4, Vendor, at its sole expense, will make a complete daily back-up of all PII and all other data, information and/or materials relating to Direct Energy, the Services and the Deliverables or collected by or on behalf of Vendor for the benefit of Direct Energy hereunder.  Such back-up copy will be stored in a secure, offsite location under appropriate protection.  Vendor shall, as soon as reasonably possible but no later than five (5) business days, provide Direct Energy with a copy of any and all such PII, data, information and/or materials upon Direct Energy's written request in a manner (via. a transmission method) and format reasonably requested by Direct Energy.

4.5.   Monitoring.  Vendor will utilize appropriate measurement and monitoring tools and procedures necessary to measure the performance of the Vendor-

Hosted Data hereunder.  Upon Direct Energy's request, Vendor will provide Direct Energy or its' representatives access to such measurement and monitoring tools (including, but not limited to, on-line visibility of such tools) and any other information reasonably necessary to verify compliance by Vendor with the terms of this Agreement.  Vendor will provide Direct Energy with a reasonably detailed written monthly report regarding the performance of the Vendor-Hosted Data for the preceding month.

5.   VENDOR'S USE OF SUBCONTRACTORS.

5.1   Subcontracting.  Vendor will not delegate or subcontract other than to Vendor's wholly-owned subsidiaries (which will be deemed to include all entities of which Vendor directly or indirectly owns or controls at least 99%) or as may be set forth in any of Vendor's obligations under this Agreement without Direct Energy's express written consent, which consent will not be unreasonably withheld (each consented subcontractor shall hereinafter be referred to as a "Permitted Subcontractor").  Notwithstanding the foregoing, it shall not be unreasonable for Direct Energy to withhold consent where, without limitation, the Permitted Subcontractor would be responsible for the performance of strategic activities, where the Permitted Subcontractor or the services that it provides would be located outside of North America, or where the use of the Permitted Subcontractor would result in a material change in the way the Services are provided.  Direct Energy shall also have the right during the Term to revoke Direct Energy's prior approval of any Permitted Subcontractor or remove any Permitted Subcontractor subject to thirty (30) days' written notice and an opportunity to cure (where cure is possible, otherwise immediately) if the Permitted Subcontractor's performance is materially deficient, or there have been material misrepresentations by or concerning the subcontractor.  Upon receipt of written notice of such revocation, Vendor or Direct Energy, at Direct Energy's sole discretion, shall take over performance of the Services from such Permitted Subcontractor subject to a reasonable transition period to prevent a

6

**Direct Energy.**

material disruption to, or other material adverse affect on, the performance of the Services within thirty (30) days. For the avoidance of doubt, Vendor's wholly-owned subsidiaries shall always be permitted hereunder and shall be treated like Vendor for the purposes of this Agreement.

5.2   Vendor's Responsibility for Subcontractors. With respect to any obligations of Vendor under this Agreement performed by Permitted Subcontractors, Vendor will remain responsible for those obligations to the same extent Vendor would be responsible for the performance by Vendor's employees. Vendor will cause the Permitted Subcontractors to comply with and adhere to the terms of this Agreement as necessary for Vendor to remain in compliance with its obligations under this Agreement. Vendor will not disclose to any Permitted Subcontractor any of Direct Energy's Confidential Information or Direct Energy Data unless and until that agent or subcontractor has agreed in writing to protect the confidentiality of all of Direct Energy's Confidential Information and the Direct Energy Data and Vendor shall be liable for any breach of Direct Energy Confidential Information by or caused by Permitted Subcontractors. From time-to-time as requested by Direct Energy, Vendor will provide documentation evidencing such written agreements.

6.   PROPRIETARY RIGHTS; LICENSES.

6.1   Deliverables.   Vendor acknowledges and agrees that the Deliverables are Confidential Information and the property of Direct Energy. All right, title and interest in and to the Deliverables will vest in Direct Energy and all Deliverables will be deemed to be works made for hire for the benefit of Direct Energy within the meaning of the copyright laws of the United States. To the extent that title to any such Deliverables may not otherwise vest in Direct Energy, or such Deliverables may not be considered works made for hire, Vendor hereby assigns all right, title and interest therein to Direct Energy.   All such Deliverables will belong exclusively to Direct Energy, with Direct Energy having the right to obtain and to hold in its own name, copyright registrations, patents and such other

intellectual property protection as may be appropriate to the subject matter, and any extensions and renewals thereof. Vendor agrees to provide to Direct Energy, and any person designated by Direct Energy, assistance in perfecting or evidencing the rights defined in this Section 6.1 including, without limitation, by executing and delivering all documents requested by Direct Energy for such purposes. Unless otherwise directed by Direct Energy, and except as otherwise required by the Agreement and the SOWs, upon expiration or earlier termination of this Agreement or any applicable SOW, Vendor will immediately turn over to Direct Energy all Deliverables (including all copies thereof) including, but not limited to, working papers, descriptions, reports, notes and data. All Deliverables will bear Direct Energy's copyright and trade secret notices, as specified by Direct Energy, in writing in advance. No rights to the Deliverables will remain with Vendor.

6.2   Vendor Materials.   Notwithstanding Section 6.1 hereof, unless otherwise specifically provided in an SOW, Vendor reserves all rights in and to the materials developed by Vendor, without Direct Energy, prior to and independent of the Services which may be used to provide the Services and are conspicuously marked, "PROPRIETARY VENDOR MATERIALS" or are otherwise the types of templates or other materials re-used by telemarketing businesses in the ordinary course of business ("Vendor Materials"). Deliverables will not include or require for proper use any intellectual property licensed from any third party unless such intellectual property is specifically identified in the applicable SOW and the cost of obtaining the necessary rights to such intellectual property is expressly allocated in the SOW. In the event and to the extent that the Deliverables contain any intellectual property (including Vendor Materials) that may be proprietary to Vendor or a third party, Vendor hereby grants Direct Energy an irrevocable, fully paid up, enterprise-wide, non-exclusive, and worldwide license to use, execute, reproduce, display, perform, and prepare derivative works based on such intellectual property (including Vendor Materials) that may be contained in the Deliverables, and to

7

Confidential Information - Subject to Protective Order

Direct Energy 000041

 Direct Energy.

authorize others to do any of the foregoing on behalf of Direct Energy; provided, however, that: (a) such license will not include the right to distribute copies of the Vendor Materials to third parties; and (b) except for such license, Vendor will retain all ownership to the Vendor Materials.

6.3     Direct Energy Marks.  Direct Energy hereby grants to Vendor a non-exclusive, revocable and limited license to use the trademarks, service marks, insignias, and logos specified by Direct Energy ("Direct Energy Marks") for the sole and exclusive purpose of performing Vendor's obligations hereunder.   Vendor shall obtain Direct Energy's written approval prior to any public use by Vendor of any Direct Energy Mark. Vendor will display the appropriate proprietary rights notice (e.g., the encircled "R" symbol ("®") and/or the letters "TM" or "SM," as appropriate) in conjunction with its display of Direct Energy Marks and properly acknowledge Direct Energy's ownership of the Direct Energy Marks in any and all publications. All uses of Direct Energy Marks by Vendor will comply with Direct Energy's branding requirements and will inure to the benefit of Direct Energy.   If Direct Energy reasonably objects to the use of any of the Direct Energy Marks, Direct Energy may, without limiting any other rights or remedies available to Direct Energy, whether under this Agreement, at law or in equity, revoke any and all of Vendor's rights thereto and Vendor shall immediately cease using the Direct Energy Marks in the manner identified by Direct Energy. Nothing in this Agreement will create in Vendor any rights in the Direct Energy Marks. Other than as required to perform Services hereunder, Vendor will not use Direct Energy's name or any abbreviation, contraction or simulation thereof, without Direct Energy's prior review and written consent, which consent may be withheld arbitrarily.

7.      FEES; TAXES; AUDIT RIGHTS.

7.1     Fees and Taxes.  The fees, and all costs and expenses, if any, to be paid by Direct Energy to Vendor for the Services shall be specifically itemized and set forth in the applicable SOW.  Direct Energy shall not be liable for any fees, costs and expenses

other than those specified herein or in an SOW. Notwithstanding any provision in this Agreement to the contrary, payment and timing of payments shall be governed by Section 7.2 below.

Unless expressly stated in an SOW, the fees to be paid by Direct Energy exclude all sales, value-added, and goods and services taxes applicable to provision of the Services by Vendor and Direct Energy shall not be responsible for any such taxes.   Vendor shall be responsible for informing Direct Energy of all such taxes and, upon receipt of an invoice including taxes expressly due from Direct Energy under an SOW, Direct Energy shall pay to Vendor, and Vendor shall remit to the appropriate taxing authorities, all such taxes. If any such taxes collected by Vendor hereunder are determined not payable by Vendor to an authority, Vendor shall promptly refund Direct Energy all such amounts incorrectly collected from Direct Energy. Excise taxes, if any, arising as a result of the provision of the Services shall be the responsibility of the Vendor.  Notwithstanding the foregoing, Direct Energy shall be entitled to deduct and withhold from the fees such amounts as are required by applicable law to be so deducted or withheld from the fees, including any amounts on account of withholding taxes or other similar taxes, and to pay such amounts to such governmental authorities as may be required by applicable law; provided, that if Direct Energy is so required to deduct, withhold or pay, Direct Energy shall forward to Vendor, at Vendor's request, a receipt or other documentation      evidencing      such      deduction, withholding or payment.

7.2 Method of Payment and Timing.  Subject to Vendor's compliance with the terms of this Agreement, Direct Energy shall pay Vendor the fees, and any costs and expenses, in accordance with the following:

7.2.1  Invoicing.  By the fifth (5th) day of each calendar month, Vendor shall submit to Direct Energy an invoice for the fees properly due for the calendar month, which invoice shall contain an itemized list of all costs or expenses available for reimbursement pursuant to Section 7.2.3 below.

8

Direct Energy.

Separate invoices will be provided to Direct Energy by Vendor for each SOW, and invoices will present in detail the Services performed. If requested by Direct Energy, each invoice from Vendor shall also include or be accompanied by a report showing Vendor's compliance with each of the service level agreements in each applicable SOW as of the date most recent to the invoice date on which such report was prepared. All invoicing shall be further subject to Direct Energy's standard policies regarding Direct Energy purchasing, vendor invoicing and vendor payment protocols, as such policies are amended by Direct Energy from time-to-time. Notwithstanding any provision herein to the contrary, Direct Energy shall have the right to offset any and all payments to Vendor for amounts, if any, due to Direct Energy pursuant to the terms and conditions of any SOW or Section 9.4 hereof.

7.2.2 Time Period. Direct Energy will initiate payment of all undisputed and properly invoiced amounts on or before forty five (45) days after receipt of a proper and correct invoice. If Direct Energy disputes any such amounts or deems an invoice improper, it will notify Vendor promptly.

7.2.3 Reimbursement. If invoices include reimbursable costs and expenses as authorized herein, receipts for those expenses will accompany the invoices. Direct Energy will reimburse Vendor for Vendor's reasonable and necessary out-of-pocket expenses directly incurred in rendering the Services, provided that: (a) any single expense over $25 or aggregate expenses over $200 are approved in advance by Direct Energy's Program Manager, and (b) such expenses otherwise comply with Direct Energy's expense reimbursement policy, as such policy is amended from time-to-time.

7.3 Records; Audit. Vendor and its agents will maintain complete and accurate records of its fulfillment of its obligations hereunder during the Term and for a period of at least seven (7) years thereafter (the "Retention Period"); provided, however, that if a dispute arises in connection with this Agreement, the Retention Period will be extended automatically until the resolution of such

dispute becomes final and non-appealable and all obligations of the parties to one another relating to the resolution have been satisfied in full. Vendor and its agents will, upon reasonable request by Direct Energy and at all reasonable times during the Retention Period make such records available for inspection by Direct Energy or its authorized representatives, to perform operational, regulatory, compliance, subcontractor, and security audits, all at the expense of Direct Energy unless the audit was caused by a material breach of this Agreement by Vendor. Direct Energy or its authorized representatives will have the right to take copies of or extracts from any records kept pursuant to this Agreement.

7.3.1 Remedy. Vendor shall, at its expense, deliver a corrective plan of action and promptly remedy any inadequacy or deficiency, which is identified as a result of an operational audit. If an operational audit discloses a material breach by Vendor of its obligations under this Agreement, Vendor shall promptly remedy such breach and reimburse Direct Energy for the out-of-pocket costs incurred by Direct Energy in connection with such audit.

7.3.2 Regulatory Audit. Vendor expressly agrees that any regulatory authority that regulates Direct Energy or any aspect of its business shall have at least the same rights of audit with respect to Vendor. If Direct Energy has notice that Vendor will be audited by a Regulatory Authority, and Direct Energy is permitted to provide notice to Vendor, Direct Energy will provide Vendor with advance notice, as soon as practicable. If practicable, Direct Energy will provide written notice identifying the agency seeking such an audit, describe the nature of the audit, and provide copies of any written requests received by the Regulatory Authority with regard to same. Direct Energy shall have the right to inspect Vendor's general operation Business Continuity Plan, in accordance with Section 13.15, and shall be entitled to copy any component specific Business Continuity Plan(s) pertaining to the Services provided to Direct Energy hereunder except that at the termination of this Agreement Direct Energy, upon instructions from Vendor, shall either return or

9

**Direct Energy.**

destroy any such copies. In addition Direct Energy agrees that it shall not disseminate the Business Continuity Plan to any third parties and shall hold the Business Continuity Plan in strictest confidence in accordance with Section 11.

7.3.3   Subcontractor Audits.   Vendor shall ensure that all agreements with Permitted Subcontractors (as defined herein) entered into after the Effective Date include the right for Direct Energy or its designee to conduct audits of the Permitted Subcontractors and shall provide evidence thereof to Direct Energy. Direct Energy shall be permitted to audit each Permitted Subcontractor retained by Vendor to provide the Services or any part of the Services in the same manner as it is permitted to audit Vendor. Vendor will, not less than once a year, conduct an audit of the operations of its Permitted Subcontractors (including the security policies and procedures of its Permitted Subcontractors), relating to the Services or employ a third party organization to conduct such audit. At Direct Energy's request, Vendor will enforce its audit rights in any agreement with a Permitted Subcontractor to audit any issues raised by Direct Energy, and will report to Direct Energy the findings of such audit.

7.3.4   Retention.   Vendor shall maintain and retain complete and accurate records in accordance with any applicable laws, but for no less than the Retention Period.

7.3.5   Access.   Without limiting the foregoing, Vendor will provide to Direct Energy and its auditors (including internal audit staff), inspectors, regulatory authorities and other representatives as Direct Energy may from time-to-time reasonably designate in writing, reasonable access to: (a) Vendor's facilities where Services are performed or data related to the Services is stored; (b) Vendor's management employees, contractors, agents and subcontractors providing any of the Services; and (c) reports, data and records in Vendor's possession or control relating to any of the Services. Vendor will provide such access to Direct Energy and Direct Energy's designees during regular business hours upon reasonable notice by Direct Energy, provided that all

such persons adhere to Vendor's customary security and safety policies. Notwithstanding the foregoing, any audit that may involve access to facilities or systems serving other clients of Vendor, shall be performed either by Direct Energy or by an independent third party auditor appointed by Direct Energy, provided that such auditor is not a Vendor Competitor, and provided that if Direct Energy performs the audit it shall not access or attempt to access the information of Vendor's other clients.

7.3.6   Co-operation.   Vendor will assist Direct Energy's auditors, inspectors, regulatory authorities, and representatives as is reasonably required. Vendor will co-operate fully with Direct Energy or its designees in connection with audit functions and with regard to examinations by regulatory authorities.

7.3.7   Expenses.   Direct Energy will bear its own expenses relating to any audit performed pursuant to this Section 7; provided, however, that for any audit that shows an overcharge, Vendor shall promptly reimburse Direct Energy for such overcharge and if the audit shows an overcharge in Vendor's invoices in an amount greater than five percent (5%) of the annual charges: (a) Direct Energy will have no liability to reimburse Vendor on a time and materials basis for such Vendor audit expenses and shall be entitled to an immediate refund; (b) Vendor will credit Direct Energy for such overcharge within thirty (30) days after the conclusion of the audit; and (c) Vendor will reimburse Direct Energy for the reasonable costs of such audit incurred by Direct Energy.

7.3.8   Exit Conference.   Following an audit or examination by Direct Energy, Direct Energy will conduct (in the case of an internal audit), or cause Direct Energy's external auditors or examiners to conduct, an exit conference with Vendor. Vendor will meet with Direct Energy and the auditors to define the resolution to any deficiencies noted during the review and establish a mutually agreed upon timetable to remedy all outstanding issues.

10

Confidential Information - Subject to Protective Order

Direct Energy 000044

 Direct Energy.

### 8. TERM; TERMINATION; SUSPENSION.

8.1     Term.  This Agreement will be effective as of the Effective Date and, unless sooner terminated in accordance with the terms set forth herein, will continue through the date that Services (including any submission of Deliverables) are to be completed under any SOW, or until March 4, 2016, whichever is later (the "Initial Term").     Subject to sooner termination under any of Sections 8.2 through 8.5 hereof, this Agreement shall be renewed automatically on a six (6) month consecutive basis following the end of the Initial Term unless a Party provides to the other Party notice of termination of this Agreement at least sixty (60) days in advance of the date of expiration (such renewal term(s), if any, along with the Initial Term, shall be referred to herein as the "Term").

8.2     Mutual Termination for Cause.  Either party may terminate this Agreement by giving written notice to the other party upon the occurrence of an Event of Default on the part of the other party.  An "Event of Default" will mean: (a) a breach by a party of any material provision of this Agreement, other than a payment provision or one that falls under a Section of this Agreement specified in Section 8.3 hereof, if such breach remains uncured for a period of seven (7) business days following receipt of notice from the non-defaulting party specifying the breach; (b) Direct Energy has failed to pay Vendor fees properly invoiced and due under this Agreement within thirty (30) days after Direct Energy has received notice from Vendor of such non-payment; or (c) if (i) the other party is adjudicated a bankrupt, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver, administrative receiver and/or administrator appointed for it, makes or proposes any arrangement for the liquidation of its debts, or ceases to carry on business, or (ii) any proceeding is commenced against the other party in which such party will be winding up, dissolved or liquidated, and such proceeding is not dismissed within thirty (30) days after its institution.

8.3     Direct Energy Termination with Cause.  Vendor shall be in default under this Agreement if:

(a)(i) Vendor is in material violation of any material provision of Schedule C; Section 7, 9, and/or Section 11 in any material respect hereof; (ii) a provision of an SOW; or (iii) Vendor or any Vendor Affiliate, or any of its or their respective controlling shareholders, members, partners, directors and officers becomes the subject of any Adverse Vendor Event (see 9.3 below); and (b) after receiving notice of the breach from Direct Energy, Vendor fails to cure the breach to the satisfaction of Direct Energy on or before the end of the five (5) day period following the date of such notice.  If Vendor is so in default under this Agreement, this Agreement shall be terminated automatically without notice, effective at the end of such five (5) day period.

8.4     Termination Without Cause.  Direct Energy may terminate this Agreement or any SOW at any time without cause upon thirty (30) days prior notice to Vendor.

8.5     Effects of Expiration/Termination.     Upon expiration of this Agreement or sooner termination of this Agreement with respect to any or all SOWs and without limiting other applicable provisions contained herein, Vendor shall immediately cease representing, mentioning or holding itself out, in any manner, as a vendor of Direct Energy for the Services described hereunder and discontinue the performance of any Services or other work under this Agreement and comply with Sections 8.5.1 through 8.5.3 below, unless Vendor receives instructions from Direct Energy for Vendor to provide continued Services pursuant to Section 8.5.4 below. Vendor shall facilitate an amicable transition with Direct Energy and Vendor shall not withhold or otherwise prevent access to any Direct Energy property, including any Direct Energy Data, in order to get negotiating leverage or use as a form of ransom.

8.5.1     Return of Materials.  Vendor shall promptly deliver to Direct Energy all original and copies of Deliverables and Direct Energy Marketing Materials, and all memoranda, notes, records, drawings, manuals, disks, documents, media, equipment, papers or other information   pertaining to the Services, Deliverables or to Direct Energy's business, or

11

 Direct Energy.

otherwise obtained by Vendor from Direct Energy. Vendor acknowledges that all such materials are the property of Direct Energy. Vendor agrees not to retain any copies of such materials. Notwithstanding anything to the contrary in this Agreement, Vendor shall be permitted to retain an electronic copy of any of the foregoing if required by law or this Agreement (which retained copy will remain Confidential Information under the terms of this Agreement).

8.5.2  Use of Direct Energy Marks. Vendor shall immediately discontinue any and all use of Direct Energy Marks including, but not limited to any use of Direct Energy Marks in Vendor's advertising or business materials.

8.5.3  Return Data and Maintain Confidentiality. Vendor agrees that it shall not during the Term of this Agreement or during the Retention Period, retain, destroy, delay, manipulate or otherwise encumber any Direct Energy Data. Upon termination of the Retention Period, Vendor shall, without notice from Direct Energy, immediately and permanently destroy all Direct Energy Data and provide Direct Energy with a certificate of destruction for any Direct Energy Data Vendor destroyed. At anytime during the Term of this Agreement or during the Retention Period, Direct Energy may instruct Vendor to destroy all or any part of Direct Energy Data, upon notice to Vendor and provide Direct Energy with a certificate of destruction for any Direct Energy Data Vendor destroys or disposes of at Direct Energy's instruction or request. Upon receipt of the notice from Direct Energy, Vendor must immediately deliver to Direct Energy or any party designated by Direct Energy or destroy all or any part of the Direct Energy Data in such manner as requested by Direct Energy. Further, Vendor shall, with respect to all Direct Energy Confidential Information under Section 11.1 hereof, comply with the terms of Section 11 hereof.

8.5.4  Continued Services. If Direct Energy, in its sole discretion, provides instructions to Vendor in advance, Vendor shall continue to provide Services at the then-current fees, all in accordance with the terms of this Agreement and applicable SOW, for not more than ninety (90) days following the expiration or

sooner termination of this Agreement (the "Transition Period"). During the Transition Period, Vendor will provide Direct Energy with assistance in transitioning the Services, any Deliverables, Direct Energy Data and any back-up to any provider(s) of Services selected by Direct Energy. At the end of such Transition Period, Vendor will invoice Direct Energy for the Services provided during such period, with the fees for such Services to be billed at the rates set forth in this Agreement, or as otherwise agreed upon by the parties in writing.

8.6  Suspension for Non-Compliance. Direct Energy may, in its sole discretion, without terminating this Agreement and upon providing three (3) days' advance notice to Vendor, immediately suspend for a period up to ninety (90) days any or all activities under this Agreement if Vendor fails to meet a compliance obligation. The notice will also contain provisions relating to Direct Energy's rights during any such suspension, including causing Vendor to receive additional training and/or re-train employees. Upon any such suspension, Vendor shall, at its sole expense: (a) fully cooperate with Direct Energy to immediately investigate all issues and implement all procedures and safeguards required by Direct Energy to prevent any further violations; and (b) resolve all alleged or actual compliance violations to Direct Energy's reasonable satisfaction.

8.7  Suspension for Other Reasons. Direct Energy may, in its sole discretion, without terminating this Agreement and upon providing at least thirty (30) days' advance notice to Vendor, immediately suspend all or any part of Vendor's activities under this Agreement for a period up to one hundred eighty (180) days if, in Direct Energy's sole discretion, adverse regulatory or market conditions exist.

9.  REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION.

9.1  General Representations, Warranties and Covenants. In addition to any specific representations, warranties and covenants contained in an SOW and those set forth elsewhere herein, each party represents, warrants and covenants to the other that:  (a) it is a

12

**Direct Energy.**

legal entity duly organized, validly existing and in good standing under the laws of the state of its formation; (b) it has all requisite corporate power and authority to execute, deliver and perform its obligations hereunder; (c) it is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the transaction of business of the character transacted by it, except when the failure to be so licensed, authorized or qualified would not have a material adverse effect on its ability to fulfill its obligations hereunder; and (d) this Agreement constitutes the valid and binding obligation of the party, enforceable against such party in accordance with its terms, except as such enforceability may be subject to the effects of bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting the rights of creditors and general principles of equity.

9.2   General Vendor Representation, Warranties and Covenants.   Vendor represents, warrants and covenants to Direct Energy each of the following: (a) the Services and any Deliverables will be provided in accordance with the highest standards of professional conduct in the applicable area or areas of expertise required to provide such Services and any Deliverables, as well as in accordance with the description of, and specifications for, such Services and any Deliverables set forth in the applicable SOW and any Documentation; (b) the Deliverables, if any, do not and will not contain any virus or any other contaminant, or disabling devices including, but not limited to, codes, commands or instructions that may be used to access, alter, delete, remotely access, damage or disable the Deliverables, other Direct Energy software, Direct Energy Data, Direct Energy's computer network or other Direct Energy property; (c) the Services and any Deliverables will not be libelous or defamatory, will not violate or infringe any common law or statutory right of any third party including, without limitation, any contractual rights, proprietary rights, copyright, trademark, service mark or patent rights, or any rights of privacy or publicity, and will not violate any applicable federal, state or local law, rule, regulation

or ordinance; (d) Vendor will not, without the prior written consent of Direct Energy, include in any Deliverables, or use in conjunction with the performance of Services, any intellectual property licensed from any third party, and Vendor will specifically identify any such third-party intellectual property in writing to Direct Energy; (e) with respect to any third-party intellectual property included within the Deliverables or used in connection with Vendor's performance of the Services, Vendor has all right, title and interest necessary to provide such intellectual property to and/or use such intellectual property for the benefit of Direct Energy; (f) any Deliverables shall be free from any and all liens, encumbrances and/or third party security interest whatsoever; (g) Vendor or any third party providing a support service or software on behalf of the Vendor will not use or distribute PII outside the scope of this Agreement, or for the benefit of the Vendor or third party acting on behalf of the Vendor; (h) Vendor and Vendor Personnel will perform the Services hereunder in compliance with all federal, state and local laws, rules, regulations and ordinances; (i) all of Vendor's employees, agents and independent contractors involved in providing Services shall, while on Direct Energy's property or conducting any Direct Energy related business, comply with all federal, state and local laws, rules, regulations and ordinances, including specifically all laws prohibiting harassment or discrimination of any kind in the workplace; (j) Vendor is not a party to any existing union contract that purports to obligate Direct Energy to a union, either as a successor or assignee of Vendor, or in any other way; (k) Vendor shall avoid deceptive, misleading or unethical practices that could adversely affect the performance of Direct Energy's obligations under this Agreement or damage the reputation of Direct Energy, any Direct Energy Affiliate, or any of their respective shareholders, members, partners, officers, directors, managers, trustees, incorporators, agents, attorneys, consultants, servants, representatives, and employees; (l) Vendor is duly licensed to conduct telephone sales of retail energy to residential customers ("Telesales License") as required under the laws, rules or regulations of each state in which it conducts Services and will maintain such license(s) in good standing throughout

13

Confidential Information - Subject to Protective Order

**Direct Energy.**

the Term; (m) in addition to any Telesales License, Vendor will obtain any permits and licenses required under the laws, rules or regulations of each state in which it conducts Services and maintain such permits and license(s) in good standing throughout the Term; (n) Vendor is not a party to any agreement with a third party, the performance of which is reasonably likely to affect adversely its ability perform fully its obligations hereunder; and (o) Vendor's performance of its obligations under this Agreement will not violate any other agreement between Vendor and any third party.

9.3    Adverse Vendor Events. Vendor further represents and warrants to Direct Energy that neither Vendor, any Vendor Affiliate, nor any of its or their respective controlling shareholders, controlling members, controlling partners, directors or officers has, in the ten (10) year period preceding the Effective Date: (a) been convicted of, or plead guilty or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to, any state or federal criminal law for fraud, theft, larceny, deceit, or violations of any customer protection or deceptive trade laws in any state; (b) been found liable in a civil proceeding for fraud, theft, larceny, deceit or violations of any customer protection or deceptive trade laws in any state; (c) been found liable in either a civil or criminal proceeding for an antitrust violation; (d) had a license or right to engage in any business or profession revoked, denied, suspended or restrained; (e) been subject to any disciplinary proceeding in connection with a license or right to engage in any business or profession; (f) been subject to a regulatory investigation or regulatory sanctions; (g) filed for bankruptcy or reorganization, or been in control of an entity that has filed a petition for bankruptcy or reorganization.    Each of the foregoing items (a) through (g) shall be referred to as an "Adverse Vendor Event". If during the Term any of Vendor, any Vendor Affiliate, or any of its or their respective shareholders, members, partners, directors and officers becomes the subject of any Adverse Vendor Event, Vendor shall immediately notify Direct Energy and provide full and complete information to Direct Energy regarding the matter. Direct Energy shall be entitled to reasonably investigate the matter

and any actions taken by Direct Energy based on the matter shall be without prejudice to Direct Energy's rights under this Agreement.

9.4 Indemnification.

9.4.1    By Vendor. Vendor shall indemnify, defend, and hold harmless Direct Energy and any individual, corporation, partnership, limited liability company, association, trust, or other business organization of any kind directly or indirectly controlling, controlled by, or under common control with Direct Energy ("Direct Energy Affiliate"), and its and their respective shareholders, members, partners, officers, directors, managers, trustees, incorporators, agents, attorneys, consultants, servants, representatives, and employees from and against any claims, causes of action, suits, judgments, fines, losses, damages and liabilities of any kind (whether the same are based in contract, tort, including negligence, strict liability or otherwise) including, without limitation, all reasonable expenses of litigation, costs of court and/or alternative dispute resolution, reasonable attorneys' fees and expenses (including costs of investigation and any expert witness fees) (each of the foregoing shall be referred to as an "Indemnifiable Liability"), which occurred, or are alleged to have occurred, directly or indirectly as a result of or in connection with any material breach or alleged breach of any representation, warranty, covenant or agreement made by Vendor set forth in this Agreement, any Vendor Personnel Event, or any willful, intentional or negligent action or failure to act by Vendor, any Vendor Affiliate, any of its or their respective shareholders, members, partners, directors and officers, any Vendor Personnel, or any agent of Vendor, except to the extent that such Indemnifiable Liability is caused by the sole, joint, concurrent, contributing or comparative negligence or fault of Direct Energy, any Direct Energy Affiliate, any of its or their respective shareholders, members, partners, directors and officers, any Direct Energy Personnel, or any agent of Direct Energy.

9.4.2    By Direct Energy.    Direct Energy shall indemnify, defend, and hold harmless Vendor and any individual, corporation, partnership, limited

14

Confidential Information - Subject to Protective Order

**Direct Energy.**

liability company, association, trust, or other business organization of any kind directly or indirectly controlling, controlled by, or under common control with Vendor ( "Vendor Affiliate"), and its and their respective shareholders, members, partners, officers, directors, managers, trustees, incorporators, agents, attorneys, consultants, servants, representatives, and employees from and against any Indemnifiable Liability, which occurred, or are alleged to have occurred directly or indirectly as a result of or in connection with any material breach or alleged breach of any representation, warranty, covenant or agreement made by Direct Energy set forth in this Agreement, or any willful, intentional or negligent action or failure to act by Direct Energy, any Direct Energy Affiliate, any of its or their respective shareholders, members, partners, directors and officers, any Direct Energy Personnel, or any agent of Direct Energy; or as a result of an event in which: (a) Direct Energy has provided to Vendor written Direct Energy Marketing Materials to use for the Services, Vendor has used the Direct Energy Marketing Materials as prescribed by Direct Energy and acted in compliance with all applicable laws, rules and regulations, and there has been a violation of any such laws, rules or regulations related solely to Vendor's use of the Direct Energy Marketing Materials or (b) an event or circumstance in which any of the Direct Energy Marks set forth in the Direct Energy Marketing Materials used to provide the Services has violated or is alleged to have violated the intellectual property rights of any third party other than a Permitted Subcontractor, except to the extent that such Indemnifiable Liability is caused by the sole, joint, concurrent, contributing or comparative negligence or fault of Vendor, any Vendor Affiliate, any of its or their respective shareholders, members, partners, directors and officers, any Vendor Personnel, or any agent of Vendor.

9.4.3 Process. A party seeking indemnification under this Section 9, as the case may be (the "Indemnified Party"), will give prompt written notice to the other (the "Indemnifying Party") of the claim, loss, demand, cause of action, debt or liability for which it seeks to be indemnified. The failure by an Indemnified Party to give such notice will not relieve the Indemnifying Party of its obligations under this Section 9, except to the extent that such failure results in the failure of actual notice and the Indemnifying Party is damaged as a result of the failure to give notice. The Indemnified Party will allow the Indemnifying Party to direct the defense and settlement of any such claim, with counsel of the Indemnifying Party's choosing, and will provide the Indemnifying Party, at the Indemnifying Party's expense, with information and assistance that are reasonably necessary for the defense and settlement of the claim. The Indemnified Party will have the right to retain separate counsel and to participate in (but not control) any such action, but the fees and expenses of such counsel will be at the expense of Indemnifying Party. Indemnifying Party will not be liable for any settlement of an action effected without its written consent (which consent will not be unreasonably withheld or delayed), nor will an Indemnifying Party settle any such action without the written consent of the Indemnified Party (which consent will not be unreasonably withheld or delayed). Indemnifying Party shall not consent to the entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the requirement of the claimant to deliver to the Indemnified Party a signed release from all liability with respect to the claim.

10.  **LIMITATION   OF   LIABILITY; INJUNCTIVE RELIEF.**

10.1  Limitation of Liability.  IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL OR SPECIAL (INCLUDING PUNITIVE OR MULTIPLE) DAMAGES, NOR SHALL DIRECT ENERGY BE LIABLE FOR ANY LOSS OF PROFIT,      BUSINESS,      CONTRACTS, OPPORTUNITY, GOODWILL OR OTHER SIMILAR LOSS.  IN NO EVENT SHALL THE LIABILITY OF EITHER PARTY UNDER THIS AGREEMENT (INCLUDING SECTION 9.4 HEREOF), OR OTHERWISE, WHETHER FOR BREACH OF CONTRACT, INDEMNITY, TORT, BREACH   OF   STATUTORY   DUTY   OR

15

**Confidential Information – Subject to Protective Order**

**Direct Energy 000049**

**Direct Energy.**

OTHERWISE, EXCEED THE FEES PAID TO VENDOR UNDER THIS AGREEMENT. THE PROVISIONS OF THIS SECTION 10 SHALL SURVIVE EXPIRATION OR SOONER TERMINATION OF THIS AGREEMENT.

10.2    Injunctive Relief. Each party understands and agrees that money damages would be both incalculable and insufficient remedy for any breach of this Agreement and that any such breach would cause the other party irreparable harm. Accordingly, each party agrees that in the event of any breach or threatened breach of this Agreement, the non-breaching party, in addition to any other remedies at law or in equity it may have, shall be entitled, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance. Each breaching party waives any and all defenses and claims as to venue, forum or jurisdiction of the person or subject matter, and any others that, if asserted under law or equity, would prevent the timely issuance of injunctive relief to the non-breaching party.

11.    CONFIDENTIALITY/PRIVACY.

11.1    Definition. For purposes of this Agreement, "Confidential Information" includes all non-public business information pertaining to the disclosing party (the "Disclosing Party") including, but not limited to, information relating to: (a) the fees and fee structure set forth in any SOW hereto; (b) the Disclosing Party's customers, customer lists, sales, profits, organizational structure and restructuring; (c) the Disclosing Party's services and products, and how such products and services are administered and managed; (d) the Disclosing Party's financial, sales and marketing strategies and plans of any kind; (e) confidential information of third parties with which the Disclosing Party conducts business; (f) in the case of Direct Energy or a Direct Energy Affiliate, Direct Energy Data and back-ups; or (g) any information that the Disclosing Party deems confidential at the time of disclosure or immediately thereafter, which information is set forth in tangible form and prominently marked "CONFIDENTIAL". Notwithstanding the foregoing, Confidential

Information will not include information that: (x) is or becomes generally known to the public not as a result of a disclosure by the receiving party or a third party acting on the receiving party's behalf (the "Receiving Party"); (y) is rightfully in the possession of the Receiving Party prior to disclosure by the Disclosing Party; or (z) is received by the Receiving Party in good faith and without restriction from a third party, not under a confidentiality obligation to the Disclosing Party and having the right to make such disclosure. The foregoing exceptions do not apply to Direct Energy Data and Direct Energy will retain all right, title and interest in and to all Direct Energy Data.

11.2    Restrictions.    The Receiving Party acknowledges that it may be provided or under this Agreement may come in contact with Confidential Information. Accordingly, the Receiving Party agrees that: (a) it will keep all Confidential Information in strict confidence, using such degree of care as is appropriate to avoid unauthorized use or disclosure, and will safeguard and protect the Confidential Information at least as carefully as the Receiving Party safeguards and protects its own confidential information, but in no event will the Receiving Party use less than all diligent and good faith efforts to safeguard the confidentiality of Confidential Information; (b) it will not, directly or indirectly, disclose any Confidential Information to anyone outside of the Disclosing Party, except with the Disclosing Party's prior written consent in each instance, which consent may be withheld arbitrarily; (c) it will not make use of any Confidential Information for its own purposes (except as necessary to exercise its rights or fulfill its obligations under this Agreement) or for the benefit of anyone other than the Disclosing Party; and (d) (i) upon the expiration or sooner termination of this Agreement; or (ii) at any time the Disclosing Party may so request, the Receiving Party will deliver promptly to the Disclosing Party or, at the Disclosing Party's option, the Receiving Party will destroy all memoranda, notes, records, reports, media and other documents and materials (and all copies thereof) regarding or including any Confidential Information that the Receiving Party may then possess or have

16

**Confidential Information - Subject to Protective Order**        **Direct Energy 000050**

**Direct Energy.**

under its control and provide the Disclosing Party with a certificate of destruction for any Confidential Information destroyed.

11.3   Permitted Disclosure.   Notwithstanding anything in this Agreement to the contrary, the Receiving Party may disclose Confidential Information to its employees and agents having a direct need to know such information in connection with fulfilling its obligations pursuant to this Agreement.   The Receiving Party may disclose Confidential Information to the limited extent required by law; provided, however, that the Receiving Party uses commercially reasonable efforts to notify the Disclosing Party in writing in advance of such disclosure, and provides the Disclosing Party with copies of any related information so that the Disclosing Party may take appropriate action to protect the Confidential Information.

12.  INSURANCE.   As a separate and independent obligation and without limiting the indemnity obligation of Vendor or its insurers, Vendor will, at its sole expense, maintain in force during the Term and for not less than two (2) years after expiration or sooner termination of this Agreement, each of the following insurance coverage:

12.1   Workers'  Compensation  and  Employers' Liability.   Vendor shall maintain Workers' Compensation insurance coverage for all employees engaged in the Services provided hereunder in accordance with the statutory requirements of the state in which the work is being performed. Further, Vendor shall maintain Employer's Liability Insurance with limits not less than $1,000,000 per accident/each employee/policy limit covering all employees engaged in the Services provided hereunder.

12.2   Comprehensive General Liability.   Vendor shall maintain Commercial General Liability Insurance, including bodily injury, death and property damage, in an amount of not less than $2,000,000 each occurrence and in the aggregate annually. Such coverage shall include, but not be limited to, blanket Contractual Liability (including

liability assumed under this Agreement), Contractual Liability, Cross Liability or Severability of Interests, Advertising Liability, Broad Form Property Damage Liability,  Products  and  Completed  Operations Liability.

12.3   Excess Liability.   Vendor shall maintain Umbrella Excess Liability Insurance that follows the form of the underlying primary liability insurance required by Section 12.2 (General Liability) in an amount not less than $3,000,000 per occurrence, Combined Single Limit in an amount not less that $100,000 per occurrence and $1,000,000 in the aggregate.

12.4   Additional  Requirements.   The  liability policy(ies) obtained by Vendor pursuant to this Section 12 will name Direct Energy and all Direct Energy Affiliates as additional insureds.   As of the Effective Date and thereafter, upon Direct Energy's written request, Vendor will provide Direct Energy with a certificate or certificates of insurance, in form satisfactory to Direct Energy, evidencing that all the insurance requirements set forth herein have been satisfied and specifying that Direct Energy will receive at least thirty (30) days advance written notice of any cancellation or reduction in any coverage. Vendor will obtain the insurance coverage set forth in this Section 12 from an insurance carrier with a minimum A.M. Best Company rating of A-.

12.5   Automobile Insurance.   If automobiles are used by Vendor in connection with the Services, Vendor shall maintain automobile liability insurance for all of Vendor's owned, hired and non-owned vehicles, with limits of at least $1,000,000 combined single limit for bodily injury and property damage per occurrence.

12.6   Waiver of Subrogation.   All such insurance must be primary and non-contributory, and required to respond and pay prior to any other insurance or self-insurance available. The insurance required by Sections 12.1, 12.2 and 12.3 hereof shall include full waivers of subrogation in favor of Direct Energy and all Direct Energy Affiliates, unless such waiver of subrogation is prohibited by the law governing such

17

**Confidential Information - Subject to Protective Order**                              **Direct Energy 000051**

**Direct Energy.**

insurance. Vendor agrees that Vendor's insurer(s) and anyone claiming by, under or through Vendor's behalf shall have no claim or right of action against Direct Energy, any Direct Energy Affiliate or any of its or their customers based on any claim, loss or liability covered by insurance required hereunder.

13.   GENERAL..

13.1   Relationship of the Parties. This Agreement is not intended to create, and does not create, any partnership, joint venture, fiduciary, employment, or other relationship between the parties, beyond the relationship of independent parties to a commercial contract. Neither party is, nor will either party hold itself out to be, vested with any authority to bind the other party contractually, or to act on behalf of the other party as a broker, agent, or otherwise.

13.2   No Publicity. Unless required by law, Vendor will not, without the prior written consent of Direct Energy, make any public statement, publicity releases, press release, presentation, or other announcement relating to the existence or terms of this Agreement or the Services performed by Vendor under this Agreement.

13.3   Waiver. No waiver of any provision hereof or of any right or remedy hereunder will be effective unless in writing and signed by the party against whom such waiver is sought to be enforced. The waiver or failure of either party to exercise any right provided for herein will not be deemed a waiver of any further right hereunder. The rights and remedies of the parties set forth in this Agreement are in addition to any rights or remedies the parties may otherwise have at law or equity.

13.4   Severability.   If any provision of this Agreement is held to be invalid, illegal or unenforceable by a court of competent jurisdiction, such provision will be deemed restated, in accordance with applicable law, to reflect as nearly as possible the original intentions of the parties, and the remainder of the Agreement will remain in full force and effect.

13.5   Assignment; Successors.   Vendor may not assign its rights, or delegate its duties, under this Agreement without the prior written consent of Direct Energy, which consent shall not be unreasonably withheld or delayed. Either party may assign all of its rights and obligations under this Agreement, without obtaining such prior written consent, to: (a) a successor-in-interest as a result of a merger or consolidation or in connection with the sale or transfer of all or substantially all of it business or assets to which this Agreement relates; or (b) any Affiliate. This Agreement will be binding upon and will inure to the benefit of the parties and their respective successors and permitted assigns.

13.6   Governing Law; Jurisdiction. This Agreement and the parties' respective performance hereunder will be governed by and construed and enforced in accordance with and subject to the internal substantive laws of the State of Texas, without giving effect to any choice of law rules or principles which may direct the application of the laws of any other jurisdiction. Each party agrees that venue for any suit, action or proceeding arising out of this Agreement will be an appropriate federal or state court located in Houston, Texas.

13.7   Notices. Any notice provided pursuant to this Agreement will be in writing and will be deemed given: (a) if mailed, five (5) days after deposit in the U.S. mails, postage prepaid, certified mail return receipt requested; or (b) if sent via overnight courier, upon receipt. All notices to Vendor pertaining to this Agreement will be delivered to: Total Marketing Concepts, Inc., Attn: President, 4395 ST Johns Parkway, Sanford, FL 32771, with copy to Crocker & Crocker, Attn: Patrick D. Crocker, 107 W Michigan Avenue, 4th Floor, Kalamazoo, MI 49007. Notice to be provided to Direct Energy under this Agreement shall be delivered to: Direct Energy, Attn: Teleservices Direct Program Manager, DE Residential, 1001 Liberty Ave. −12th Floor, Pittsburgh, Pennsylvania 15222; with copy to: General Counsel, Direct Energy, 12 Greenway Plaza - Suite 250, Houston, Texas 77046. Either party may change its address or its designated addressee by

18

**Confidential Information - Subject to Protective Order**


Direct Energy.

giving written notice to the other party in accordance with the terms of this Section 13.7.

13.8 <u>Survival</u>. Any and all provisions in this Agreement which would reasonably be expected to be performed after the expiration or sooner termination of this Agreement will survive and be enforceable after the date of such expiration or sooner termination including, without limitation provisions relating to compliance, confidentiality, ownership of materials, representations and warranties, indemnification, limitations of liability, audit rights, effects of termination, insurance, non-solicitation and governing law.

13.9 <u>Entire Agreement; Amendment</u>. This Agreement constitutes the complete and exclusive agreement between the parties relating to the subject matter hereof. It supersedes all prior proposals, understandings and all other agreements, oral and written, between the parties relating to this subject matter. This Agreement may not be modified or altered except by written instrument duly executed by the parties.

13.10 <u>Third-Party Beneficiaries</u>. This Agreement is intended for the sole and exclusive benefit of the parties. It is not intended to benefit any third party, and only the parties may enforce this Agreement.

13.11 <u>Contract Interpretation</u>. Ambiguities, inconsistencies or conflicts in this Agreement will not be strictly construed against either party, but will be resolved by applying the most reasonable interpretation under the circumstances, giving full consideration to the parties' intentions at the time this Agreement is entered into and common practice in the industry.

13.12 <u>Force Majeure</u>. Performance of this Agreement shall be pursued by each party with due diligence. Vendor shall establish and maintain its systems supporting the Services in a commercially reasonable manner with adequate protections and back-up, consistent with the standards of the teleservices industry. However, subject to the foregoing requirements of this Section 13.12, neither

Party shall be liable for any loss or damage for delay or for non-performance due directly to causes not reasonably within its control including, but not limited to, acts of civil, regulatory or military authority, acts of God, war, riot or insurrection, terrorism, blockades, embargoes, sabotage, epidemics, and natural disasters. In the event of any delay or non-performance caused by an event of force majeure, the affected Party shall promptly notify the other Party in writing and take commercially reasonable steps to mitigate the effects of such cause and non-performance.

13.13 <u>Non-Compete</u>. Vendor shall not, during the term of this Agreement and for a period of one (1) year following expiration or sooner termination of this Agreement: (a) use any call lists except to provide the Services; (b) unless Vendor activity included energy offerings prior to the effective date of the SOW, engage, directly or indirectly, for itself, any Vendor Affiliate or other third party, in marketing or provision of teleservices for energy offerings in the same service Territory(ies) covered by each SOW which engagement is, in Direct Energy's reasonable opinion, competitive with Direct Energy's retail energy services business; and (c) do, omit or permit to be done, anything which will place Vendor in a conflict of interest with Direct Energy or any Direct Energy Affiliate or damage the reputation of Direct Energy or any Direct Energy Affiliates.

The parties agree that a breach of this Section would result in damages to Direct Energy or possibly Direct Energy Affiliates, and Direct Energy and such Direct Energy Affiliates would not be adequately compensated by damages alone. Accordingly, without limiting Direct Energy's rights under this Agreement, Vendor agrees that in the event of such breach, in addition to any other remedies available at law or otherwise, Direct Energy and any Direct Energy Affiliate shall be entitled, as a matter of right, to apply to a court of competent jurisdiction for relief by way of injunction, restraining order, decree or otherwise as may be appropriate to ensure compliance with this Section 13.13.

13.14 <u>Reserved</u>.

19

Confidential Information - Subject to Protective Order

 Direct Energy.

13.15 <u>Business Continuity Services</u>. Vendor shall have in place, throughout the Term, a business continuity program, that shall include a fully documented business impact analysis, records management plan, disaster recovery plan, and crisis management plan (collectively, the "Business Continuity Plans"). Vendor shall be responsible for implementing, executing and keeping current the Business Continuity Plans. As part of implementing a Business Continuity Plan, Vendor shall be required to have the capability to operate and provide call center services on a contingency basis, reconstruct and restore Direct Energy Data, and certify systems recovery. Vendor shall test the Business Continuity Plans on an annual basis.

13.16 <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.   This Agreement may be delivered via facsimile or email/pdf, it being the express intent of the Parties that such Agreement delivered via facsimile or email/pdf shall have the same force and effect as if it was                    an                    original.

20

**Confidential Information - Subject to Protective Order**                    **Direct Energy 000054**

# EXHIBIT B

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
IN AND FOR SEMINOLE COUNTY, FLORIDA

BIG ELK FUNDING, LLC, a Delaware limited
liability company,

Plaintiff,

v.                                                      CASE NO:  2019-CA-002536

TOTAL   MARKETING   CONCEPTS,   INC.,
FLORIDA COMMUNITY BANK, N.A., XEROX
FINANCIAL    SERVICES,    LLC,    QUEEN
FUNDING, LLC, BUSINESS ADVANCE, LLC,
CORPORATION   SERVICE   COMPANY,   AS
REPRESENTATIVE,  AFFILIATED  FUNDING
CORPORATION,  CAPSTONE  CREDIT,  LLC,
DISCOUNT    LONG    DISTANCE,    LLC,
SOUTHERN    NEVADA    FINANCE,    LLC,
INTERNAL REVENUE SERVICE, BROADBAND
DYNAMICS,  LLC,  STATE  OF  FLORIDA
DEPARTMENT OF REVENUE, , GTR SOURCE
LLC,

      Defendants.
_____/

**ORDER GRANTING BIG ELK FUNDING, LLC'S
EXPEDITED MOTION TO AMEND ORDER APPOINTING RECEIVER**

**THIS CAUSE** having come before the Court upon Plaintiff's, **BIG ELK FUNDING,**

**LLC** ("Plaintiff"), Expedited Motion to Amend Order Appointing Receiver (the "Motion"), the

Court having reviewed and considered the Motion, the argument of counsel, and being otherwise

duly advised in the premises, it is hereby

      **ORDERED AND ADJUDGED** as follows:

      1.      The Motion is **GRANTED** as set forth herein.

      2.      Upon the conclusion of the foreclosure sale of Total Marketing Concepts, Inc.'s

("TMC") personal property set forth in this matter, Plaintiff, shall immediately be appointed as

the records custodian over all records of TMC (hereinafter "TMC Records' Custodian") if it is the successful bidder at the foreclosure sale. Plaintiff shall ensure that any and all documents, records, electronic or physical, shall be preserved and maintained until further order of this Court. The Receiver in this action shall fulfil obligations to preserve TMC records prior to the receivership's termination and assist with the transition of such documents to the TMC Records' Custodian. In the event that Plaintiff is the unsuccessful bidder of TMC personal property at the foreclosure sale, Patrick Crocker and the Law Firm of Crocker Law Firm, PLLC, located at The Kalamazoo Building, 107 W. Michigan Avenue, 4th Floor, Kalamazoo, Michigan 49007, with telephone number (269) 381-8893 and email of patrick@crockerlawfirm.com shall serve as interim TMC Records' Custodians. As interim TMC Records Custodians, Patrick Crocker and the Law Firm of Crocker Law Firm, PLLC, shall ensure that any and all documents, records, electronic or physical, shall be preserved and maintained until further order of this Court. Patrick Crocker and the Law Firm of Crocker Law Firm, PLLC acknowledge and voluntarily submit themselves to the jurisdiction of this Court for the purpose of acting as interim TMC Records' Custodians.

      3.     The Court hereby provides specific notice to potential buyers that certain personal property subject to the foreclosure sale, specifically certain TMC records, documents, and data:

         (a) are currently the subject of ongoing preservation obligations. *See* Exhibit A to this Order;

         (b) may be subject to additional preservations obligations as ordered by this Court; and

         (c) may be subject to additional preservation obligations as ordered by the Honorable George C. Hanks, Jr. for the United States District Court for the

Southern District of Texas in Cause No. 4:19-cv-00663, styled *Brittany Burk, on behalf of herself and all other similarly situated v. Direct Energy, LP*.

4.    The terms of paragraphs 2 and 3 shall be published with the contents of any notice required under Fla. Stat. § 45.031.

5.    All other provisions of the Amended Receiver Order entered on November 26, 2019 remain in full force and effect.

**DONE AND ORDERED IN CHAMBERS,** in Sanford, Seminole County, Florida, this _____**30**_____ day of January, 2020.

_____
Honorable Melanie Chase

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 30 2020, I electronically filed the foregoing with the Clerk of the Courts using the Florida Courts E-Filing Portal, and provided copies via e-mail to: Total Marketing Concepts, Inc., c/o Patrick Crocker, Esq., Crocker & Crocker, The Kalamazoo Building, 107 W. Michigan Avenue, 4th Floor, Kalamazoo, Michigan 49007, patrick@crockerlawfirm.com; Discount Long Distance, LLC, c/o Jack M. Brennan, Esq., GrayRobinson, P.A., 301 E. Pine Street, Suite 1400, Orlando, Florida 32801, jack.brennan@gray-robinson.com; Southern Nevada Finance, c/o Bradley J. Anderson, Esq., Kevin P. Robinson, Esq., Zimmerman, Kiser & Sutcliffe, P.A., 315 E. Robinson Street, Suite 600 (32801), P.O. Box 3000, Orlando, Florida 32802, banderson@akslawfirm.com, krobinson@zkslawfirm.com, service@zkslawfirm.com; Lara R. Fernandez, Esq., Trenam Law, 101 East Kennedy Boulevard, Suite 2700, Tampa, Florida 33602 and lfernandez@trenam.com a/f Synovous Bank; and via U.S. Mail to: Total Marketing Concepts, Inc., Attention: Andrew Dorko, Jr., 4395 St. Johns Parkway, Sanford, FL 32771; Florida Community Bank, N.A., 2500 Weston Road, Suite 300, Weston, Florida 33331; Xerox Financial Services, LLC, c/o Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301; Queen Funding, LLC, c/o Israel Gross, 2221 NE 164th Street, Miami Beach, FL 33160; Business Advance, LLC, c/o USACORP, Inc., 325 Division Avenue, Suite 201, Brooklyn, New York 11211; Corporation Service Company, as representative (CSC), 801 Adial Stevenson Drive, Springfield, IL 62703; Affiliated Funding Corporation, c/o Ronald N. Hyatt, 2614 E. Tuxedo Circle, Sandy, UT 84093; Capstone Credit, LLC, 810 7th Avenue, 27th Floor, New York, New York 10019; Internal Revenue Service (IRS), U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Room 2242, Washington, DC 20530-0001; Broadband Dynamics, LLC, c/o Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301-2525; GTR

SOURCE LLC, 1006 Monmouth Avenue, Lakewood, New Jersey 08701 and State of Florida, Department of Revenue, 2450 Shumard Oaks Blvd., Tallahassee, Florida 32399.

_____
Judicial Assistant/Attorney

## LIMITED ASSUMPTION AND ASSIGNMENT AGREEMENT

This Limited Assumption and Assignment Agreement is entered into by and between Direct Energy, LP; Big Elk Funding, LLC ("Big Elk"); Total Marketing Concepts, Inc. ("TMC"); Jeremiah Foster as the Receiver for TMC (the "Receiver"); and Bill Eckholm ("Eckholm"). The purpose of the Agreement is for TMC to assign to Big Elk and Eckholm limited contractual obligations that TMC owes to Direct Energy, LP and/or Direct Energy Services, LLC (collectively, "Direct Energy")—and for Big Elk and Eckholm to assume those limited obligations. Direct Energy, TMC, Big Elk, and Eckholm, are collectively referred to herein as the "Parties."

### Recitals

On March 4, 2015, Direct Energy and TMC entered into a Teleservices Agreement, attached here as Exhibit 1, under which TMC, among other things, performed telemarketing services for Direct Energy.

Under the corresponding Statement of Work, dated March 4, 2015 (attached here as Exhibit 2), TMC was supposed to place calls to persons about Direct Energy's services after first obtaining opt-in consents from such persons. TMC represented that each opt-in would be accompanied with a TrustedForm Certificate that would "provide independent proof of consent of the opt-in by the consumer . . ." *See* Statement of Work, Ex. 2 at ¶ 3.

The Teleservices Agreement required TMC to store and retain records related to the Agreement. *See* Teleservices Agreement, Ex. 1 at ¶¶ 3.2, 4.3, 7.3, 7.3.4, 8.5.1. Additionally, under the Teleservices Agreement, TMC warranted that it would "retain on record during the Term of the SOW or Agreement (whichever is longer) plus an additional five (5) years all information related to leads, sources, leads identities . . . and any third party consents . . . Vendor shall make such information available to Direct Energy within one (1) business day of Direct Energy's request." *Id.* at Schedule A, ¶ 5.

The Statement of Work likewise required TMC to store and maintain records including TMC's agreement that "TMC . . . will retain on record for no less than five (5) years all statute-required information related to leads sources, leads identities, enrollments, and applicable opt-in information related to that lead and its subsequent inbound or outbound telesales call [and] shall make such information available to Direct Energy upon request." Statement of Work, Ex. 2 at 5.

Direct Energy has made repeated requests to TMC to produce, pursuant to its contractual obligations, all documents retained and/or stored pursuant to the Teleservices Agreement and corresponding Statement of Work. TMC has produced some but not all documents responsive to Direct Energy's demand for records.

Because of TMC's non-payment and other material defaults on promissory notes and other loan documents, Big Elk requested and received a Florida state-court order appointing the Receiver. Big Elk previously obtained a final judgment against a number of inferior lien holders

and TMC to foreclose its first priority security interest in collateral belonging to TMC ("Foreclosure Sale").

Direct Energy filed a Verified Motion for Preliminary Injunction in Cause No. 4:19-cv-663, styled: *Brittany Burk v. Direct Energy, LP et al.*, pending in the United States District Court for the Southern District of Texas, Dkt. 33 (the "Motion"). The Motion sought a preliminary injunction enjoining Big Elk, TMC, Receiver, and the Clerk of Court for Seminole County, Florida from proceeding with the foreclosure sale previously scheduled for January 16, 2020 ("Foreclosure Sale") or otherwise selling or disposing of any TMC assets until all records of TMC's telemarketing calls regarding Direct Energy services can be transmitted to Direct Energy.

On January 10, 2020, the Florida court vacated the final judgment and cancelled the Foreclosure Sale. Big Elk desires to reinstate and proceed with the Foreclosure Sale.

Eckholm is an owner and managing member of Big Elk.

Mr. Jeremiah Foster has been appointed as the Receiver for TMC ("Receiver") in *Big Elk Funding, LLC v. Total Marketing Concepts, Inc., et al.*, pending in the Circuit Court of the Eighteenth Judicial Circuit in and for Seminole County, Florida, Case No. 2019-CA-00256 ("Foreclosure Litigation").

Direct Energy maintains that it requires all responsive records prior to any future Foreclosure Sale, as any Foreclosure sale will threaten the preservation of key records in *Brittany Burk v. Direct Energy, LP et al.* ("Burk Litigation") and other pending and future litigation, including but not limited to *Matthew Dickson v. Direct Energy, LP et al* ("Dickson Litigation"), pending in the United States District Court in the Northern District of Ohio, Case No. 5:18-cv-182.

NOW THEREFORE, in consideration for the mutual promises contained herein, and for the good and valuable consideration recited herein, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. **Agreements:**

   a. **TMC and Receiver:**

      i. TMC assigns to Big Elk all rights to receive documents, data, recordings, or other records relating to Direct Energy services from those TMC vendors engaged in any telemarketing operations related to Direct Energy, including but not limited to creation of opt-in or other similar consents to receive telemarketing calls; placement of text messages, ringless voicemails, prerecorded messages, or outbound calling in any form or capacity; creation and preservation of TrustedForm Certificates; or other services preserving documents or data ("TMC Vendors").

ii.    Prior to filing his Notice of Termination, the Receiver shall execute in the next thirty (30) days, on behalf of TMC, agreements with TMC Vendors effectuating the limited assignment of rights to Big Elk to receive documents, data, recordings, and other records relating to TMC Vendors' telemarketing operations for Direct Energy. Direct Energy and TMC will approve the form of these assignment agreements. No obligation under such agreements are assigned to Big Elk, except as expressly set forth herein.

iii.   The Receiver will contact all TMC Vendors prior any Foreclosure Sale and demand, pursuant to TMC's own contracts and business relationships with TMC Vendors, that the TMC Vendors produce to Big Elk and Direct Energy all documents, data, recordings, and other records related to telemarketing operations for Direct Energy.

iv.    If Big Elk is not the successful bidder at the Foreclosure Sale, TMC and its Receiver shall comply with any order from the Honorable Melanie Chase in the Foreclosure Litigation to transfer any TMC records, documents, or data to Big Elk, Patrick Crocker, and/or, Law Firm of Crocker Law Firm, PLLC.

v.     TMC and Receiver will not oppose any Direct Energy request for injunctive relief to preserve Direct Energy records.

b.  **Big Elk:**

i.    Big Elk hereby assumes TMC's contractual obligations to Direct Energy to store, retain, and produce all documents relating to the Teleservices Agreement and all corresponding Statements of Work, subject to the Teleservices Agreement, including but not limited to terms in the Statements of Work at Exhibit 1 ¶¶ 3.2, 4.3, 7.3, 7.3.4, 8.5.1, Schedule A, ¶ 5 and Exhibit 2 at ¶¶ 3, 5.  However, Big Elk only assumes such obligations to Direct Energy subject to what is available and provided by TMC and its vendors. Big Elk shall not be responsible for any such contractual obligation to the extent such information is not available or not previously preserved by TMC.

ii.   Big Elk agrees to continue to make reasonable efforts to preserve, produce, and procure from TMC Vendors all documents, data, recordings, and other records related to telemarketing operations for Direct Energy. This provision includes making reasonable efforts relating to the *Burk* Litigation and *Dickson* Litigation, as well as future litigation arising from TMC telemarketing services for Direct Energy.

iii.  Big Elk will no later than four hours following any Foreclosure Sale notify counsel for Direct Energy, Michael D. Matthews, Jr., via email at Matt.Matthews@mhllp.com, the results of the Foreclosure Sale, including whether Big Elk is the successful bidder, and if it is not the successful bidder,

Big Elk shall provide the identity and contact information of the successful bidder.

iv. If Big Elk is not the successful bidder at the Foreclosure Sale, Big Elk will not oppose any Direct Energy request for injunctive relief to preserve Direct Energy records except to the extent Direct Energy were to try to undo the results of the Foreclosure Sale itself.

c. **Eckholm:**

i. Eckholm hereby assumes TMC's contractual obligations to Direct Energy to store, retain, and produce all documents relating to the Teleservices Agreement and all corresponding Statements of Work, subject to the Teleservices Agreement, including but not limited to terms in the Statements of Work at Exhibit 1 ¶¶ 3.2, 4.3, 7.3, 7.3.4, 8.5.1, Schedule A, ¶ 5 and Exhibit 2 at ¶¶ 3, 5. However, Eckholm only assumes such obligations to Direct Energy subject to what is available and provided by TMC and its vendors. Eckholm shall not be responsible for any such contractual obligation to the extent such information is not available or not previously preserved by TMC.

ii. Eckholm agrees to make reasonable efforts to preserve, produce, and procure from TMC Vendors all documents, data, recordings, and other records related to telemarketing operations for Direct Energy. This provision includes making reasonable efforts relating to the *Burk* Litigation and *Dickson* Litigation, as well as future litigation arising from TMC telemarketing services for Direct Energy.

iii. Eckholm agrees to bind any successor to Big Elk to this Agreement.

iv. Eckholm will provide to Direct Energy thirty (30) days prior notice of any sale, assignment, or transfer of ownership interest in Big Elk. Eckholm further agrees to provide to Direct Energy immediate notice of any event that could preclude, prohibit, or in any way limit Big Elk's ability to perform its obligations under this Agreement.

v. Eckholm shall provide notice, as required under Paragraph 1.c.iv. by contacting Direct Energy's counsel, Michael D. Matthews, Jr, via email at Matt.Matthews@mhllp.com and Direct Energy General Counsel, via certified mail return receipt requested, sent to 12 E Greenway Plaza #250, Houston TX, 77046.

d. **Direct Energy:**

i. Direct Energy agrees to immediately withdraw its Motion and discontinue its efforts to enjoin the Foreclosure Sale.

ii.    Direct Energy agrees to cooperate with TMC and Big Elk in drafting assignment agreements described in Paragraph 1.a.ii.

2.    **Injunction in the Event of Breach**. Big Elk, TMC, the Receiver, and Eckholm acknowledge and agree that a violation of this Agreement, including any failure to cooperate, preserve, or produce records that are subject to this Agreement, shall cause irreparable harm to Direct Energy and that monetary damages alone would not constitute an adequate remedy of law. Therefore, the Parties agree that Direct Energy will be entitled to injunctive relief prohibiting any violation or threatened violation of this Agreement, in addition to any potential damages to which Direct Energy may be entitled. The prevailing party shall be entitled to its reasonable attorneys' fees as the prevailing party in any action filed pursuant to this Paragraph.

3.    **Integrated Agreement.** This Agreement contains all agreements, covenants, representations and warranties, express or implied, oral or written, of the parties hereto concerning the subject matter hereof. No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any party hereto to any other party concerning the subject matter hereof. All prior and contemporaneous conversations, negotiations, possible and alleged agreements, representations, covenants and warranties concerning the subject matter hereof are merged into this Agreement.

4.    **Modification.** This Agreement may not be modified, amended, or terminated except by an instrument in writing, signed by each of the parties affected thereby. No failure to exercise and no delay in exercising any right, remedy, or power under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy or power under this agreement preclude any other or further exercise thereof, or the exercise of any other right, remedy or power provided herein or by law or in equity.

5.    **Joint Drafting.** Each party hereto has cooperated in the drafting and preparation of this Agreement. The Parties have jointly drafted this Agreement and no party shall be entitled to the benefit of any rule of law that states that in the event of an ambiguity the document shall be interpreted against the interests of the drafting party. Hence, in any construction to be made of this Agreement, the same will not be construed against any party on the basis that the party was the drafter.

6.    **Choice of Law, Forum, and Venue.** This Agreement is to be interpreted and construed in accordance with the laws of the State of Texas, without reference to any choice of law provisions. Each party agrees that the appropriate forum and venue for any suit, action, or proceeding arising out of this Agreement will be in an appropriate federal or state court located in Harris County, Texas.

7.    **Advice of Counsel.** In signing this Agreement, the Parties have respectively relied wholly upon their own judgment and advice of their own counsel and have not been influenced to any extent whatsoever in entering into this Agreement by any representations or statements made by any other party hereto.

8. **No Reliance.** In signing this Agreement, no party has relied on or been induced to execute this Agreement by any statements, representations, offers, agreements or promises, oral or written, made by any other party, their agents, employees, servants or attorneys, or anyone else, other than the statements expressly written herein.

9. **Section Headings.** Section headings have been included for convenience or reference only, and are not to be considered a part of this Agreement, and are not intended to be a full and accurate description of the contents hereof.

10. **Counterparts and Electronic Copies.** If this Agreement is executed in counterparts, each counterpart shall be deemed an original, and all counterparts so executed shall constitute one agreement binding on all of the Parties, notwithstanding that all of the parties are not a signatory to the same counterpart. Executed electronic copies of this Agreement shall be treated identically as original copies.

11. **Opportunity to Review.** The Parties have each had an opportunity to review this Agreement prior to its execution.

12. **Effective Date.** This Agreement will become effective upon the date on which the last of the Parties executes a counterpart of the agreement.

13. **Binding and Inuring Agreement.** This Agreement and the covenants, obligations, rights, or benefits hereof shall be binding upon and shall inure to the benefit of the Parties hereto and their respective representatives, successors, heirs and assigns.

14. **Attestation of Authority.** Each of the Parties represents that it has the authority to execute this document to be fully binding on behalf of the person or entity indicated.

<b>AGREED:</b>

_____     _____
**DIRECT ENERGY, LP**                **DATE**

Printed Name: _____

Title: _____


_____     _____
**TOTAL MARKEING CONCEPTS, INC.**    **DATE**


Printed Name: Jeremiah Foster

Title: Receiver for Total Marketing Concepts, Inc.

LIMITED ASSUMPTION & ASSIGNMENT
AGREEMENT                 Page 6 of 7

**JEREMIAH FOSTER, AS RECEIVER FOR**                    **DATE**
**TOTAL MARKEING CONCEPTS, INC.**

Printed Name:  Jeremiah Foster

Title:  Receiver for Total Marketing Concepts, Inc.


**BIG ELK FUNDING, LLC**                    **DATE**

Printed Name: _____

Title: _____


**BILL ECKHOLM**                    **DATE**

Printed Name:  Bill Eckholm

# EXHIBIT 1

 Direct Energy.

## TELESERVICES AGREEMENT

THIS TELESERVICES AGREEMENT (as it may be amended from time-to-time, the "Agreement") is made as of March 4, 2015 ("Effective Date"), by and between **DIRECT ENERGY SERVICES, LLC,** a Delaware limited liability company with its principal office at 1001 Liberty Ave. 12th Floor, Pittsburgh, Pennsylvania 15222 ("Direct Energy"), and **TOTAL MARKETING CONCEPTS, INC.,** a Florida corporation, with its principal office at 4395 St Johns Pkwy, Sanford, FL 32771 (the "Vendor"). This Agreement will include the attached Terms and Conditions, all attached Schedule(s) and Statements of Work ("SOWs"), and any and all attached or referenced and incorporated Direct Energy policies, all of which are hereby incorporated by reference and made a part hereof in the manner set forth herein. In the event of a conflict among a term set forth in the Agreement, the attached Terms and Conditions, a term set forth in a Schedule, and/or an SOW, and a term set forth in an attached or incorporated policy or other document, the following order of precedence will control: (a) the SOW(s); (b) the Agreement, (c) the Schedule(s); and (d) any attached or incorporated Direct Energy policy or other document, if any.

EACH OF THE PARTIES HEREBY AGREES TO ALL TERMS AND CONDITIONS OF THIS AGREEMENT.

**DIRECT ENERGY SERVICES, LLC,**
a Delaware limited liability company:

By:

Name: _Brian Cain_

Title: _Operations Category Manager_

**TOTAL MARKETING CONCEPTS, INC.**

By:

George Lonabaugh

Its: President

**Confidential Information - Subject to Protective Order**

Direct Energy.

**TERMS AND CONDITIONS**

1.     SERVICES.   Vendor shall provide to Direct Energy the services set forth in Sections 1.1 and 1.2 below, and more fully described in one or more separately executed, sequentially numbered SOWs to be attached to, and made subject to the terms set forth in, this Agreement (the "Services"), all in accordance with the following:

1.1.   Outbound/Inbound   Customer   Telesales. Vendor shall manage one or more outbound, and when specifically requested by Direct Energy, inbound customer telesales campaigns for Direct Energy in various North American territories with respect to one or more Direct Energy customer segments, as detailed in individual sequentially numbered SOWs to be attached to, and made subject to the terms set forth in this Agreement.   Vendor shall monitor and manage the teleservices campaigns with the goal of maximizing performance of each campaign and achieving Direct Energy's desired results, as set forth in each SOW.

1.2.   Additional Services.   From time-to-time, including during and/or at the conclusion of each campaign, Direct Energy and Vendor may agree upon additional services to be performed by Vendor for Direct Energy, or may agree upon modifications to a campaign.  The terms of any such additional services or modifications shall be set forth in additional individual SOWs.

1.3.   Ancillary Functions.  Vendor shall perform all set-up and ancillary functions associated with the Services in the particular SOW, which may include the following: (a) as required by Direct Energy on a campaign-by-campaign basis, Vendor shall, at its expense, develop, or acquire and implement, all computer systems, software applications and other programs required for performance of the Services and any future enhancements or modifications thereto; and (b) Vendor shall properly screen, select and train

representatives to perform the Services in accordance with each SOW and general teleservices industry standards and practices, using only Direct Energy Marketing Materials (as defined herein).

1.4.   Direct Energy Marketing Materials.   As required by Direct Energy, Vendor shall, at its expense, cooperate and collaborate with Direct Energy to create Direct Energy Marketing Materials for each of Direct Energy's offerings, and coordinate the management and implementation of Direct Energy Marketing Materials at Vendor's teleservices call center(s).  Vendor shall not make any change to any of the terms of Direct Energy's offerings, or to any Direct Energy Marketing Materials, without prior written consent of Direct Energy signed by the Program Manager of Direct Energy, which consent may be withheld arbitrarily.

1.5.   Certain Definitions.   For purposes of this Agreement, these definitions shall apply.  The term "Deliverables" means all ideas, concepts, customer acquisition strategies, scripts, lists, offering design, offering information, creative material, works of authorship, information, data and other materials supplied, conceived, originated, prepared, generated or required to be used by Vendor under this Agreement. The term "Documentation" means all written materials and documentation relating to the Services and/or the Deliverables including, without limitation, training information and customer call lists, as well as any written proposals and marketing materials submitted by one party to the other hereunder.   The term "Direct Energy Marketing Materials" means all such Documentation and Deliverables.

1.6.   SOWs.  All SOWs, if any, attached to this Agreement on the date hereof, or subsequently entered into pursuant hereto, must reference this Agreement. Any SOW entered into pursuant hereto, may be entered into by Direct Energy or a Direct

1

**Confidential Information - Subject to Protective Order**

**Direct Energy.**

Energy affiliate, who may enforce the terms of the SOW and the terms of this Agreement, as if the Direct Energy affiliate was a party hereto and thereafter Vendor may enforce the terms of this Agreement against such Direct Energy affiliate. All SOWs executed by the parties are hereby incorporated by reference into this Agreement. Each SOW will specify, to the extent applicable: (a) the specific objective and goals of the Services to be furnished by Vendor; (b) a description of each of the quantitative and qualitative performance requirements of the Services, as applicable; (c) the time schedule relating to the Services; (d) the applicable fees, and reimbursable costs and expenses for the Services, if any; and (e) any other applicable terms and conditions. In each SOW, each party will designate a "Program Manager" who will be the principal point of contact between the parties for all matters relating to the Services to be provided under such SOW.

1.7.    SOW Change Order Procedure.    If Direct Energy believes that a change in an SOW (whether in time frames, costs Services or any Deliverable) is necessary or desirable, Direct Energy will submit a written change request to the Vendor (a "Change Request"). Vendor will factor into Vendor's estimated time to provide any such Services or Deliverables adequate contingencies for de minimis Change Requests, and such de minimis Change Requests will not impact the hours to be provided under any SOW. In the event of such a Change Request, Vendor will, within two (2) business days, provide Direct Energy with a written quote describing in detail: (a) any modifications to the Services or Deliverables that will be required as a result of the Change Request; (b) the effect, if any, on overall Services or Deliverables performance and Direct Energy requirements; and (c) the effect, if any, of the Change Request on any applicable performance milestones. Changes to an SOW will not become effective unless a new SOW or an amendment to an existing SOW is executed by both parties. Absent the execution of such an SOW or such an amendment, the parties will proceed to fulfill their obligations under the then current SOW.

1.8.    SOW Responsibilities. References to Direct Energy's responsibilities in an SOW (other than Direct Energy's promise to make payments due hereunder) are intended solely for purposes of indicating what is not Vendor's responsibility is. Vendor shall, within one (1) business day, notify the Direct Energy Program Manager in writing if Vendor fails to receive any assistance from Direct Energy, as detailed in the applicable SOW that may impact the timelines for any Services and/or Deliverables hereunder.

1.9.    No Additional Terms.    No additional terms contained in any invoice, order acknowledgment, other correspondence, or written or oral communication between the parties will be valid and such additional or conflicting terms are deemed rejected by the parties unless such terms are contained in an SOW, an amendment to this Agreement or an SOW, or another written agreement executed by authorized representatives of both parties.

1.10.    Vendor Meetings. Vendor will participate in Service review meetings, whether in-person or via video-conference or teleconference with Direct Energy, as reasonably requested by Direct Energy.

1.11.    Ownership Rights.    Direct Energy will own all right, title, and interest in and to: (a) the Direct Energy Marketing Materials; and (b) all data and information collected from, obtained via or otherwise relating or attributable to the Services or Deliverables including, without limitation, data relating to users of any Direct Energy website, PII (as defined below) and any click stream data (collectively, the items under this Subsection (b) are "Direct Energy Data"). Direct Energy Data will be treated as Confidential Information of Direct Energy.

1.12.    Releases and Rights Clearances. Subject to the prior written approval of, and the payment of any related, previously approved amounts due to a third party by, Direct Energy in each instance (which third-party amounts, for the avoidance of doubt, Vendor will be responsible for paying in the first instance and then pass-through to Direct Energy without markup),

2

**Direct Energy.**

Vendor will be responsible for obtaining all third-party rights, clearances, authorizations, permissions and releases (collectively, "Releases") necessary or required in order for Vendor to produce, and for Direct Energy to use, the Deliverables as set forth in any SOW or in the Documentation, including those Releases necessary to furnish the Services, to obtain images, names, likenesses, marks, music, footage or any other work of authorship used in the Deliverables, and to use all creative elements, appearances, and all third-party materials comprising, appearing in, or otherwise displayed via the Deliverables (including, without limitation, stock footage, visual arts, music, trademarks, service marks, rights of publicity and indicia of identity, literary materials and other works of authorship).

1.13.  Distribution of Marketing Materials.  Vendor will not use or disseminate (or cause or permit the use or dissemination of) any Direct Energy Marketing Materials pursuant to this Agreement without, in each instance, obtaining prior written consent from Direct Energy's Program Manager, which consent may be withheld arbitrarily.

1.14.  Vendor Third Party Support.  Except as otherwise instructed in writing by Direct Energy, to the extent Vendor receives services (such as telephony or computer services) or products (such as software) used to support Vendor's provision of Services or Deliverables to Direct Energy (or Direct Energy's use or exploitation of a Service or Deliverable), ("Vendor Third Party Agreement(s)"), Vendor will enter into such Vendor Third Party Agreements on its own behalf and its own expense, and will have no right to bind, nor will it represent that it has any authority to bind, Direct Energy to any such Vendor Third-Party Agreements or any other obligations. Vendor agrees and acknowledges that any Vendor Third Party Agreement will not affect the agreed-upon fees for Services as set forth in an applicable SOW. If any such third party vendor is providing Services or Deliverables directly to Direct Energy on behalf of Vendor, Vendor agrees to pass through the cost for such Services or Deliverables without mark-up to Direct Energy. Vendor is solely responsible for the work product of each such third

party vendors, if any.  Vendor shall inspect the work product of such third parties and promptly correct any deficiencies and maintain proper performance by such parties.

1.15.  Standards of Performance.  Vendor shall, at all times, perform the Services on behalf of Direct Energy and will cause all of its employees and contractor agents to perform the Services on behalf of Direct Energy: (a) in accordance with the terms and conditions of each SOW, including any service level agreements; and (b) in a professional and business-like manner, consistent with standards and practices of the teleservices industry with respect to performance, timeliness and accuracy; and (c) in accordance in all material respects with the applicable portions of the corporate responsibility policy outlined in Schedule A to this Agreement ("CR Policy"); and (d) in compliance in all material respects the applicable portions of Direct Energy's Abbreviated Information Security Policy attached in Schedule B, as they may be updated from time-to-time in writing. Without limiting the foregoing, Vendor will at all times comply with and will cause all of its employees and contractor agents to comply with all Direct Energy's policies and procedures (the "Direct Energy Policies and Procedures") and business rules in effect from time-to-time, including data privacy and security regulations, policies and requirements applicable to the Services and provided in writing to Vendor. Direct Energy shall be responsible for reasonable costs incurred by Vendor associated with Vendor's compliance with new or updated Direct Energy Policies and Procedures. Vendor shall obtain Direct Energy's written consent prior to Vendor incurring said costs of compliance with the new or updated Direct Energy Policies and Procedures.  In addition to any review rights herein, the Vendor shall allow Direct Energy reasonable access to Vendor's premises and personnel during normal business hours as may be reasonably required in order to review the Vendor's compliance with the CR Policy.

1.16.  Conduct of Vendor Personnel.  Vendor agrees that each of its, and its wholly owned subsidiaries' employees, including officers (collectively, "Vendor

3

**Direct Energy.**

Personnel") performing Services under this Agreement will at all times carry out the Services courteously, respectfully and in a nondiscriminatory manner.

1.17. **Additional Terms and Conditions for Promoter of Direct Energy Services.** The Additional Terms and Conditions for Promoter of Direct Energy Services, attached as Schedule C, are incorporated herein by reference.

2. **DATA PRIVACY.**

2.1. **PII.** Vendor will collect and/or use personally identifiable information relating to customers or prospective customers of Direct Energy, a Direct Energy Affiliate and/or users of Direct Energy-offered products and services ("PII"). Except as provided herein or in an SOW, Vendor agrees that no such PII will be collected or stored by Vendor unless authorized by Direct Energy, and any PII collected by Vendor will be considered Direct Energy's proprietary and Confidential Information. Vendor will only use such PII for the sole and exclusive purpose of fulfilling its obligations under this Agreement and may not use or permit the use of such PII for any other purpose whatsoever. PII will include, but will not be limited to: names, addresses, telephone numbers, e-mail addresses, energy usage information and/or deposit balances. Except as required by law, Vendor will not provide any PII to any third party for any purpose, without: (a) the prior written consent of Direct Energy in each instance, which consent may be withheld arbitrarily; and (b) entering into an agreement with such third party that includes the following: (i) terms governing such third party's collection, storage and use of such PII that are substantially similar, in all material respects, and no less protective of such PII or Direct Energy, than the corresponding terms set forth in this Agreement; (ii) terms causing Direct Energy to be named as a third-party beneficiary of any such agreement; and (iii) terms requiring such third party to (A) obtain insurance coverage identical to that set forth in Section 12 of this Agreement, (B) maintain that insurance during the term of this Agreement plus two (2) years after the end of the term, and (C) require Direct

Energy to be named as an additional insured with a waiver of subrogation on all such policies.

2.2. **Non-PII.** PII excludes demographic or behavioral information or data collected or compiled on an anonymous basis (i.e., without identification of, or correlation to, any individual). Such information will be considered Direct Energy's proprietary and Confidential Information. Vendor may not collect, compile or use any such anonymous information for any purpose without the prior written consent of Direct Energy's Program Manager in each instance, which consent may be withheld arbitrarily.

2.3. **Maintenance of PII.** Vendor will remain in compliance with all applicable federal, state and other applicable statutes, regulations, ordinances, and orders with respect to privacy and data security relative to PII and will implement and, at all times during the Term, maintain an effective information security program to protect PII, which program includes administrative, technical, and physical safeguards sufficient to: (a) ensure the security and confidentiality of PII; (b) protect against any reasonably anticipated threats or hazards to the security or integrity of such PII; and (c) protect against unauthorized access to or use of PII that could result in harm or inconvenience to Direct Energy or any of its users, customers or vendors. Vendor shall provide a copy of the information security program to Direct Energy prior to Services being conducted by Vendor under this Agreement. In the event that Vendor is in material breach of this Section 2, it will immediately advise Direct Energy and take steps to remedy such breach including, but not limited to, protecting Direct Energy and its users, customers and vendors against the consequences of any disclosure or use of PII in violation of this Agreement. Direct Energy reserves the right to terminate this Agreement immediately upon written notice to Vendor should a breach of this Section 2 occur and to pursue any and all remedies available to Direct Energy, whether under this Agreement, at law, or in equity. Notwithstanding anything to the contrary in this Agreement and in addition to Direct Energy's rights herein, Vendor will also immediately indemnify Direct Energy and Direct Energy Affiliates from and against any costs (including without limitation any

4

**Direct Energy.**

costs incurred by any of the foregoing entities in order to comply with federal and/or state security breach notification laws), claims, losses, demands, actions, allegations or liabilities, including reasonable attorneys' fees and costs of investigation, incurred by any of the foregoing as a result of an unauthorized disclosure of any PII.

**3.   SECURITY**

3.1   Security. In providing the Services, Vendor shall implement, adhere to, maintain and enforce at all times reasonable security standards and procedures, in accordance with industry practices and standards, including establishing and maintaining reasonable physical and electronic safeguards against the disclosure, destruction, loss, theft or alteration of Direct Energy Data, Direct Energy materials and the software, hardware and other technology or other applications or materials used in providing the Services, including the Direct Energy hosted applications and other software and systems of Direct Energy.

3.2.   Storage of Direct Energy Data. Vendor will store all Direct Energy Data, computer storable Direct Energy Marketing Materials or other computer storable applications or materials of Direct Energy processed or used at Vendor's facilities in a physically secure Vendor location/facility located within the United States. Vendor will restrict access of third parties to that area and provide physical locks for all physical entries to that area reasonable to prevent unauthorized entry. Vendor will electronically segregate Direct Energy Data and Direct Energy Confidential Information used to provide the Services from all other customers of Vendor.

3.3.   Security Manager. Vendor will designate a member of Vendor's management team for the Services as Vendor's Security Manager, with responsibility for Vendor's compliance with its security obligations hereunder.

3.4.   Notification of Security Breach. Vendor shall promptly notify Direct Energy of any breach of

security, including, any loss, theft, and unauthorized access, or any improper disclosure, copying, use or modification of Direct Energy Data, Direct Energy materials and the software, hardware and other technology or other applications or materials used in providing the Services.

**4.   SERVICE LEVEL AGREEMENT FOR DATA HOSTING.** If an SOW requires Vendor to serve, host or otherwise maintain, or provide for the serving, hosting or other maintenance of, any Direct Energy Data, which includes PII (collectively, "Vendor-Hosted Data"), the terms of this Section 4 shall apply.

4.1.   Performance. Vendor will provide hosting, support and maintenance of the Vendor-Hosted Data in a manner that provides the following response times, regardless of the number of concurrent users of any Vendor-Hosted Data: (a) the maximum response time to access the Vendor-Hosted Data will not exceed more than three (3) seconds; and (b) the average response time to access the Vendor-Hosted Data during any consecutive sixty (60) minutes will not exceed one and a half (1 1/2) seconds. These response times are to be measured from the time the Vendor-Hosted Data receives a request or query from a user, to the time the response is transmitted back to the requesting server, not including response transmission time.

4.2.   Hosting. Vendor will provide for the hosting of the Vendor-Hosted Data in a manner that provides ninety-nine and nine-tenths percent (99.9%) Uptime during the Term. "Uptime" means the absence of "Downtime," which is defined as any interruption, for fifteen (15) seconds or more, in the availability of the Vendor-Hosted Data, other than scheduled maintenance conducted between the hours of 2:00 a.m. CT and 5:00 a.m. CT, of which Vendor provides Direct Energy with at least forty-eight (48) hours prior written notice ("Scheduled Downtime"). Any other planned downtime will be conducted only with Direct Energy's prior written approval and with at least seventy-two (72) hours prior written notice. Vendor will respond (or cause its vendor to respond)

5

**Confidential Information - Subject to Protective Order**          **Direct Energy 000039**

**Direct Energy.**

to any Downtime (other than Scheduled Downtime or planned downtime in accordance with the preceding sentence) in accordance with a process to be reasonably specified by Direct Energy.

4.3.    Hardware.  The Vendor-Hosted Data will at all times be maintained on servers and other hardware (the "Primary Hardware") maintained by or on behalf of Vendor that will be located in a data center ("Data Center") that employs industry-leading security measures, with regard to both physical security (e.g., restricted access to servers, etc.) and electronic security (e.g., firewalls).  Vendor will also provide for redundant servers and other hardware ("Redundant Hardware") at such Data Center so that, if the Primary Hardware malfunctions, the Redundant Hardware will immediately host the Vendor-Hosted Data according to the specifications set forth in this Agreement.  Vendor will also provide for additional servers and other hardware (the "Hot Backup Hardware") at a secure location (the "Hot Backup Center") other than the Data Center.  The Hot Backup Hardware will contemporaneously mirror the Vendor-Hosted Data and will be available to host the Vendor-Hosted Data in the event the Primary Hardware and Backup Hardware at the Data Center become unavailable.

4.4.    Back-up.  Without limiting the terms of this Section 4, Vendor, at its sole expense, will make a complete daily back-up of all PII and all other data, information or materials relating to Direct Energy, the Services and the Deliverables or collected by or on behalf of Vendor for the benefit of Direct Energy hereunder.  Such back-up copy will be stored in a secure, offsite location under appropriate protection.  Vendor shall, as soon as reasonably possible but no later than five (5) business days, provide Direct Energy with a copy of any and all such PII, data, information and/or materials upon Direct Energy's written request in a manner (via a transmission method) and format reasonably requested by Direct Energy.

4.5.    Monitoring.  Vendor will utilize appropriate measurement and monitoring tools and procedures necessary to measure the performance of the Vendor-

Hosted Data hereunder.  Upon Direct Energy's request, Vendor will provide Direct Energy or its' representatives access to such measurement and monitoring tools (including, but not limited to, on-line visibility of such tools) and any other information reasonably necessary to verify compliance by Vendor with the terms of this Agreement.  Vendor will provide Direct Energy with a reasonably detailed written monthly report regarding the performance of the Vendor-Hosted Data for the preceding month.

5.    **VENDOR'S USE OF SUBCONTRACTORS.**

5.1    Subcontracting.  Vendor will not delegate or subcontract other than to Vendor's wholly-owned subsidiaries (which will be deemed to include all entities of which Vendor directly or indirectly owns or controls at least 99%) or as may be set forth in any of Vendor's obligations under this Agreement without Direct Energy's express written consent, which consent will not be unreasonably withheld (each consented subcontractor shall hereinafter be referred to as a "Permitted Subcontractor").  Notwithstanding the foregoing, it shall not be unreasonable for Direct Energy to withhold consent where, without limitation, the Permitted Subcontractor would be responsible for the performance of strategic activities, where the Permitted Subcontractor or the services that it provides would be located outside of North America, or where the use of the Permitted Subcontractor would result in a material change in the way the Services are provided.  Direct Energy shall also have the right during the Term to revoke Direct Energy's prior approval of any Permitted Subcontractor or remove any Permitted Subcontractor subject to thirty (30) days' written notice and an opportunity to cure (where cure is possible, otherwise immediately) if the Permitted Subcontractor's performance is materially deficient, or there have been material misrepresentations by or concerning the subcontractor.  Upon receipt of written notice of such revocation, Vendor or Direct Energy, at Direct Energy's sole discretion, shall take over performance of the Services from such Permitted Subcontractor subject to a reasonable transition period to prevent a

6

**Direct Energy.**

material disruption to, or other material adverse affect on, the performance of the Services within thirty (30) days. For the avoidance of doubt, Vendor's wholly-owned subsidiaries shall always be permitted hereunder and shall be treated like Vendor for the purposes of this Agreement.

5.2    Vendor's Responsibility for Subcontractors. With respect to any obligations of Vendor under this Agreement performed by Permitted Subcontractors, Vendor will remain responsible for those obligations to the same extent Vendor would be responsible for the performance by Vendor's employees. Vendor will cause the Permitted Subcontractors to comply with and adhere to the terms of this Agreement as necessary for Vendor to remain in compliance with its obligations under this Agreement. Vendor will not disclose to any Permitted Subcontractor any of Direct Energy's Confidential Information or Direct Energy Data unless and until that agent or subcontractor has agreed in writing to protect the confidentiality of all of Direct Energy's Confidential Information and the Direct Energy Data and Vendor shall be liable for any breach of Direct Energy Confidential Information by or caused by Permitted Subcontractors. From time-to-time as requested by Direct Energy, Vendor will provide documentation evidencing such written agreements.

6.    PROPRIETARY RIGHTS; LICENSES.

6.1    Deliverables.    Vendor acknowledges and agrees that the Deliverables are Confidential Information and the property of Direct Energy. All right, title and interest in and to the Deliverables will vest in Direct Energy and all Deliverables will be deemed to be works made for hire for the benefit of Direct Energy within the meaning of the copyright laws of the United States. To the extent that title to any such Deliverables may not otherwise vest in Direct Energy, or such Deliverables may not be considered works made for hire, Vendor hereby assigns all right, title and interest therein to Direct Energy.    All such Deliverables will belong exclusively to Direct Energy, with Direct Energy having the right to obtain and to hold in its own name, copyright registrations, patents and such other

intellectual property protection as may be appropriate to the subject matter, and any extensions and renewals thereof. Vendor agrees to provide to Direct Energy, and any person designated by Direct Energy, assistance in perfecting or evidencing the rights defined in this Section 6.1 including, without limitation, by executing and delivering all documents requested by Direct Energy for such purposes. Unless otherwise directed by Direct Energy, and except as otherwise required by the Agreement and the SOWs, upon expiration or earlier termination of this Agreement or any applicable SOW, Vendor will immediately turn over to Direct Energy all Deliverables (including all copies thereof) including, but not limited to, working papers, descriptions, reports, notes and data. All Deliverables will bear Direct Energy's copyright and trade secret notices, as specified by Direct Energy, in writing in advance. No rights to the Deliverables will remain with Vendor.

6.2    Vendor Materials.    Notwithstanding Section 6.1 hereof, unless otherwise specifically provided in an SOW, Vendor reserves all rights in and to the materials developed by Vendor, without Direct Energy, prior to and independent of the Services which may be used to provide the Services and are conspicuously marked, "PROPRIETARY VENDOR MATERIALS" or are otherwise the types of templates or other materials re-used by telemarketing businesses in the ordinary course of business ("Vendor Materials"). Deliverables will not include or require for proper use any intellectual property licensed from any third party unless such intellectual property is specifically identified in the applicable SOW and the cost of obtaining the necessary rights to such intellectual property is expressly allocated in the SOW. In the event and to the extent that the Deliverables contain any intellectual property (including Vendor Materials) that may be proprietary to Vendor or a third party, Vendor hereby grants Direct Energy an irrevocable, fully paid up, enterprise-wide, non-exclusive, and worldwide license to use, execute, reproduce, display, perform, and prepare derivative works based on such intellectual property (including Vendor Materials) that may be contained in the Deliverables, and to

7



authorize others to do any of the foregoing on behalf of Direct Energy; provided, however, that: (a) such license will not include the right to distribute copies of the Vendor Materials to third parties; and (b) except for such license, Vendor will retain all ownership to the Vendor Materials.

6.3    Direct Energy Marks.    Direct Energy hereby grants to Vendor a non-exclusive, revocable and limited license to use the trademarks, service marks, insignias, and logos specified by Direct Energy ("Direct Energy Marks") for the sole and exclusive purpose of performing Vendor's obligations hereunder.    Vendor shall obtain Direct Energy's written approval prior to any public use by Vendor of any Direct Energy Mark. Vendor will display the appropriate proprietary rights notice (e.g., the encircled "R" symbol ("®") and/or the letters "TM" or "SM," as appropriate) in conjunction with its display of Direct Energy Marks and properly acknowledge Direct Energy's ownership of the Direct Energy Marks in any and all publications. All uses of Direct Energy Marks by Vendor will comply with Direct Energy's branding requirements and will inure to the benefit of Direct Energy.    If Direct Energy reasonably objects to the use of any of the Direct Energy Marks, Direct Energy may, without limiting any other rights or remedies available to Direct Energy, whether under this Agreement, at law or in equity, revoke any and all of Vendor's rights thereto and Vendor shall immediately cease using the Direct Energy Marks in the manner identified by Direct Energy. Nothing in this Agreement will create in Vendor any rights in the Direct Energy Marks. Other than as required to perform Services hereunder, Vendor will not use Direct Energy's name or any abbreviation, contraction or simulation thereof, without Direct Energy's prior review and written consent, which consent may be withheld arbitrarily.

7.    FEES; TAXES; AUDIT RIGHTS.

7.1    Fees and Taxes.    The fees, and all costs and expenses, if any, to be paid by Direct Energy to Vendor for the Services shall be specifically itemized and set forth in the applicable SOW. Direct Energy shall not be liable for any fees, costs and expenses

other than those specified herein or in an SOW. Notwithstanding any provision in this Agreement to the contrary, payment and timing of payments shall be governed by Section 7.2 below.

Unless expressly stated in an SOW, the fees to be paid by Direct Energy exclude all sales, value-added, and goods and services taxes applicable to provision of the Services by Vendor and Direct Energy shall not be responsible for any such taxes.   Vendor shall be responsible for informing Direct Energy of all such taxes and, upon receipt of an invoice including taxes expressly due from Direct Energy under an SOW, Direct Energy shall pay to Vendor, and Vendor shall remit to the appropriate taxing authorities, all such taxes. If any such taxes collected by Vendor hereunder are determined not payable by Vendor to an authority, Vendor shall promptly refund Direct Energy all such amounts incorrectly collected from Direct Energy. Excise taxes, if any, arising as a result of the provision of the Services shall be the responsibility of the Vendor.   Notwithstanding the foregoing, Direct Energy shall be entitled to deduct and withhold from the fees such amounts as are required by applicable law to be so deducted or withheld from the fees, including any amounts on account of withholding taxes or other similar taxes, and to pay such amounts to such governmental authorities as may be required by applicable law; provided, that if Direct Energy is so required to deduct, withhold or pay, Direct Energy shall forward to Vendor, at Vendor's request, a receipt or other documentation    evidencing    such    deduction, withholding or payment.

7.2  Method of Payment and Timing.    Subject to Vendor's compliance with the terms of this Agreement, Direct Energy shall pay Vendor the fees, and any costs and expenses, in accordance with the following:

7.2.1    Invoicing.    By the fifth (5th) day of each calendar month, Vendor shall submit to Direct Energy an invoice for the fees properly due for the calendar month, which invoice shall contain an itemized list of all costs or expenses available for reimbursement pursuant to Section 7.2.3 below.

8

**Direct Energy.** Simple. Friendly. Direct.

Separate invoices will be provided to Direct Energy by Vendor for each SOW, and invoices will present in detail the Services performed. If requested by Direct Energy, each invoice from Vendor shall also include or be accompanied by a report showing Vendor's compliance with each of the service level agreements in each applicable SOW as of the date most recent to the invoice date on which such report was prepared. All invoicing shall be further subject to Direct Energy's standard policies regarding Direct Energy purchasing, vendor invoicing and vendor payment protocols, as such policies are amended by Direct Energy from time-to-time. Notwithstanding any provision herein to the contrary, Direct Energy shall have the right to offset any and all payments to Vendor for amounts, if any, due to Direct Energy pursuant to the terms and conditions of any SOW or Section 9.4 hereof.

**7.2.2** <u>Time Period.</u> Direct Energy will initiate payment of all undisputed and properly invoiced amounts on or before forty five (45) days after receipt of a proper and correct invoice. If Direct Energy disputes any such amounts or deems an invoice improper, it will notify Vendor promptly.

**7.2.3** <u>Reimbursement.</u> If invoices include reimbursable costs and expenses as authorized herein, receipts for those expenses will accompany the invoices, Direct Energy will reimburse Vendor for Vendor's reasonable and necessary out-of-pocket expenses directly incurred in rendering the Services, provided that: (a) any single expense over $25 or aggregate expenses over $200 are approved in advance by Direct Energy's Program Manager; and (b) such expenses otherwise comply with Direct Energy's expense reimbursement policy, as such policy is amended from time-to-time.

**7.3** <u>Records; Audit.</u> Vendor and its agents will maintain complete and accurate records of its fulfillment of its obligations hereunder during the Term and for a period of at least seven (7) years thereafter (the "<u>Retention Period</u>"); provided, however, that if a dispute arises in connection with this Agreement, the Retention Period will be extended automatically until the resolution of such

dispute becomes final and non-appealable and all obligations of the parties to one another relating to the resolution have been satisfied in full. Vendor and its agents will, upon reasonable request by Direct Energy and at all reasonable times during the Retention Period make such records available for inspection by Direct Energy or its authorized representatives, to perform operational, regulatory, compliance, subcontractor, or security audits, all at the expense of Direct Energy unless the audit was caused by a material breach of this Agreement by Vendor. Direct Energy or its authorized representatives will have the right to take copies of or extracts from any records kept pursuant to this Agreement.

**7.3.1** <u>Remedy.</u> Vendor shall, at its expense, deliver a corrective plan of action and promptly remedy any inadequacy or deficiency, which is identified as a result of an operational audit. If an operational audit discloses a material breach by Vendor of its obligations under this Agreement, Vendor shall promptly remedy such breach and reimburse Direct Energy for the out-of-pocket costs incurred by Direct Energy in connection with such audit.

**7.3.2** <u>Regulatory Audit.</u> Vendor expressly agrees that any regulatory authority that regulates Direct Energy or any aspect of its business shall have at least the same rights of audit with respect to Vendor. If Direct Energy has notice that Vendor will be audited by a Regulatory Authority, and Direct Energy is permitted to provide notice to Vendor, Direct Energy will provide Vendor with advance notice, as soon as practicable. If practicable, Direct Energy will provide written notice identifying the agency seeking such an audit, describe the nature of the audit, and provide copies of any written requests received by the Regulatory Authority with regard to same. Direct Energy shall have the right to inspect Vendor's general corporate Business Continuity Plan, in accordance with Section 13.15, and shall be entitled to copy any component specific Business Continuity Plan(s) pertaining to the Services provided to Direct Energy hereunder except that at the termination of this Agreement Direct Energy, upon instructions from Vendor, shall either return or

9


Direct Energy.

destroy any such copies. In addition Direct Energy agrees that it shall not disseminate the Business Continuity Plan to any third parties and shall hold the Business Continuity Plan in strictest confidence in accordance with Section 11.

**7.3.3   Subcontractor Audits.**   Vendor shall ensure that all agreements with Permitted Subcontractors (as defined herein) entered into after the Effective Date include the right for Direct Energy or its designee to conduct audits of the Permitted Subcontractors and shall provide evidence thereof to Direct Energy. Direct Energy shall be permitted to audit each Permitted Subcontractor retained by Vendor to provide the Services or any part of the Services in the same manner as it is permitted to audit Vendor. Vendor will, not less than once a year, conduct an audit of the operations of its Permitted Subcontractors (including the security policies and procedures of its Permitted Subcontractors), relating to the Services or employ a third party organization to conduct such audit. At Direct Energy's request, Vendor will enforce its audit rights in any agreement with a Permitted Subcontractor to audit any issues raised by Direct Energy, and will report to Direct Energy the findings of such audit.

**7.3.4   Retention.**   Vendor shall maintain and retain complete and accurate records in accordance with any applicable laws, but for no less than the Retention Period.

**7.3.5   Access.**   Without limiting the foregoing, Vendor will provide to Direct Energy and its auditors (including internal audit staff), inspectors, regulatory authorities and other representatives as Direct Energy may from time-to-time reasonably designate in writing, reasonable access to: (a) Vendor's facilities where Services are performed or data related to the Services is stored; (b) Vendor's management employees, contractors, agents and subcontractors providing any of the Services; and (c) reports, data and records in Vendor's possession or control relating to any of the Services. Vendor will provide such access to Direct Energy and Direct Energy's designees during regular business hours upon reasonable notice by Direct Energy, provided that all

such persons adhere to Vendor's customary security and safety policies. Notwithstanding the foregoing, any audit that may involve access to facilities or systems serving other clients of Vendor, shall be performed either by Direct Energy or by an independent third party auditor appointed by Direct Energy, provided that such auditor is not a Vendor Competitor, and provided that if Direct Energy performs the audit it shall not access or attempt to access the information of Vendor's other clients.

**7.3.6   Co-operation.**   Vendor will assist Direct Energy's auditors, inspectors, regulatory authorities, and representatives as is reasonably required. Vendor will co-operate fully with Direct Energy or its designees in connection with audit functions and with regard to examinations by regulatory authorities.

**7.3.7   Expenses.**   Direct Energy will bear its own expenses relating to any audit performed pursuant to this Section 7; provided, however, that for any audit that shows an overcharge, Vendor shall promptly reimburse Direct Energy for such overcharge and if the audit shows an overcharge in Vendor's invoices in an amount greater than five percent (5%) of the annual charges: (a) Direct Energy will have no liability to reimburse Vendor on a time and materials basis for such Vendor audit expenses and shall be entitled to an immediate refund; (b) Vendor will credit Direct Energy for such overcharge within thirty (30) days after the conclusion of the audit; and (c) Vendor will reimburse Direct Energy for the reasonable costs of such audit incurred by Direct Energy.

**7.3.8        Exit Conference.**   Following an audit or examination by Direct Energy, Direct Energy will conduct (in the case of an internal audit), or cause Direct Energy's external auditors or examiners to conduct, an exit conference with Vendor. Vendor will meet with Direct Energy and the auditors to define the resolution to any deficiencies noted during the review and establish a mutually agreed upon timetable to remedy all outstanding issues.

10

**Direct Energy.**
Simple. Friendly. Clear.

## 8. TERM; TERMINATION; SUSPENSION.

**8.1** <u>Term</u>. This Agreement will be effective as of the Effective Date and, unless sooner terminated in accordance with the terms set forth herein, will continue through the date that Services (including any submission of Deliverables) are to be completed under any SOW, or until March 4, 2016, whichever is later (the "<u>Initial Term</u>"). Subject to sooner termination under any of Sections 8.2 through 8.5 hereof, this Agreement shall be renewed automatically on a six (6) month consecutive basis following the end of the Initial Term unless a Party provides to the other Party notice of termination of this Agreement at least sixty (60) days in advance of the date of expiration (such renewal term(s), if any, along with the Initial Term, shall be referred to herein as the "<u>Term</u>").

**8.2** <u>Mutual Termination for Cause</u>. Either party may terminate this Agreement by giving written notice to the other party upon the occurrence of an Event of Default on the part of the other party. An "<u>Event of Default</u>" will mean: (a) a breach by a party of any material provision of this Agreement, other than a payment provision or one that falls under a Section of this Agreement specified in Section 8.3 hereof, if such breach remains uncured for a period of seven (7) business days following receipt of notice from the non-defaulting party specifying the breach; (b) Direct Energy has failed to pay Vendor fees properly invoiced and due under this Agreement within thirty (30) days after Direct Energy has received notice from Vendor of such non-payment; or (c) if (i) the other party is adjudicated a bankrupt, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver, administrative receiver and/or administrator appointed for it, makes or proposes any arrangement for the liquidation of its debts, or ceases to carry on business, or (ii) any proceeding is commenced against the other party in which such party will be winding up, dissolved or liquidated, and such proceeding is not dismissed within thirty (30) days after its institution.

**8.3** <u>Direct Energy Termination with Cause</u>. Vendor shall be in default under this Agreement if:

(a)(i) Vendor is in material violation of any material provision of Schedule C; Section 7, 9, and/or Section 11 in any material respect hereof; (ii) a provision of an SOW; or (iii) Vendor or any Vendor Affiliate, or any of its or their respective controlling shareholders, members, partners, directors and officers becomes the subject of any Adverse Vendor Event (see 9.3 below); and (b) after receiving notice of the breach from Direct Energy, Vendor fails to cure the breach to the satisfaction of Direct Energy on or before the end of the five (5) day period following the date of such notice. If Vendor is so in default under this Agreement, this Agreement shall be terminated automatically without notice, effective at the end of such five (5) day period.

**8.4** <u>Termination Without Cause</u>. Direct Energy may terminate this Agreement or any SOW at any time without cause upon thirty (30) days prior notice to Vendor.

**8.5** <u>Effects of Expiration/Termination</u>. Upon expiration of this Agreement or sooner termination of this Agreement with respect to any or all SOWs and without limiting other applicable provisions contained herein, Vendor shall immediately cease representing, mentioning or holding itself out, in any manner, as a vendor of Direct Energy for the Services described hereunder and discontinue the performance of any Services or other work under this Agreement and comply with Sections 8.5.1 through 8.5.3 below, unless Vendor receives instructions from Direct Energy for Vendor to provide continued Services pursuant to Section 8.5.4 below. Vendor shall facilitate an amicable transition with Direct Energy and Vendor shall not withhold or otherwise prevent access to any Direct Energy property, including any Direct Energy Data, in order to get negotiating leverage or use as a form of ransom.

**8.5.1** <u>Return of Materials</u>. Vendor shall promptly deliver to Direct Energy all original and copies of Deliverables and Direct Energy Marketing Materials, and all memoranda, notes, records, drawings, manuals, disks, documents, media, equipment, papers or other information pertaining to the Services, Deliverables or to Direct Energy's business, or

11



otherwise obtained by Vendor from Direct Energy. Vendor acknowledges that all such materials are the property of Direct Energy. Vendor agrees not to retain any copies of such materials. Notwithstanding anything to the contrary in this Agreement, Vendor shall be permitted to retain an electronic copy of any of the foregoing if required by law or this Agreement (which retained copy will remain Confidential Information under the terms of this Agreement).

8.5.2  Use of Direct Energy Marks.  Vendor shall immediately discontinue any and all use of Direct Energy Marks including, but not limited to any use of Direct Energy Marks in Vendor's advertising or business materials.

8.5.3  Return Data and Maintain Confidentiality. Vendor agrees that it shall not during the Term of this Agreement or during the Retention Period, retain, destroy, delay, manipulate or otherwise encumber any Direct Energy Data.  Upon termination of the Retention Period, Vendor shall, without notice from Direct Energy, immediately and permanently destroy all Direct Energy Data and provide Direct Energy with a certificate of destruction for any Direct Energy Data Vendor destroyed.  At anytime during the Term of this Agreement or during the Retention Period, Direct Energy may instruct Vendor to destroy all or any part of Direct Energy Data, upon notice to Vendor and provide Direct Energy with a certificate of destruction for any Direct Energy Data Vendor destroys or disposes of at Direct Energy's instruction or request.  Upon receipt of the notice from Direct Energy, Vendor must immediately deliver to Direct Energy or any party designated by Direct Energy or destroy all or any part of the Direct Energy Data in such manner as requested by Direct Energy.  Further, Vendor shall, with respect to all Direct Energy Confidential Information under Section 11.1 hereof, comply with the terms of Section 11 hereof.

8.5.4  Continued Services.  If Direct Energy, in its sole discretion, provides instructions to Vendor in advance, Vendor shall continue to provide Services at the then-current fees, all in accordance with the terms of this Agreement and applicable SOW, for not more than ninety (90) days following the expiration or sooner termination of this Agreement (the "Transition Period").  During the Transition Period, Vendor will provide Direct Energy with assistance in transitioning the Services, any Deliverables, Direct Energy Data and any back-up to any provider(s) of Services selected by Direct Energy.  At the end of such Transition Period, Vendor will invoice Direct Energy for the Services provided during such period, with the fees for such Services to be billed at the rates set forth in this Agreement, or as otherwise agreed upon by the parties in writing.

8.6  Suspension for Non-Compliance.  Direct Energy may, in its sole discretion, without terminating this Agreement and upon providing three (3) days' advance notice to Vendor, immediately suspend for a period up to ninety (90) days any or all activities under this Agreement if Vendor fails to meet a compliance obligation.  The notice will also contain provisions relating to Direct Energy's rights during any such suspension, including causing Vendor to receive additional training and/or re-train employees.  Upon any such suspension, Vendor shall, at its sole expense: (a) fully cooperate with Direct Energy to immediately investigate all issues and implement all procedures and safeguards required by Direct Energy to prevent any further violations; and (b) resolve all alleged or actual compliance violations to Direct Energy's reasonable satisfaction.

8.7  Suspension for Other Reasons.  Direct Energy may, in its sole discretion, without terminating this Agreement and upon providing at least thirty (30) days' advance notice to Vendor, immediately suspend all or any part of Vendor's activities under this Agreement for a period up to one hundred eighty (180) days if, in Direct Energy's sole discretion, adverse regulatory or market conditions exist.

9.  REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION.

9.1  General Representations, Warranties and Covenants.  In addition to any specific representations, warranties and covenants contained in an SOW and those set forth elsewhere herein, each party represents, warrants and covenants to the other that:  (a) it is a

12

 Direct Energy.

legal entity duly organized, validly existing and in good standing under the laws of the state of its formation; (b) it has all requisite corporate power and authority to execute, deliver and perform its obligations hereunder; (c) it is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the transaction of business of the character transacted by it, except when the failure to be so licensed, authorized or qualified would not have a material adverse effect on its ability to fulfill its obligations hereunder; and (d) this Agreement constitutes the valid and binding obligation of the party, enforceable against such party in accordance with its terms, except as such enforceability may be subject to the effects of bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting the rights of creditors and general principles of equity.

9.2    General Vendor Representation, Warranties and Covenants.    Vendor represents, warrants and covenants to Direct Energy each of the following: (a) the Services and any Deliverables will be provided in accordance with the highest standards of professional conduct in the applicable area or areas of expertise required to provide such Services and any Deliverables, as well as in accordance with the description of, and specifications for, such Services and any Deliverables set forth in the applicable SOW and any Documentation; (b) the Deliverables, if any, do not and will not contain any virus or any other contaminant, or disabling devices including, but not limited to, codes, commands or instructions that may be used to access, alter, delete, remotely access, damage or disable the Deliverables, other Direct Energy software, Direct Energy Data, Direct Energy's computer network or other Direct Energy property; (c) the Services and any Deliverables will not be libelous or defamatory, will not violate or infringe any common law or statutory right of any third party including, without limitation, any contractual rights, proprietary rights, copyright, trademark, service mark or patent rights, or any rights of privacy or publicity, and will not violate any applicable federal, state or local law, rule, regulation

or ordinance; (d) Vendor will not, without the prior written consent of Direct Energy, include in any Deliverables, or use in conjunction with the performance of Services, any intellectual property licensed from any third party, and Vendor will specifically identify any such third-party intellectual property in writing to Direct Energy; (e) with respect to any third-party intellectual property included within the Deliverables or used in connection with Vendor's performance of the Services, Vendor has all right, title and interest necessary to provide such intellectual property to and/or use such intellectual property for the benefit of Direct Energy; (f) any Deliverables shall be free from any and all liens, encumbrances and/or third party security interest whatsoever; (g) Vendor or any third party providing a support service or software on behalf of the Vendor will not use or distribute PII outside the scope of this Agreement, or for the benefit of the Vendor or third party acting on behalf of the Vendor; (h) Vendor and Vendor Personnel will perform the Services hereunder in compliance with all federal, state and local laws, rules, regulations and ordinances; (i) all of Vendor's employees, agents and independent contractors involved in providing Services shall, while on Direct Energy's property or conducting any Direct Energy related business, comply with all federal, state and local laws, rules, regulations and ordinances, including specifically all laws prohibiting harassment or discrimination of any kind in the workplace; (j) Vendor is not a party to any existing union contract that purports to obligate Direct Energy to a union, either as a successor or assignee of Vendor, or in any other way; (k) Vendor shall avoid deceptive, misleading or unethical practices that could adversely affect the performance of Direct Energy's obligations under this Agreement or damage the reputation of Direct Energy, any Direct Energy Affiliate, or any of their respective shareholders, members, partners, officers, directors, managers, trustees, incorporators, agents, attorneys, consultants, servants, representatives, and employees; (l) Vendor is duly licensed to conduct telephone sales of retail energy to residential customers ("Telesales License") as required under the laws, rules or regulations of each state in which it conducts Services and will maintain such license(s) in good standing throughout

13

**Confidential Information - Subject to Protective Order**

**Direct Energy.**

the Term; (m) in addition to any Telesales License, Vendor will obtain any permits and licenses required under the laws, rules or regulations of each state in which it conducts Services and maintain such permits and license(s) in good standing throughout the Term; (n) Vendor is not a party to any agreement with a third party, the performance of which is reasonably likely to affect adversely its ability perform fully its obligations hereunder; and (o) Vendor's performance of its obligations under this Agreement will not violate any other agreement between Vendor and any third party.

9.3  Adverse Vendor Events. Vendor further represents and warrants to Direct Energy that neither Vendor, any Vendor Affiliate, nor any of its or their respective controlling shareholders, controlling members, controlling partners, directors or officers has, in the ten (10) year period preceding the Effective Date: (a) been convicted of, or plead guilty or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to, any state or federal criminal law for fraud, theft, larceny, deceit, or violations of any customer protection or deceptive trade laws in any state; (b) been found liable in a civil proceeding for fraud, theft, larceny, deceit or violations of any customer protection or deceptive trade laws in any state; (c) been found liable in either a civil or criminal proceeding for an antitrust violation; (d) had a license or right to engage in any business or profession revoked, denied, suspended or restrained; (e) been subject to any disciplinary proceeding in connection with a license or right to engage in any business or profession; (f) been subject to a regulatory investigation or regulatory sanctions; (g) filed for bankruptcy or reorganization, or been in control of an entity that has filed a petition for bankruptcy or reorganization.  Each of the foregoing items (a) through (g) shall be referred to as an "Adverse Vendor Event".  If during the Term any of Vendor, any Vendor Affiliate, or any of its or their respective shareholders, members, partners, directors and officers becomes the subject of any Adverse Vendor Event, Vendor shall immediately notify Direct Energy and provide full and complete information to Direct Energy regarding the matter.  Direct Energy shall be entitled to reasonably investigate the matter

and any actions taken by Direct Energy based on the matter shall be without prejudice to Direct Energy's rights under this Agreement.

9.4 Indemnification.

9.4.1  By Vendor. Vendor shall indemnify, defend, and hold harmless Direct Energy and any individual, corporation, partnership, limited liability company, association, trust, or other business organization of any kind directly or indirectly controlling, controlled by, or under common control with Direct Energy ("Direct Energy Affiliate"), and its and their respective shareholders, members, partners, officers, directors, managers, trustees, incorporators, agents, attorneys, consultants, servants, representatives, and employees from and against any claims, causes of action, suits, judgments, fines, losses, damages and liabilities of any kind (whether the same are based in contract, tort, including negligence, strict liability or otherwise) including, without limitation, all reasonable expenses of litigation, costs of court and/or alternative dispute resolution, reasonable attorneys' fees and expenses (including costs of investigation and any expert witness fees) (each of the foregoing shall be referred to as an "Indemnifiable Liability"), which occurred, or are alleged to have occurred, directly or indirectly as a result of or in connection with any material breach or alleged breach of any representation, warranty, covenant or agreement made by Vendor set forth in this Agreement, any Vendor Personnel Event, or any willful, intentional or negligent action or failure to act by Vendor, any Vendor Affiliate, any of its or their respective shareholders, members, partners, directors and officers, any Vendor Personnel, or any agent of Vendor, except to the extent that such Indemnifiable Liability is caused by the sole, joint, concurrent, contributing or comparative negligence or fault of Direct Energy, any Direct Energy Affiliate, any of its or their respective shareholders, members, partners, directors and officers, any Direct Energy Personnel, or any agent of Direct Energy.

9.4.2  By Direct Energy.  Direct Energy shall indemnify, defend, and hold harmless Vendor and any individual, corporation, partnership, limited

14

**Direct Energy.**

liability company, association, trust, or other business organization of any kind directly or indirectly controlling, controlled by, or under common control with Vendor ( "Vendor Affiliate"), and its and their respective shareholders, members, partners, officers, directors, managers, trustees, incorporators, agents, attorneys, consultants, servants, representatives, and employees from and against any Indemnifiable Liability, which occurred, or are alleged to have occurred directly or indirectly as a result of or in connection with any material breach or alleged breach of any representation, warranty, covenant or agreement made by Direct Energy set forth in this Agreement, or any willful, intentional or negligent action or failure to act by Direct Energy, any Direct Energy Affiliate, any of its or their respective shareholders, members, partners, directors and officers, any Direct Energy Personnel, or any agent of Direct Energy; or as a result of an event in which: (a) Direct Energy has provided to Vendor written Direct Energy Marketing Materials to use for the Services, Vendor has used the Direct Energy Marketing Materials as prescribed by Direct Energy and acted in compliance with all applicable laws, rules and regulations, and there has been a violation of any such laws, rules or regulations related solely to Vendor's use of the Direct Energy Marketing Materials or (b) an event or circumstance in which any of the Direct Energy Marks set forth in the Direct Energy Marketing Materials used to provide the Services has violated or is alleged to have violated the intellectual property rights of any third party other than a Permitted Subcontractor, except to the extent that such Indemnifiable Liability is caused by the sole, joint, concurrent, contributing or comparative negligence or fault of Vendor, any Vendor Affiliate, any of its or their respective shareholders, members, partners, directors and officers, any Vendor Personnel, or any agent of Vendor.

9.4.3 Process. A party seeking indemnification under this Section 9, as the case may be (the "Indemnified Party"), will give prompt written notice to the other (the "Indemnifying Party") of the claim, loss, demand, cause of action, debt or liability for which it seeks to be indemnified. The failure by an Indemnified Party to give such notice will not relieve the Indemnifying Party of its obligations under this Section 9, except to the extent that such failure results in the failure of actual notice and the Indemnifying Party is damaged as a result of the failure to give notice. The Indemnified Party will allow the Indemnifying Party to direct the defense and settlement of any such claim, with counsel of the Indemnifying Party's choosing, and will provide the Indemnifying Party, at the Indemnifying Party's expense, with information and assistance that are reasonably necessary for the defense and settlement of the claim. The Indemnified Party will have the right to retain separate counsel and to participate in (but not control) any such action, but the fees and expenses of such counsel will be at the expense of Indemnifying Party. Indemnifying Party will not be liable for any settlement of an action effected without its written consent (which consent will not be unreasonably withheld or delayed), nor will an Indemnifying Party settle any such action without the written consent of the Indemnified Party (which consent will not be unreasonably withheld or delayed). Indemnifying Party shall not consent to the entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the requirement of the claimant to deliver to the Indemnified Party a signed release from all liability with respect to the claim.

10. LIMITATION OF LIABILITY; INJUNCTIVE RELIEF.

10.1 Limitation of Liability. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL OR SPECIAL (INCLUDING PUNITIVE OR MULTIPLE) DAMAGES, NOR SHALL DIRECT ENERGY BE LIABLE FOR ANY LOSS OF PROFIT, BUSINESS, CONTRACTS, OPPORTUNITY, GOODWILL OR OTHER SIMILAR LOSS. IN NO EVENT SHALL THE LIABILITY OF EITHER PARTY UNDER THIS AGREEMENT (INCLUDING SECTION 9.4 HEREOF), OR OTHERWISE, WHETHER FOR BREACH OF CONTRACT, INDEMNITY, TORT, BREACH OF STATUTORY DUTY OR

15

Confidential Information - Subject to Protective Order

Direct Energy 000049

 Direct Energy.

OTHERWISE, EXCEED THE FEES PAID TO VENDOR UNDER THIS AGREEMENT. THE PROVISIONS OF THIS SECTION 10 SHALL SURVIVE EXPIRATION OR SOONER TERMINATION OF THIS AGREEMENT.

10.2   Injunctive Relief. Each party understands and agrees that money damages would be both incalculable and insufficient remedy for any breach of this Agreement and that any such breach would cause the other party irreparable harm. Accordingly, each party agrees that in the event of any breach or threatened breach of this Agreement, the non-breaching party, in addition to any other remedies at law or in equity it may have, shall be entitled, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance. Each breaching party waives any and all defenses and claims as to venue, forum or jurisdiction of the person or subject matter, and any others that, if asserted under law or equity, would prevent the timely issuance of injunctive relief to the non-breaching party.

11.   CONFIDENTIALITY/PRIVACY.

11.1   Definition. For purposes of this Agreement, "Confidential Information" includes all non-public business information pertaining to the disclosing party (the "Disclosing Party") including, but not limited to, information relating to: (a) the fees and fee structure set forth in any SOW hereto; (b) the Disclosing Party's customers, customer lists, sales, profits, organizational structure and restructuring; (c) the Disclosing Party's services and products, and how such products and services are administered and managed; (d) the Disclosing Party's financial, sales and marketing strategies and plans of any kind; (e) confidential information of third parties with which the Disclosing Party conducts business; (f) in the case of Direct Energy or a Direct Energy Affiliate, Direct Energy Data and back-ups; or (g) any information that the Disclosing Party deems confidential at the time of disclosure or immediately thereafter, which information is set forth in tangible form and prominently marked "CONFIDENTIAL". Notwithstanding the foregoing, Confidential

Information will not include information that: (x) is or becomes generally known to the public not as a result of a disclosure by the receiving party or a third party acting on the receiving party's behalf (the "Receiving Party"); (y) is rightfully in the possession of the Receiving Party prior to disclosure by the Disclosing Party; or (z) is received by the Receiving Party in good faith and without restriction from a third party, not under a confidentiality obligation to the Disclosing Party and having the right to make such disclosure. The foregoing exceptions do not apply to Direct Energy Data and Direct Energy will retain all right, title and interest in and to all Direct Energy Data.

11.2   Restrictions.   The Receiving Party acknowledges that it may be provided or under this Agreement may come in contact with Confidential Information. Accordingly, the Receiving Party agrees that: (a) it will keep all Confidential Information in strict confidence, using such degree of care as is appropriate to avoid unauthorized use or disclosure, and will safeguard and protect the Confidential Information at least as carefully as the Receiving Party safeguards and protects its own confidential information, but in no event will the Receiving Party use less than all diligent and good faith efforts to safeguard the confidentiality of Confidential Information; (b) it will not, directly or indirectly, disclose any Confidential Information to anyone outside of the Disclosing Party, except with the Disclosing Party's prior written consent in each instance, which consent may be withheld arbitrarily; (c) it will not make use of any Confidential Information for its own purposes (except as necessary to exercise its rights or fulfill its obligations under this Agreement) or for the benefit of anyone other than the Disclosing Party; and (d) (i) upon the expiration or sooner termination of this Agreement; or (ii) at any time the Disclosing Party may so request, the Receiving Party will deliver promptly to the Disclosing Party or, at the Disclosing Party's option, the Receiving Party will destroy all memoranda, notes, records, reports, media and other documents and materials (and all copies thereof) regarding or including any Confidential Information that the Receiving Party may then possess or have

16

**Direct Energy.**

under its control and provide the Disclosing Party with a certificate of destruction for any Confidential Information destroyed.

11.3 Permitted Disclosure. Notwithstanding anything in this Agreement to the contrary, the Receiving Party may disclose Confidential Information to its employees and agents having a direct need to know such information in connection with fulfilling its obligations pursuant to this Agreement. The Receiving Party may disclose Confidential Information to the limited extent required by law; provided, however, that the Receiving Party uses commercially reasonable efforts to notify the Disclosing Party in writing in advance of such disclosure, and provides the Disclosing Party with copies of any related information so that the Disclosing Party may take appropriate action to protect the Confidential Information.

12. INSURANCE. As a separate and independent obligation and without limiting the indemnity obligation of Vendor or its insurers, Vendor will, at its sole expense, maintain in force during the Term and for not less than two (2) years after expiration or sooner termination of this Agreement, each of the following insurance coverage:

12.1 Workers' Compensation and Employers' Liability. Vendor shall maintain Workers' Compensation insurance coverage for all employees engaged in the Services provided hereunder in accordance with the statutory requirements of the state in which the work is being performed. Further, Vendor shall maintain Employer's Liability Insurance with limits not less than $1,000,000 per accident/each employee/policy limit covering all employees engaged in the Services provided hereunder.

12.2 Comprehensive General Liability. Vendor shall maintain Commercial General Liability Insurance, including bodily injury, death and property damage, in an amount of not less than $2,000,000 each occurrence and in the aggregate annually. Such coverage shall include, but not be limited to, blanket Contractual Liability (including

liability assumed under this Agreement), Contractual Liability, Cross Liability or Severability of Interests, Advertising Liability, Broad Form Property Damage Liability, Products and Completed Operations Liability.

12.3 Excess Liability. Vendor shall maintain Umbrella Excess Liability Insurance that follows the form of the underlying primary liability insurance required by Section 12.2 (General Liability) in an amount not less than $3,000,000 per occurrence, Combined Single Limit in an amount not less that $100,000 per occurrence and $1,000,000 in the aggregate.

12.4 Additional Requirements. The liability policy(ies) obtained by Vendor pursuant to this Section 12 will name Direct Energy and all Direct Energy Affiliates as additional insureds. As of the Effective Date and thereafter, upon Direct Energy's written request, Vendor will provide Direct Energy with a certificate or certificates of insurance, in form satisfactory to Direct Energy, evidencing that all the insurance requirements set forth herein have been satisfied and specifying that Direct Energy will receive at least thirty (30) days advance written notice of any cancellation or reduction in any coverage. Vendor will obtain the insurance coverage set forth in this Section 12 from an insurance carrier with a minimum A.M. Best Company rating of A-.

12.5 Automobile Insurance. If automobiles are used by Vendor in connection with the Services, Vendor shall maintain automobile liability insurance for all of Vendor's owned, hired and non-owned vehicles, with limits of at least $1,000,000 combined single limit for bodily injury and property damage per occurrence.

12.6 Waiver of Subrogation. All such insurance must be primary and non-contributory, and required to respond and pay prior to any other insurance or self-insurance available. The insurance required by Sections 12.1, 12.2 and 12.3 hereof shall include full waivers of subrogation in favor of Direct Energy and all Direct Energy Affiliates, unless such waiver of subrogation is prohibited by the law governing such

17

**Direct Energy.**

insurance. Vendor agrees that Vendor, Vendor's insurer(s) and anyone claiming by, under or through Vendor's behalf shall have no claim or right of action against Direct Energy, any Direct Energy Affiliate or any of its or their customers based on any claim, loss or liability covered by insurance required hereunder.

13.   GENERAL.

13.1   Relationship of the Parties. This Agreement is not intended to create, and does not create,. any partnership, joint venture, fiduciary, employment, or other relationship between the parties, beyond the relationship of independent parties to a commercial contract. Neither party is, nor will either party hold itself out to be, vested with any authority to bind the other party contractually, or to act on behalf of the other party as a broker, agent, or otherwise.

13.2   No Publicity. Unless required by law, Vendor will not, without the prior written consent of Direct Energy, make any public statement, publicity releases, press release, presentation, or other announcement relating to the existence or terms of this Agreement or the Services performed by Vendor under this Agreement.

13.3   Waiver. No waiver of any provision hereof or of any right or remedy hereunder will be effective unless in writing and signed by the party against whom such waiver is sought to be enforced. The waiver or failure of either party to exercise any right provided for herein will not be deemed a waiver of any further right hereunder. The rights and remedies of the parties set forth in this Agreement are in addition to any rights or remedies the parties may otherwise have at law or equity.

13.4   Severability. If any provision of this Agreement is held to be invalid, illegal or unenforceable by a court of competent jurisdiction, such provision will be deemed restated, in accordance with applicable law, to reflect as nearly as possible the original intentions of the parties, and the remainder of the Agreement will remain in full force and effect.

13.5   Assignment: Successors. Vendor may not assign its rights, or delegate its duties, under this Agreement without the prior written consent of Direct Energy, which consent shall not be unreasonably withheld or delayed. Either party may assign all of its rights and obligations under this Agreement, without obtaining such prior written consent, to: (a) a successor-in-interest as a result of a merger or consolidation or in connection with the sale or transfer of all or substantially all of it business or assets to which this Agreement relates; or (b) any Affiliate. This Agreement will be binding upon and will inure to the benefit of the parties and their respective successors and permitted assigns.

13.6   Governing Law: Jurisdiction. This Agreement and the parties' respective performance hereunder will be governed by and construed and enforced in accordance with and subject to the internal substantive laws of the State of Texas, without giving effect to any choice of law rules or principles which may direct the application of the laws of any other jurisdiction. Each party agrees that venue for any suit, action or proceeding arising out of this Agreement will be an appropriate federal or state court located in Houston, Texas.

13.7   Notices. Any notice provided pursuant to this Agreement will be in writing and will be deemed given: (a) if mailed, five (5) days after deposit in the U.S. mails, postage prepaid, certified mail return receipt requested; or (b) if sent via overnight courier, upon receipt. All notices to Vendor pertaining to this Agreement will be delivered to: Total Marketing Concepts, Inc., Attn: President, 4395 ST Johns Parkway, Sanford, FL 32771, with copy to Crocker & Crocker, Attn: Patrick D. Crocker, 107 W Michigan Avenue, 4th Floor, Kalamazoo, MI 49007. Notice to be provided to Direct Energy under this Agreement shall be delivered to: Direct Energy, Attn: Teleservices Direct Program Manager, DE Residential, 1001 Liberty Ave. –12th Floor, Pittsburgh, Pennsylvania 15222; with copy to: General Counsel, Direct Energy, 12 Greenway Plaza - Suite 250, Houston, Texas 77046. Either party may change its address or its designated addressee by

18

**Direct Energy.**

giving written notice to the other party in accordance with the terms of this Section 13.7.

13.8  Survival.  Any and all provisions in this Agreement which would reasonably be expected to be performed after the expiration or sooner termination of this Agreement will survive and be enforceable after the date of such expiration or sooner termination including, without limitation provisions relating to compliance, confidentiality, ownership of materials, representations and warranties, indemnification, limitations of liability, audit rights, effects of termination, insurance, non-solicitation and governing law.

13.9  Entire Agreement; Amendment.  This Agreement constitutes the complete and exclusive agreement between the parties relating to the subject matter hereof.  It supersedes all prior proposals, understandings and all other agreements, oral and written, between the parties relating to this subject matter.  This Agreement may not be modified or altered except by written instrument duly executed by the parties.

13.10  Third-Party Beneficiaries.  This Agreement is intended for the sole and exclusive benefit of the parties.  It is not intended to benefit any third party, and only the parties may enforce this Agreement.

13.11  Contract   Interpretation.  Ambiguities, inconsistencies or conflicts in this Agreement will not be strictly construed against either party, but will be resolved  by  applying  the  most  reasonable interpretation under the circumstances, giving full consideration to the parties' intentions at the time this Agreement is entered into and common practice in the industry.

13.12  Force Majeure.  Performance of this Agreement shall be pursued by each party with due diligence.  Vendor shall establish and maintain its systems supporting the Services in a commercially reasonable manner with adequate protections and back-up, consistent with the standards of the teleservices industry.  However, subject to the foregoing requirements of this Section 13.12, neither

Party shall be liable for any loss or damage for delay or for non-performance due directly to causes not reasonably within its control including, but not limited to, acts of civil, regulatory or military authority, acts of God, war, riot or insurrection, terrorism,  blockades,  embargoes,  sabotage, epidemics, and natural disasters.  In the event of any delay or non-performance caused by an event of force majeure, the affected Party shall promptly notify  the  other  Party  in  writing  and  take commercially reasonable steps to mitigate the effects of such cause and non-performance.

13.13  Non-Compete.  Vendor shall not, during the term of this Agreement and for a period of one (1) year following expiration or sooner termination of this Agreement: (a)  use any call lists except to provide the Services; (b)  unless Vendor activity included energy offerings prior to the effective date of the SOW, engage, directly or indirectly, for itself, any Vendor Affiliate or other third party, in marketing or provision of teleservices for energy offerings in the same service Territory(ies)  covered  by  each  SOW  which engagement is, in Direct Energy's reasonable opinion, competitive with Direct Energy's retail energy services business; and (c)  do, omit or permit to be done, anything which will place Vendor in a conflict of interest with Direct Energy or any Direct Energy Affiliate or damage the reputation of Direct Energy or any Direct Energy Affiliates.

The parties agree that a breach of this Section would result in damages to Direct Energy or possibly Direct Energy Affiliates, and Direct Energy and such Direct Energy  Affiliates  would  not  be  adequately compensated by damages alone.  Accordingly, without limiting Direct Energy's rights under this Agreement, Vendor agrees that in the event of such breach, in addition to any other remedies available at law or otherwise, Direct Energy and any Direct Energy Affiliate shall be entitled, as a matter of right, to apply to a court of competent jurisdiction for relief by way of injunction, restraining order, decree or otherwise as may be appropriate to ensure compliance with this Section 13.13.

13.14  Reserved.

19



13.15  <u>Business Continuity Services</u>.  Vendor shall have in place, throughout the Term, a business continuity program, that shall include a fully documented business impact analysis, records management plan, disaster recovery plan, and crisis management plan (collectively, the "Business Continuity Plans"). Vendor shall be responsible for implementing, executing and keeping current the Business Continuity Plans. As part of implementing a Business Continuity Plan, Vendor shall be required to have the capability to operate and provide call center services on a contingency basis, reconstruct and restore Direct Energy Data, and certify systems recovery. Vendor shall test the Business Continuity Plans on an annual basis.

13.16  <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may be delivered via facsimile or email/pdf, it being the express intent of the Parties that such Agreement delivered via facsimile or email/pdf shall have the same force and effect as if it was                an                original.

20



**SCHEDULE A**

i

**Confidential Information - Subject to Protective Order**

**Direct Energy 000055**



**SCHEDULE B**

Confidential Information - Subject to Protective Order

Direct Energy 000056

 Direct Energy.

SCHEDULE C



Confidential Information - Subject to Protective Order

Direct Energy 000057



### SCHEDULE A
### STATEMENT OF WORK (OUTBOUND TELESERVICES)

This Statement of Work ("SOW") between **Direct Energy LP.**, ("Direct Energy") and Total Marketing Concepts, Inc. ("Vendor") dated March 4, 2015 ("Effective Date") incorporates and is subject to the terms and conditions of the Teleservices Agreement dated March 4, 2015 (the "Agreement") between Direct Energy Services, LLC ("DES") and Vendor. All capitalized terms not defined herein shall have the meaning specified in the Agreement. Each of Vendor and Direct Energy may be referred to herein as a "Party" or, collectively, as "Parties." If this SOW is entered into by an affiliate of DES, then pursuant to Section 1.6 of the Teleservices Agreement this SOW along with the Teleservices Agreement shall constitute a separate agreement between the Parties hereto.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained and other good and valuable consideration (the receipt and sufficiency of which are acknowledged), the Direct Energy and Vendor agree:

1. Scope of Services. Vendor shall provide the services set forth below in accordance with the terms and conditions herein:

    a. Vendor will use its best efforts to identify and acquire customers for Direct Energy via outbound teleservices, and if applicable, inbound teleservices (the "Services") within the jurisdictions Direct Energy may dictate from time-to-time in writing (collectively, "Territory") in accordance with the terms and conditions set forth below.

    b. Vendor shall provide the Services for the Direct Energy customer segments ("Customer Segments") and Direct Energy telesales and/or telemarketing campaigns ("Campaign") set forth in **Exhibit A**.

    c. Vendor shall provide, and shall ensure that it's customer service representatives ("CSRs") provide the Services in accordance with the terms of this SOW, in a professional and business-like manner, consistent with leading standards and practices of the telesales industry, and in compliance with approved script materials provided by Direct Energy ("Scripts").

    d. Vendor shall provide the Services during the times and on the dates as follows (the "Program Hours"): Monday through Saturday between the hours of 8 AM (ET) and 11 PM (ET), except for the "holidays" set forth below, unless otherwise specified in writing by Direct Energy at least seven (7) business days before the date that is the subject of such writing or as agreed according to by the Parties. The Parties consider the following "holidays" for purposes of this SOW: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Eve, Christmas Day and New Year's Eve.

1

**Direct Energy**

e. Vendor shall recruit and organize a team of CSRs and ensure the staffing profile of CSRs is specific to the Services and consistent with the terms and conditions set forth herein and any separate instructions provided by Direct Energy in writing.

f. Vendor shall train and manage staff, employees, CSRs and associated resources, as required, to provide the Services in accordance with the Direct Energy's training instructions and materials.

g. Vendor shall facilitate "focus groups" at the Direct Energy's request to obtain direct feedback from third party customers regarding their contract experiences with Vendor and/or its CSRs.

h. Vendor shall call record and verify all telemarketing calls made or received by Services Provider and/or CSRs that result in sales to any third party ("Verified Sales").

i. Vendor shall maintain copies of telephone recordings in digital form (in ".wav" format or such other format as Direct Energy may require, the "Sound Files") and shall make two permanent digital backup copies to be stored by Vendor for the duration of the Term of this SOW or Agreement (whichever is longer) plus an additional five (5) years ("Sound Files Recordkeeping Period") and must provide the Sound Files to Direct Energy at the end of the Sound Files Recordkeeping Period in a format to be agreed upon by the Parties. Vendor shall store one of the copies of the Sound Files onsite for thirty (30) days and thereafter may store all copies at an offsite location.

j. Vendor shall deliver all Sound Files to Direct Energy on a daily basis to Direct Energy's file transfer protocol site according to the Direct Energy's security standards, which must include appropriate encryption and other security measures. Each day's Sound Files shall be delivered by 10:00am CT on the next day. At the request of Direct Energy, Vendor will provide a compact disk for each thirty (30) day period that contains all Sound Files for all calls during that period. In addition, Vendor shall deliver, in a manner specified by Direct Energy, promptly on request, individual or multiple Sound Files for the purpose of investigating any customer or regulatory complaints or requests.

k. Vendor shall provide a minimum of eight (8) call quality monitoring evaluations per CSR per calendar month using a call quality evaluation template that will be developed jointly between Direct Energy and Vendor.

l. Vendor shall provide a level of supervision for each CSR used to provide the Services that Direct Energy deems appropriate. Direct Energy expects the Vendor's program supervisor to spend 85-90% of his or her time worked during the Program Hours coaching and motivating CSRs, listening to telemarketing calls, and driving overall sales performance and sales quality improvements.

2



m. Vendor shall allow Direct Energy to be present during the Program Hours to assist with motivating, coaching and training CSRs and team managers, launching incentives, evaluating the Services and assisting with overall sales performance.

n. Vendor shall allow Direct Energy to specify the number of CSRs providing the Services at any time.

o. Vendor shall participate in a weekly two (2) hour calibration session between Direct Energy and Vendor's Management Team.

p. Vendor shall evaluate each recorded sale as it pertains to the verification portion of the Script and ensure all requirements are met verbatim.

q. Vendor shall provid complete daily sales file(s) to Direct Energy in a format acceptable to Direct Energy.

r. Vendor shall consult with Direct Energy to improve Scripts and advise of issues with respect to the Scripts to:

    i. ensure compliance with all applicable laws; and

    ii. manage any customer contacts in a manner to maximize the effective performance of each CSR.

s. Vendor shall perform the Services in a professional, honest and ethical manner, without engaging in any false, misleading or deceptive conduct.

t. Vendor shall adhere to those fiduciary standards, ethical practices, and standards of care and competence which are customary for professionals engaged in rendering the type of Services described herein, and any Direct Energy policies, including Direct Energy's Statement of Business Ethics, provided to Vendor from time to time.

u. Vendor shall provide all Services in accordance with all applicable laws, regulations and rules, including, without limitation, the Telephone Consumer Protection Act of 1991, as amended, and all accompanying regulations and rules.

v. Vendor shall arrange and maintain exclusive toll-free numbers for the Services performed hereunder (specific numbers) to facilitate tracking and reporting of outbound teleservices results, and if applicable, inbound teleservices results to Direct Energy.

2. **Location(s).** The Services described herein will be provided at the call center location(s) listed below:

3

**Direct Energy.**

       i.  ENTER Service Provider Address  4395 ST Johns Parkway, Sanford FL. 32771

             OR

      ii.  Enter second address

3. **Representatives.**

    Vendor Representative:

      **[Insert Representatives Titles & Contacts]**

    Direct Energy Representative:

        Vendor Manager – Hector Laya
        Sr. Vendor Manager – Jennifer Lee
        Procurement Manager – Brian Cain
        Sr. Director Call Centers – Jack Meek

4. **Term.**  This SOW will be effective as of the Effective Date and, unless earlier terminated in accordance with the terms set forth in this SOW or the Agreement, will continue through **[Enter Date]** (the "Initial Term").  This SOW shall be renewed automatically on a six (6) month consecutive basis (each a, "Renewal Term") following the end of the Initial Term unless a Party provides to the other Party notice of termination of this SOW at least sixty (60) days in advance of the date of expiration of the Initial Term or Renewal Term, as applicable (the Renewal Term(s), if any, along with the Initial Term, shall be referred to herein as the "Term"). During the Term, either party may terminate this SOW in accordance with the terms of the Agreement or if Vendor does not meet or exceed the Performance Metrics (such term defined below) as set forth below. Furthermore, either party may terminate any Campaign for any reason or no reason by providing thirty (30) days' prior written notice to the other party.

5. **Record Keeping.**  Vendor will retain on record during the Term of the SOW or Agreement (whichever is longer) plus an additional five (5) years all information related to leads sources, leads identities, inbound telesales calls, enrollments, and any third party consents required by applicable laws related to a lead and its subsequent outbound telesales call. Vendor shall make such information available to Direct Energy within one (1) business day of Direct Energy's request. Except as provided by law, and within the terms and conditions of this SOW, Direct Energy shall use such information solely in support of services rendered by Vendor hereunder, or in response to complaints or enrollment issues raised by any third party. Vendor will provide to Direct Energy any opt-out record for third parties contacted or solicited via this Services hereunder so Direct Energy can maintain its own internal do-not-call or do-not-email lists. Likewise, Direct Energy will provide to Vendor

4



any do-not-contact requests from third parties who previously contacted Direct Energy directly.

6. **Reporting.** Vendor shall provide the following reports daily, weekly and monthly:

   (a) Outbound Teleservices
   - i. Outbound performance report – details of report for outbound calling performance
   - ii. Agent Performance report – details of report for agents' performance
   - iii. Outbound Disposition Report – details of report for dialer disposition code
   - iv. Outbound Sales reports – Cumulative Details of the Sales activities
   - v. Outbound Agent Sales report – Agent level Details of the Sales activities
   - vi. Sales Per Hour reports – details regarding total number of Sales per hour per agent
   - vii. Production hour report – details of report for production hour monitoring
   - viii. Details of all compliance failures – Report detailing any compliance matter
   - ix. Training Service Activities report – Report regarding training schedules
   - x. Training Performance report - Report for new & reoccurring training performance
   - xi. Cost to Acquire report – details and costs associated with partner performance costs

   (b) Inbound Teleservices (if applicable)
   - i. Details of inbound Call statistics and performance
   - ii. Any other report requested by Direct Energy from time to time.
   - iii. Inbound intraday reporting.
   - iv. Inbound Center score card report
   - v. Variance to Actual reporting for month to date.
   - vi. Cap plan reporting w/ attrition
   - vii. Transfer rate % and dispositions
   - viii. QA reporting including compliance to PTG, DPP regulatory scripting.
   - ix. Training file. ( Class billable or non-billable, Attendance, number of hours) Back up for any training concerning bill backup data.

7. **Compensation Structure & Payment Terms.** The compensation structure and payment terms for the Services provided by Vendor shall be set forth in **Exhibit B** ("Compensation & Payment Terms").

8. **Performance Metrics.** The chart set forth in **Exhibit C** sets forth the minimum performance requirements required by Direct Energy for the provision of Services by Vendor (collectively, "Performance Metrics"). If Vendor does not meet any of the Performance Metrics at any time, Direct Energy shall have the right to immediately (i) terminate this SOW and/or (ii) modify the Compensation & Payment Terms.

9. **Additional Campaigns.** At any time and from time-to-time Direct Energy may request in writing that Vendor provide the Services for one or more additional campaigns ("Additional

5



Campaign(s)") for an initial thirty (30) calendar day ramp up period ("Ramp-Up Period"). During the Ramp-Up Period, the compensation structure and payment terms for the Services provided for the Additional Campaign(s) shall be mutually agreed to by the Parties. At the conclusion of the Ramp-Up Period, if Direct Energy requests that Vendor continue to provide the Services for the Additional Campaign(s), then (i) the compensation structure and payment terms shall be consistent with those terms set forth in Exhibit B and the Parties will amend Exhibit A to add such Additional Campaign.

**[Signatures on following page.]**

6



Each of the Parties represents and warrants that the signatory below has authority to sign this SOW on its behalf.

IN WITNESS WHEREOF, the Parties hereto have caused this SOW to be duly executed as of the Effective Date.

Direct Energy, LP.

Signature: _____

Print Name: Brian Cain

Title: Operations Category Manager

Total Marketing Concepts, Inc.

Signature: _____

Print Name: George Lonabaugh

Title: President

7

Confidential Information - Subject to Protective Order

Direct Energy 000064

 **Direct Energy.**

**EXHIBIT A**
**AUTHORIZED CUSTOMER SEGMENTS & CAMPAIGNS**

**Customer Segments**

- [Commercial or Business to Business Sales.
- Residential or Business to Consumer Sales.
- Appointment booking for Home Services.]

**Campaigns**

8

**Confidential Information - Subject to Protective Order**



## EXHIBIT B
## COMPENSATION STRUCTURE & PAYMENT TERMS

[Language & Table Below Exemplary only
and may vary depending on Services and LOB.]

<u>Compensation Structure</u>.  The table below sets forth the compensation that Vendor will receive from Direct Energy for [Billable Production Hours] and each [Lead Generated, Net Commercial Sale, Net Residential Sale and/or Net Service Appointment Ran] (collectively, "Compensation").

| TMC Pricing for Residential | Net Sale |
|---|---|
| Plan | $ |
| 12 months | $85 |
| 12 months+ DEPP plan | $100 |
| 24 months | $120 |
| 24 months + NEST | $140 |
| 24 months + NEST + DEPP plan | $150 |
| DE Pre-Paid (Power to Go) | $65 |

9



**Payment Terms.** For each calendar month, Vendor shall provide Direct Energy an invoice within five (5) business days of the end of such calendar month for the Compensation due to Vendor for all [Billable Production Hours] and each [Lead Generated, Net Commercial Sale, Net Residential Sale and/or Net Service Appointment Ran] during such calendar month ("Invoice"). The Invoice if undisputed by Direct Energy will be paid within forty-five (45) days of receipt.

**Defined Terms [Updated Depending on Services & LOB]**

(a)  Billable Production Hours
(b)  Lead Generated
(c)  Net Commercial Sale
(d)  Net Residential Sale
(e)  Net Service Appointment Ran
(f)  SPH or Net Sales Per Hour



10

**Confidential Information - Subject to Protective Order**

**Direct Energy 000067**



**EXHIBIT C**
**PERFORMANCE METRICS**

[Table Below Exemplary only and may vary depending on Services and LOB.]

| Metric | Definition | Calculation | Frequency | Target |
|---|---|---|---|---|
| Cost to Acquire (CTA) | The cost of a business to acquire a new customer. For this purpose, costs are defined as all costs incurred under the specific Call type inclusive of New Hire training, Inbound IVR & Talk time, commissions and production costs | The customer acquisition cost is calculated by dividing total acquisition costs by total new customers over a set period of time. | Daily, Weekly, Monthly, Quarterly | $90 - Residential $125 - Commercial $85 - Services |
| Conversion Rate | The sales conversion rate is defined as the total number of sales in relation to number of calls received over a specified period. | Number of sales in relation to number of calls initiated or received. | Daily, Weekly, Monthly, Quarterly | 50% |
| Total Sales Generated | Sales generated is defined as the total number of sales after all out of buyer remorse withdrawls. | Total Number of Net Sales (Verified) divided by the sales generated by the live Agents. | Daily, Weekly, Monthly | 70% |

11

Direct Energy 000068



# EXHIBIT 2

**STATEMENT OF WORK (OPT-IN LEADS)**

**to Teleservices Agreement between Total Marketing Concepts, Inc. and Direct Energy Services, LLC**

This Statement of Work for Opt-In Leads ("SOW") between **Direct Energy, LP** and its U.S. Affiliates (collectively "Direct Energy") and Total Marketing Concepts, Inc. ("TMC") dated March 14th, 2016 ("Effective Date") incorporates and is subject to the terms and conditions of the Teleservices Agreement between Direct Energy Services, LLC, an affiliate of Direct Energy, and TMC dated March 4, 2015 (the "Agreement"). All capitalized terms not defined herein shall have the meaning specified in the Agreement. To the extent of any conflict between the Agreement and this SOW (Opt-In Leads), this SOW (Opt-In Leads) controls. TMC and Direct Energy may each be referred to herein as a "Party" or, collectively, as "Parties."

1. Term:  The Parties agree to a 30 calendar-day trial period beginning on the date upon which Services commence, as mutually determined by the Parties ("Trial Period"). During the Trial Period, either Party may terminate this SOW for any reason upon forty-eight (48) hours' written notice to the other Party. The Parties will negotiate in good faith and determine if the Services will continue past the Trial Period upon execution of a written agreement between the Parties reflecting mutually agreeable commercial terms for performance of the Services. If this SOW continues in effect beyond the Trial Period, either Party may terminate this SOW upon 30 days' written notice to the other Party, without penalty.

2. Territories:  TMC shall provide Services (defined below) in the State of Texas, and the US North Region (Connecticut, Delaware, District of Columbia, Illinois, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Ohio, Pennsylvania)

3. Services:

**Program Name:** Test Campaign with DMI Partners for Co-Registration (Co-Reg) Opt-in Leads

**Program Offering:**
- TMC named sub-contractor DMI Partners will conduct a test with TMC to provide opt-in leads for the purpose of selling Direct Energy products and services in the State of Texas and the US North Region.
- DMI will provide co-registration leads for potential customers who have opted-in through an online advertisement to receive a call regarding the specific offers determined by Direct Energy for the market in question.
- TrustedForm certificates will provide independent proof of consent of the opt-in by the consumer for compliance purposes.
- Anticipated initial volume will be 1000 leads per calendar day, additional volume to be

1

determined based on the sales performance and final cost per acquisition ("CPA").

**Payment:**
**TMC will invoice Direct Energy for the leads and will pay DMI Partners directly.**

**Leads are priced at $0.50 plus the Trusted Form Fee based on volume shown in the Table below. We are anticipating falling between $0.54 and $0.575 per lead based on the chart below.**

| Monthly Tier | Included Volume (Total monthly claims) | Overage Rate (per claim) |
|---|---|---|
| $500.00 | 2,500 | $0.200 |
| $750.00 | 5,000 | $0.150 |
| $1,000.00 | 10,000 | $0.100 |
| $1,500.00 | 20,000 | $0.075 |
| $3,000.00 | 50,000 | $0.060 |
| $4,000.00 | 100,000 | $0.040 |
| $7,500.00 | 500,000 | $0.020 |

Total Marketing Concepts, Inc. (TMC)

By: _____

Name: Tyson Chavarie

Direct Energy, LP on behalf of
itself and its U.S. Affiliates

By: _____

Name: STEPHEN HAND

Confidential Information - Subject to Protective Order

Examples of the opt-in ad and permission language, as it can appear on various websites, are attached to this SOW as "Exhibit A" for Tier 1 content providing websites, and "Exhibit B" for Tier 2 consumer survey websites (Note that owing to design and layout differences amongst websites, the look and placement of the opt-in ad and permission language may vary, but the content will remain as stated in the paragraph above and as shown in Exhibits A and B.)

Records of such "opt-in" consumers will be maintained and retained by TMC and/or its sub-contractor DMI Partners in accordance with Federal and State laws regarding such permissions and records, and in compliance with the U.S. Federal E-Sign Act. At a minimum, the records will include: First and last name of opt-in party, phone number of opt-in party, zip code of residence of opt-in party, IP address of computer used by opt-in party, date/time stamp of opt-in, confirmation that the opt-in party is age 21 years or older. Such records will be made available to Direct Energy upon request.

No outbound sales calls will be made by TMC or DMI Partners under this program to cellular phones, or phones on the FCC wireless/wireline ported list, to consumers indicating by zip code that they reside in the states of New Jersey, Arizona, or Wyoming, as per the laws in those states.

No outbound sales calls will be made by TMC or DMI Partners under this program to cellular phones, or phones on the FCC wireless/wireline ported list, using automated dialer equipment, or systems capable of storing telephone numbers and dialing those numbers, unless prior written consent has been provided by a party who is age 21 years or older.

TMC or DMI Partners shall arrange and maintain exclusive toll-free numbers for this program (program-specific numbers), or some other mechanism, to facilitate tracking and reporting of call results to Direct Energy.

It is the opt-in permission that permits a subsequent outbound telesales call that is the essential service being provided by TMC or DMI Partners to Direct Energy under this SOW.

4. <u>Enrollments</u>:  Completed consumer enrollments and applicable third-party verifications shall be defined in and governed by the terms and conditions of the Agreement.

5. <u>Record Keeping</u>:  TMC and/or its sub-contractor DMI Partners will retain on record for no less than five (5) years all statute-required information related to leads sources, leads identities, enrollments, and applicable opt-in information related to that lead and its subsequent inbound or outbound telesales call. TMC or DMI Partners shall make such information available to Direct Energy upon request. Except as provided by law, and within the terms and conditions of the agreement, Direct Energy shall use such information solely in support of Services rendered by TMC and/or TMC sub-contractor DMI Partners, or in response to complaints or enrollment issues raised by that consumer (lead) or Direct Energy.

TMC, in conjunction with its sub-contractor DMI Partners, will provide to Direct Energy any opt-out record for consumers contacted or solicited via this program so Direct Energy can maintain its own internal do-not-call or do-not-email lists. Likewise, Direct Energy will provide to TMC any do-not-contact requests from consumers who contact Direct Energy directly. TMC in turn will inform its sub-contractor DMI Partners of any do-not-contact requests from opt-in consumers under this program that are received by TMC and/or Direct Energy.

6. <u>Reporting</u>:  Unless otherwise noted standard reporting per the Agreement.

7. <u>Adjustments, Modifications, and Amendments</u>:

The intent of the Services under this SOW's Test Campaign  is to create and build an effective opt-in campaign whereby TMC can increase energy telesales for Direct Energy, within a viable framework for all Parties.

As the Test Campaign proceeds, it may require adjustments in marketing volumes, schedules, geographies, and compensation in order to meet the viability and sales goals envisioned, which is in keeping with the nature of test programs.

Any adjustments, modifications or amendments to this Test Campaign shall be conducted in writing and shall not affect the remaining terms of this SOW or the Agreement.



8. Copyrights, Trademarks, and Properties:

Direct Energy hereby grants to TMC and its sub-contractor DMI Partners a non-exclusive, non-transferable, right, during the term of this SOW, and solely for the purposes of fulfillment of the terms of this SOW, to display the Direct Energy company name (attached as "Exhibit A") in online advertising to solicit opt-in consumers. TMC affirms and acknowledges that Direct Energy owns and retains all use and distribution rights, titles, interest, and ownership of the Direct Energy name.

Confidential Information - Subject to Protective Order

Direct Energy 000095

EXHIBIT "A"



Confidential Information - Subject to Protective Order





EXHIBIT "B"





Sample Ad Flow

**vindale research**



## New Member Questionnaire

New member signup

Congratulations! You have qualified for a membership to Vindale Research. Please take a minute to complete the new member questionnaire below. Then answer the questions that appear and you will become a member.

Your answers will be held in complete confidence and never shared with anyone.

Just select "Yes" or "No" next to each of the questions below and then click the confirm button below to complete your membership.

Do you have a good idea or invention that you would like to make a reality?   ☑ Yes   ☐ No

**Direct Energy - YES!**

Start saving today - lock in metal fee to get a free Nest smart thermostat ($249 value) with our 24 month contract.

### Contact Information

First Name

Last Name

ZIP Code

E-mail Address

Phone Number







# EXHIBIT C

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
IN AND FOR SEMINOLE COUNTY, FLORIDA

BIG ELK FUNDING, LLC, a Delaware limited
liability company,

      Plaintiff,

v.                                      CASE NO: 2019-CA-002536

TOTAL MARKETING CONCEPTS, INC.,
FLORIDA COMMUNITY BANK, N.A.,
XEROX FINANCIAL SERVICES, LLC,
QUEEN FUNDING, LLC, BUSINESS
ADVANCE, LLC, CORPORATION SERVICE
COMPANY, AS REPRESENTATIVE,
AFFILIATED FUNDING CORPORATION,
CAPSTONE CREDIT, LLC, DISCOUNT LONG
DISTANCE, LLC, SOUTHERN NEVADA
FINANCE, LLC, INTERNAL REVENUE
SERVICE, BROADBAND DYNAMICS, LLC,
STATE OF FLORIDA DEPARTMENT OF
REVENUE, GTR SOURCE LLC,

      Defendants.

_____/

## ORDER GRANTING EXPEDITED MOTION FOR REHEARING AND RESETTING FORECLOSURE SALE

**THIS CAUSE** came before the Court on January 30, 2020 at 9:30 a.m. upon the

*Expedited Motion for Rehearing* (the "Motion") filed by Plaintiff, **BIG ELK FUNDING, LLC**

(the "Plaintiff"). The Court has reviewed the Motion, having noted the Motion and notice of

hearing for the Motion were duly served and noticed, heard the argument of counsel present at

the hearing, it is

**HEREBY ORDERED AND ADJUDGED AS FOLLOWS:**

      1.    The Motion is **GRANTED.**    Additionally, the terms and conditions of this

Court's *Order Granting Big Elk Funding, LLC's Expedited Motion to Amend Order Appointing*

*Receiver,* entered on January 30, 2020 is hereby incorporated and made a part of this order.

2.      The Final Judgment as to Count III dated November 26, 2019 is hereby reinstated (the "Final Judgment").

3.      If the total sum with interest at the rate described in numbered paragraph 3 of the Final Judgment above and all costs accrued subsequent to this judgment are not paid, the Clerk of this Court shall sell the Personal Property at public sale on  *March 24, 2020*  at *11 :00* a.m./p.m. to the highest bidder for cash in accordance with section 45.031, Florida Statutes at: Seminole County Courthouse, 301 North Park Avenue, Room S201 (Second Floor of South Tower), Sanford, Florida 32771.

4.      Plaintiff shall advance all subsequent costs of this action and shall be reimbursed for them by the clerk if Plaintiff is not the purchaser of the property for sale; provided, however, that the purchaser of the property for sale shall be responsible for the documentary stamps payable on the certificate of title. If Plaintiff is the purchaser, the clerk shall credit Plaintiff's bid with the total sum with interest and costs accruing subsequent to this judgment or such part of it as is necessary to pay the bid in full.

5.      On the filing of the certificate of title, the clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of Plaintiff's costs; second, documentary stamps affixed to the certificate; third, the total sum due to Plaintiff less the items paid, plus interest at the rate prescribed in numbered paragraph 3 from this date to the date of the sale; and by retaining any remaining amount pending the further order of this Court.

6.      On a certificate of sale, Defendants and any and all persons claiming by, through, under or against any of them shall be foreclosed of all estate or claim in the Personal Property. Upon the filing of the certificate of title, the person named on the certificate of title shall be let into possession of the property.

2

7. Jurisdiction of this action is retained to enter further orders that are proper, including, without limitation, a deficiency judgment.

8. Plaintiff may assign this judgment, credit bid, and/or its successful bid by the filing of an assignment without further Order of the Court.

**IF THE PERSONAL PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THE FINAL JUDGMENT.**

**IF YOU ARE A SUBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN SIXTY (60) DAYS AFTER THE SALE. IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.**

9. The Receiver appointed in this action is directed to make a final report and accounting and filed a Notice of Termination of the receivership within thirty (30) days of the date of foreclosure sale scheduled pursuant to this Final Judgment. Unless objection is filed with the Court within five (5) court days following the filing of the Notice of Termination with the Clerk of Court, the Receiver appointed in this case shall be discharged and receivership bond discharged and returned to the Receiver. Upon filing of the Notice of Termination of the receivership, the Receiver is directed to transfer possession of all of the Personal Property remaining the receivership estate, and any documents or records relating to such property, to the designated representative of TMC (except in the event of a sale or other transaction that disposes of all of the Property, in which case the transfer of possession shall be made to the person or entity that acquired ownership of the Property) and to submit a final report and accounting pursuant to applicable law, unless such final report and accounting are waived by the then parties to this action.

3

IT IS FURTHER ORDERED that except by leave of this Court, all lessors, lessees, customers/clients/patients, principles, investors, suppliers and/or creditors seeking to enforce any claim, right, or interest against TMC and/or the Personal Property are barred by this Final Judgment from using any self-help or doing anything whatsoever to interfere in any way with the Receiver in the conduct of his/her duties under this order.

DONE AND ORDERED in Chambers, Seminole County, Florida this _____ day of _____ 2020.

ORIGINAL SIGNED ON

FEB 18 2020

_____
Honorable Melanie Chase
BY MELANIE CHASE
CIRCUIT COURT JUDGE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on _February 18_, 2020, a true and correct copy of the foregoing has been filed through the Florida Courts eFiling Portal and furnished via U.S. mail to:

Total Marketing Concepts, Inc.
c/o Patrick Crocker, Esq.
The Kalamazoo Building
107 W. Michigan Avenue, 4th Floor
Kalamazoo, MI 49007

Synovus Bank f/k/a Florida Community Bank, N.A.
2500 Weston Road, Suite 300
Weston, Florida 33331

Xerox Financial Services, LLC
1201 Hayes Street
Tallahassee, Florida 32301

State of Florida, Dept. of Revenue
Orlando Service Center
400 W. Robinson Street, Suite N302
Orlando, Florida 32801-1759

Southern Nevada Finance, LLC
c/o Bradley J. Anderson
315 E. Robinson Street, Suite 600
Orlando, Florida 3000

4

Internal Revenue Service
U.S. Dept. of Justice
950 Pennsylvania Avenue, NW
Room 2242
Washington, DC 20530-000

Discount Long Distance, LLC
c/o Jack M. Brennen, Esq.
301 E. Pine Street, Suite 1400
Orlando, Florida 32801

Capstone Credit, LLC
810 7th Avenue, 27th Floor
New York, NY 10019

Business Advance, LLC
325 Division Avenue, Suite 201
Brooklyn, NY 11211

Broadband Dynamics, LLC
c/o Corporation Service Company
1201 Hays Street
Tallahassee, Florida 32301

Affiliated Funding Corporation
2614 E. Tuxedo Circle
Sandy, Utah 84093

Corporation Service Company, as Representative
801 Adial Stevenson Drive
Springfield, IL 62703

Queen Funding, LLC
Israel Gross
2221 Northeast 164th Street, Suite 1144
N. Miami Beach, Florida 33160

GTR Source, LLC
1006 Monmouth Avenue
Lakewood, New Jersey 08701

/s/Jennifer Jones

_____
Judicial Assistant/Attorney

5

# EXHIBIT D

Filing # 106530577 E-Filed 04/21/2020 05:10:54 PM

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
IN AND FOR SEMINOLE COUNTY, FLORIDA

BIG ELK FUNDING, LLC, a Delaware limited
    liability company,

        Plaintiff,

v.                                CASE NO: 2019-CA-002536

TOTAL MARKETING CONCEPTS, INC.,
FLORIDA COMMUNITY BANK, N.A., XEROX
FINANCIAL SERVICES, LLC, QUEEN
FUNDING, LLC, BUSINESS ADVANCE, LLC,
CORPORATION SERVICE COMPANY, AS
REPRESENTATIVE, AFFILIATED FUNDING
CORPORATION, CAPSTONE CREDIT, LLC,
DISCOUNT LONG DISTANCE, LLC,
SOUTHERN NEVADA FINANCE, LLC,
INTERNAL REVENUE SERVICE,
BROADBAND DYNAMICS, LLC, STATE OF
FLORIDA DEPARTMENT OF REVENUE, GTR
SOURCE LLC,

        Defendants.

_____/

## PLAINTIFF'S MOTION TO RESCHEDULE FORECLOSURE SALE

Plaintiff, **BIG ELK FUNDING, LLC** ("Plaintiff" or "Big Elk"), by and through its

undersigned counsel, and pursuant to Rule 1.530, Florida Rules of Civil Procedure, hereby moves,

to reschedule the foreclosure sale, and as grounds therefore states as follows:

    1.      On November 27, 2019, the Court entered a judgment in favor of Big Elk and

against defendant, Total Marketing Concepts, Inc. ("TMC"), in the amount of the $8,589,247.23

(the "Judgment"). No party to this case objected to entry of the Judgment. By virtue of the

Judgment, the Court also set a public sale of TMC's Personal Property for January 16, 2020 (the

"Foreclosure Sale").

    2.      On December 31, 2019, Direct Energy, LP, an alleged interested third-party in this

case, filed its *Verified Motion for Preliminary Injunction* in the United States District Court for the

Southern District of Texas, Houston Division, seeking to prevent the destruction of key records of telemarketing calls made by TMC (a Direct Energy vendor) to certain class-action plaintiffs about Direct Energy's services (the "Direct Energy Records"). As it relates to this case, Direct Energy specifically sought to enjoin Big Elk from proceeding with the Foreclosure Sale until such time as the Direct Energy Records could be transmitted to Direct Energy.

3.      On January 10, 2020, the Court entered its *Order Vacating Final Judgment as to Count III*, which order provided that the Foreclosure Sale was cancelled.

4.      On February 20, 2020, the Court entered its *Order Granting Expedited Motion for Rehearing and Resetting Foreclosure Sale*, which order rescheduled the Foreclosure Sale for March 24, 2020.

5.      Due the effects of the COVID-19 pandemic, on March 19, 2020, the Chief Judge for the Eighteenth Judicial Circuit of Florida entered  Amended Administrative Order AO-20-15 cancelling all foreclosure sales through April 15, 2010.

6.      On April 6, 2020, the Chief Judge entered Second Administrative Order AO-20-15 the cancellation of foreclosure sales through May 29, 2020.

7.      Big Elk requests that this Court reschedule the Foreclosure Sale for a date as soon as practicable after May 29, 2020.

**WHEREFORE**, Plaintiff respectfully requests the Court respectfully request the Court to reset the foreclosure sale to a date after May 29, 2020 and granting such other and further relief as this Court deems just and appropriate.

DATED: April 21, 2020.

*/s/ Justin M. Luna, Esq.*
JUSTIN M. LUNA, ESQ.
Florida Bar No. 0037131
jluna@lathamluna.com
DANIEL A. VELASQUEZ, ESQ.
Florida Bar No. 0098158

dvelasquez@lathamluna.com
**Latham, Luna, Eden & Beaudine, LLP**
111 N. Magnolia Ave., Suite 1400
Orlando, Florida 32801
Tel: 407-481-5800
Fax: 407-481-5801
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 21, 2020, I electronically filed the foregoing with the Clerk of the Courts using the Florida Courts E-Filing Portal, and provided copies via e-mail and US Mail to: Total Marketing Concepts, Inc., c/o Patrick Crocker, Esq., Crocker & Crocker, The Kalamazoo Building, 107 W. Michigan Avenue, 4th Floor, Kalamazoo, Michigan 49007, patrick@crockerlawfirm.com; Direct Energy, LP, c/o Michael D. Matthews, 1001 Fannin Street, Suite 2700, Houston, Texas, 77002, matt.matthews@mhllp.com; William.thomas@mhllp.com; Direct Energy, LP, c/o Miriam J. Rosenblatt, 2101 N.W. Corporate Blvd., Suite 316, Boca Raton, Florida 33431; Jeremiah Foster, Resolute Commercial, 7201 E. Camelback Road, Suite 250, Scottsdale, Arizona 85251, jfoster@resolutecommercial.com; Discount Long Distance, LLC, c/o Jack M. Brennan, Esq., GrayRobinson, P.A., 301 E. Pine Street, Suite 1400, Orlando, Florida 32801, jack.brennan@gray-robinson.com; Southern Nevada Finance, c/o Bradley J. Anderson, Esq., Kevin P. Robinson, Esq., Zimmerman, Kiser & Sutcliffe, P.A., 315 E. Robinson Street, Suite 600 (32801), P.O. Box 3000, Orlando, Florida 32802, banderson@akslawfirm.com, krobinson@zkslawfirm.com, service@zkslawfirm.com; Amos Financial, LLL, c/o Andrew Fulton, IV, 1665 Palm Beach Lakes Blvd., Suite 1000, West Palm Beach, Florida 33401, eservice@kelleylawoffice.com; Lara R. Fernandez, Esq., Trenam Law, 101 East Kennedy Boulevard, Suite 2700, Tampa, Florida 33602 and lfernandez@trenam.com a/f Synovous Bank; and via U.S. Mail to: Florida Community Bank, N.A., 2500 Weston Road, Suite 300, Weston, Florida 33331; Xerox Financial Services, LLC, c/o Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301; Queen Funding, LLC, c/o Israel Gross, 2221 NE 164th Street, Miami Beach, FL 33160; Business Advance, LLC, c/o USACORP, Inc., 325 Division Avenue, Suite 201, Brooklyn, New York 11211; Corporation Service Company, as representative (CSC), 801 Adial Stevenson Drive, Springfield, IL 62703; Affiliated Funding Corporation, c/o Ronald N. Hyatt, 2614 E. Tuxedo Circle, Sandy, UT 84093; Capstone Credit, LLC, 810 7th Avenue, 27th Floor, New York, New York 10019; Internal Revenue Service (IRS), U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Room 2242,Washington, DC 20530-0001; Broadband Dynamics, LLC, c/o Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301-2525; GTR SOURCE LLC, 211 Boulevard of Americas, Suite 205, Lakewood, NJ 08701-4777; and State of Florida, Department of Revenue, 2450 Shumard Oaks Blvd., Tallahassee, Florida 32399.

*/s/ Justin M. Luna*
Justin M. Luna, Esq.

# EXHIBIT E

# LATHAM, LUNA, EDEN & BEAUDINE, LLP
### ATTORNEYS AT LAW

MICHAEL J. BEAUDINE
MICHAEL G. CANDIOTTI
JAN ALBANESE CARPENTER
DANIEL H. COULTOFF
JENNIFER S. EDEN
DOROTHY F. GREEN
JOSHUA D. GROSSHANS
JOSHUA L. HAWES
KATHRYN A. HUYNH

111 NORTH MAGNOLIA AVENUE, SUITE 1400
ORLANDO, FLORIDA 32801
POST OFFICE BOX 3353
ORLANDO, FLORIDA 32802
TELEPHONE: (407) 481-5800
FACSIMILE: (407) 481-5801
WWW.LATHAMLUNA.COM

BRUCE D. KNAPP
PETER G. LATHAM
*JUSTIN M. LUNA
PATRICIA R. McCONNELL
LORI T. MILVAIN
KRISTEN E. TRUCCO
CHRISTINA Y. TAYLOR
DANIEL A. VELASQUEZ
*FRANK M. WOLFF

DIRECT DIAL: 407-481-5804
EMAIL JLUNA@LATHAMLUNA.COM

June 10, 2020

\* BOARD CERTIFIED
   BUSINESS BANKRUPTCY ATTORNEY

Honorable Melanie Chase
Seminole County Courthouse
301 N. Park Avenue
Sanford, FL 32771

> Re:   Big Elk Funding, LLC v. Total Marketing Concepts, Inc., et al.
>       Case No. 2019-CA-002536

Dear Judge Chase:

Enclosed for your consideration is a proposed order granting Plaintiff's Motion to Reschedule Foreclosure Sale (the "Motion"). No party objects to the entry of the Motion. However, the Receiver has previously asserted an oral objection to a hearing on the Motion but has not filed an objection with the Court.

In light of the Court shutdown and the Court not having any short matter hearings, Plaintiff submits this order for consideration and approval to simply set the foreclosure sale for commercial personal property that has been cancelled and re-set twice due to COVID as well as the Texas matter.

Thank you for your consideration. Please contact me if you have any questions.

Sincerely,

Justin M. Luna

Enclosure
JML/wrt
cc:    All Counsel of Record

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
IN AND FOR SEMINOLE COUNTY, FLORIDA

BIG ELK FUNDING, LLC, a Delaware limited
liability company,

Plaintiff,

v.                                                    CASE NO:  2019-CA-002536

TOTAL   MARKETING   CONCEPTS,   INC.,
FLORIDA COMMUNITY BANK, N.A., XEROX
FINANCIAL     SERVICES,     LLC,     QUEEN
FUNDING, LLC, BUSINESS ADVANCE, LLC,
CORPORATION   SERVICE   COMPANY,   AS
REPRESENTATIVE,   AFFILIATED   FUNDING
CORPORATION, CAPSTONE CREDIT, LLC,
DISCOUNT     LONG     DISTANCE,     LLC,
SOUTHERN     NEVADA     FINANCE,     LLC,
INTERNAL          REVENUE          SERVICE,
BROADBAND DYNAMICS, LLC, STATE OF
FLORIDA DEPARTMENT OF REVENUE, , GTR
SOURCE LLC,

          Defendants.
_____ /

## <u>ORDER GRANTING PLAINTIFF'S MOTION TO RESCHEDULE FORECLOSURE SALE</u>

**THIS CAUSE** having come before the Court upon Plaintiff's, **BIG ELK FUNDING,**

**LLC** ("Plaintiff"), Motion to Reschedule Foreclosure Sale (the "Motion"), the Court having

reviewed and considered the Motion, the record, and noting the position of the parties including

the Reciver, and being otherwise duly advised in the premises, it is hereby

**ORDERED AND ADJUDGED** as follows:

1.      The Motion is **GRANTED**.

2.      If the total sum with interest at the rate described in numbered paragraph 3 of the

Final Judgment as to Count III dated November 26, 2019 and all costs accrued subsequent to this

judgment are not paid, the Clerk of this Court shall sell the Personal Property at public sale on

_____, 2020 at ____:___ a.m./p.m. to the highest bidder for cash in accordance with section 45.031, Florida Statutes at: Seminole County Courthouse, 301 North Park Avenue, Room S201 (Second Floor of South Tower), Sanford, Florida 32771.

3.     Plaintiff shall advance all subsequent costs of this action and shall be reimbursed for them by the clerk if Plaintiff is not the purchaser of the property for sale; provided, however, that the purchaser of the property for sale shall be responsible for the documentary stamps payable on the certificate of title. If Plaintiff is the purchaser, the clerk shall credit Plaintiffs bid with the total sum with interest and costs accruing subsequent to this judgment or such part of it as is necessary to pay the bid in full.

4.     On the filing of the certificate of title, the clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of Plaintiffs costs; second, documentary stamps affixed to the certificate; third, the total sum due to Plaintiff less the items paid, plus interest at the rate prescribed in numbered paragraph 3 from this date to the date of the sale; and by retaining any remaining amount pending the further order of this Court.

5.     On a certificate of sale, Defendants and any and all persons claiming by, through, under or against any of them shall be foreclosed of all estate or claim in the Personal Property. Upon the filing of the certificate of title, the person named on the certificate of title shall be let into possession of the property.

6.     Jurisdiction of this action is retained to enter further orders that are proper, including, without limitation, a deficiency judgment.

7.     Plaintiff may assign this judgment, credit bid, and/or its successful bid by the filing of an assignment without further Order of the Court.

**IF THE PERSONAL PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THE FINAL JUDGMENT.**

**IF YOU ARE A SUBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN SIXTY (60) DAYS AFTER THE SALE. IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.**

8.     The Receiver appointed in this action is directed to make a final report and accounting and filed a Notice of Termination of the receivership within thirty (30) days of the date of foreclosure sale scheduled pursuant to this Final Judgment. Unless objection is filed with the Court within five (5) court days following the filing of the Notice of Termination with the Clerk of Court, the Receiver appointed in this case shall be discharged and receivership bond discharged and returned to the Receiver. Upon filing of the Notice of Termination of the receivership, the Receiver is directed to transfer possession of all of the Personal Property remaining the receivership estate, and any documents or records relating to such property, to the designated representative of TMC ( except in the event of a sale or other transaction that disposes of all of the Property, in which case the transfer of possession shall be made to the person or entity that acquired ownership of the Property) and to submit a final report and accounting pursuant to applicable law, unless such final report and accounting are waived by the then parties to this action.

**DONE AND ORDERED IN CHAMBERS,** in Sanford, Seminole County, Florida, this _____ day of June, 2020.

**IT IS FURTHER ORDERED** that except by leave of this Court, all lessors, lessees, customers/clients/patients, principles, investors, suppliers and/or creditors seeking to enforce any claim, right, or interest against TMC and/or the Personal Property are barred by this Final

Judgment from using any self-help or doing anything whatsoever to interfere in any way with the Receiver in the conduct of his/her duties under this order.

**DONE AND ORDERED** in Chambers, Seminole County, Florida this _____ day of June, 2020.

_____

Honorable Melanie Chase

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June ___ , 2020, a true and correct copy of the foregoing has been filed through the Florida Courts eFiling Portal and furnished via U.S. mail to:

Total Marketing Concepts, Inc.
c/o Patrick Crocker, Esq.
The Kalamazoo Building
107 W. Michigan A venue, 4th Floor
Kalamazoo, MI 49007

Synovus Bank f/k/a Florida Community Bank, N.A.
2500 Weston Road, Suite 300
Weston, Florida 33331

Xerox Financial Services, LLC
1201 Hayes Street
Tallahassee, Florida 32301

State of Florida, Dept. of Revenue
Orlando Service Center
400 W. Robinson Street, Suite N302
Orlando, Florida 32801-1759

Southern Nevada Finance, LLC
c/o Bradley J. Anderson
315 E. Robinson Street, Suite 600
Orlando, Florida 3000

Internal Revenue Service
U.S. Dept. of Justice
950 Pennsylvania A venue, NW
Room 2242
Washington, DC 20530-000

Discount Long Distance, LLC
c/o Jack M. Brennen, Esq.
301 E. Pine Street, Suite 1400
Orlando, Florida 32801

Capstone Credit, LLC
810 7th Avenue, 27th Floor
New York, NY 10019

Business Advance, LLC
325 Division Avenue, Suite 201
Brooklyn, NY 11211

Broadband Dynamics, LLC
c/o Corporation Service Company
1201 Hays Street
Tallahassee, Florida 32301

Affiliated Funding Corporation
2614 E. Tuxedo Circle
Sandy, Utah 84093

Corporation Service Company, as Representative
801 Adial Stevenson Drive
Springfield, IL 62703

Queen Funding, LLC
Israel Gross
2221 Northeast 164th Street, Suite 1144
N. Miami Beach, Florida 33160

GTR Source, LLC
1006 Monmouth A venue
Lakewood, New Jersey 08701

Kirby McDonough, Esq.
Spencer Fane LLP
201 N. Franklin Street, Suite 2150
Tampa, FL 33602

_____
Judicial Assistant/Attorney

# EXHIBIT F

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
IN AND FOR SEMINOLE COUNTY, FLORIDA

BIG ELK FUNDING, LLC, a Delaware limited
liability company,

Plaintiff,

v.                                                                      CASE NO:   2019-CA-002536

TOTAL   MARKETING   CONCEPTS,   INC.,
FLORIDA COMMUNITY BANK, N.A., XEROX
FINANCIAL     SERVICES,     LLC,     QUEEN
FUNDING, LLC, BUSINESS ADVANCE, LLC,
CORPORATION   SERVICE   COMPANY,   AS
REPRESENTATIVE, AFFILIATED FUNDING
CORPORATION,   CAPSTONE   CREDIT,   LLC,
DISCOUNT      LONG      DISTANCE,      LLC,
SOUTHERN     NEVADA     FINANCE,     LLC,
INTERNAL            REVENUE            SERVICE,
BROADBAND DYNAMICS, LLC, STATE OF
FLORIDA DEPARTMENT OF REVENUE, , GTR
SOURCE LLC,

          Defendants.

_____/

**ORDER GRANTING PLAINTIFF'S MOTION TO RESCHEDULE FORECLOSURE SALE**

          **THIS CAUSE** having come before the Court upon Plaintiff's, **BIG ELK FUNDING,**

**LLC** ("Plaintiff"), Motion to Reschedule Foreclosure Sale (the "Motion"), the Court having

reviewed and considered the Motion, the record, and noting the position of the parties including

the Receiver, and being otherwise duly advised in the premises, it is hereby

          **ORDERED AND ADJUDGED** as follows:

          1.        The Motion is **GRANTED**.

          2.        If the total sum with interest at the rate described in numbered paragraph 3 of the

Final Judgment as to Count III dated November 26, 2019 and all costs accrued subsequent to this

judgment are not paid, the Clerk of this Court shall sell the Personal Property at public sale on July 14, 2020 at 11:00 a.m. to the highest bidder for cash in accordance with section 45.031, Florida Statutes at: Seminole County Courthouse, 301 North Park Avenue, Room S201 (Second Floor of South Tower), Sanford, Florida 32771.

3.      Plaintiff shall advance all subsequent costs of this action and shall be reimbursed for them by the clerk if Plaintiff is not the purchaser of the property for sale; provided, however, that the purchaser of the property for sale shall be responsible for the documentary stamps payable on the certificate of title. If Plaintiff is the purchaser, the clerk shall credit Plaintiffs bid with the total sum with interest and costs accruing subsequent to this judgment or such part of it as is necessary to pay the bid in full.

4.      On the filing of the certificate of title, the clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of Plaintiffs costs; second, documentary stamps affixed to the certificate; third, the total sum due to Plaintiff less the items paid, plus interest at the rate prescribed in numbered paragraph 3 from this date to the date of the sale; and by retaining any remaining amount pending the further order of this Court.

5.      On a certificate of sale, Defendants and any and all persons claiming by, through, under or against any of them shall be foreclosed of all estate or claim in the Personal Property. Upon the filing of the certificate of title, the person named on the certificate of title shall be let into possession of the property.

6.      Jurisdiction of this action is retained to enter further orders that are proper, including, without limitation, a deficiency judgment.

7.      Plaintiff may assign this judgment, credit bid, and/or its successful bid by the filing of an assignment without further Order of the Court.

**IF THE PERSONAL PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THE FINAL JUDGMENT.**

**IF YOU ARE A SUBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN SIXTY (60) DAYS AFTER THE SALE. IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.**

8.     The Receiver appointed in this action is directed to make a final report and accounting and filed a Notice of Termination of the receivership within thirty (30) days of the date of foreclosure sale scheduled pursuant to this Final Judgment. Unless objection is filed with the Court within five (5) court days following the filing of the Notice of Termination with the Clerk of Court, the Receiver appointed in this case shall be discharged and receivership bond discharged and returned to the Receiver. Upon filing of the Notice of Termination of the receivership, the Receiver is directed to transfer possession of all of the Personal Property remaining the receivership estate, and any documents or records relating to such property, to the designated representative of TMC ( except in the event of a sale or other transaction that disposes of all of the Property, in which case the transfer of possession shall be made to the person or entity that acquired ownership of the Property) and to submit a final report and accounting pursuant to applicable law, unless such final report and accounting are waived by the then parties to this action.

**IT IS FURTHER ORDERED** that except by leave of this Court, all lessors, lessees, customers/clients/patients, principles, investors, suppliers and/or creditors seeking to enforce any claim, right, or interest against TMC and/or the Personal Property are barred by this Final Judgment from using any self-help or doing anything whatsoever to interfere in any way with the Receiver in the conduct of his/her duties under this order.

> **DONE AND ORDERED** in Seminole County, Florida on Monday, June 15, 2020.

59-2019-CA-002536 06/15/2020 01:27:51 PM

Melanie Chase, Circuit Judge
59-2019-CA-002536 06/15/2020 01:27:51 PM

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on Monday, June 15, 2020, a true and correct copy of the foregoing has been filed through the Florida Courts eFiling Portal. Copies provided via e-service only. Moving party is responsible for service of all non-registered parties.

Total Marketing Concepts, Inc.
c/o Patrick Crocker, Esq.
The Kalamazoo Building
107 W. Michigan A venue, 4th Floor
Kalamazoo, MI 49007

Synovus Bank f/k/a Florida Community Bank, N.A.
2500 Weston Road, Suite 300
Weston, Florida 33331

Xerox Financial Services, LLC
1201 Hayes Street
Tallahassee, Florida 32301

State of Florida, Dept. of Revenue
Orlando Service Center
400 W. Robinson Street, Suite N302
Orlando, Florida 32801-1759

Southern Nevada Finance, LLC
c/o Bradley J. Anderson
315 E. Robinson Street, Suite 600
Orlando, Florida 3000

Internal Revenue Service
U.S. Dept. of Justice
950 Pennsylvania A venue, NW
Room 2242
Washington, DC 20530-000

Discount Long Distance, LLC
c/o Jack M. Brennen, Esq.
301 E. Pine Street, Suite 1400
Orlando, Florida 32801

Capstone Credit, LLC
810 7th Avenue, 27th Floor
New York, NY 10019

Business Advance, LLC
325 Division Avenue, Suite 201
Brooklyn, NY 11211

Broadband Dynamics, LLC
c/o Corporation Service Company
1201 Hays Street
Tallahassee, Florida 32301

Affiliated Funding Corporation
2614 E. Tuxedo Circle
Sandy, Utah 84093

Corporation Service Company, as Representative
801 Adial Stevenson Drive
Springfield, IL 62703

Queen Funding, LLC
Israel Gross
2221 Northeast 164th Street, Suite 1144
N. Miami Beach, Florida 33160

GTR Source, LLC

1006 Monmouth A venue
Lakewood, New Jersey 08701

Kirby McDonough, Esq.
Spencer Fane LLP
201 N. Franklin Street, Suite 2150
Tampa, FL 33602

59-2019-CA-002536 06/15/2020 02:54:31 PM

Jennifer Jones, Judicial Assistant
59-2019-CA-002536 06/15/2020 02:54:31 PM