-1-

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| BRITTANY BURK, on behalf of herself and all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>DIRECT ENERGY, LP,<br><br>*Defendant.* | Case No. 4:19-cv-663 |

**DECLARATION OF GARY M. KLINGER IN SUPPORT OF (i) PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUBSTITUTE NAMED PLAINTIFF; and (ii) PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

I, Gary M. Klinger, being competent to testify, make the following declaration based on my personal knowledge, and where stated, upon information and belief, I declare:

1. I am currently a partner in the law firm of Mason Lietz & Klinger LLP ("MLK" or "Mason Lietz & Klinger"). I am one of the lead attorneys for Plaintiff Brittany Burk and the putative Class in this matter. I submit this declaration in support of (i) Plaintiff's Reply in Support of Motion to Substitute Named Plaintiff; and (ii) Plaintiff's Reply in Support of Motion for Class Certification. Except as otherwise noted, I have personal knowledge of the facts set forth in this declaration, and could testify competently to them if called upon to do so.

2. On February 25, 2019, Plaintiff filed her class action complaint (Dkt. 1) asserting violations of the Telephone Consumer Protection Act ("TCPA") against Defendant Direct Energy, LP ("Direct Energy").

3. Prior to filing this lawsuit, my predecessor law firm, Kozonis & Klinger, Ltd., investigated the claims that formed the basis of this lawsuit. In connection with that investigation,

DECLARTION OF GARY M. KLINGER

I personally interviewed Ms. Burk and inquired about the nature of her claims as well as her criminal background, if any. As part of that process, Ms. Burk was asked whether she had any felony convictions. In addition, my co-counsel at Lieff Cabraser Heimann & Bernstein LLP ("LCHB") ran a background check on Ms. Burk which, unfortunately, did not divulge any criminal history.

4. Prior to filing suit, Ms. Burk was also apprised by my predecessor law firm that by serving as a class representative she would be subject to testifying at deposition and possibly trial, and answering written interrogatories. Ms. Burk was further informed that this would include questions about any potential criminal background.

5. After Ms. Burk's lawsuit was filed, and prior to the first hearing in the matter on July 12, 2019, I spoke with Ms. Burk and, along with my co-counsel, conducted additional independent research related to Ms. Burk's claims.

6. During the course of the litigation I, along with my co-counsel, have worked with Ms. Burk on an ongoing basis to update her on the litigation and to prepare her responses to Direct Energy's discovery requests, which Ms. Burk reviewed and approved and also assisted with document search and collection efforts.

7. In addition, prior to each of Ms. Burk's depositions, I spoke with Ms. Burk to help her prepare for her examinations. This included again exploring Ms. Burk's criminal background, if any.

8. Unfortunately, it appears Ms. Burk was not forthright with myself or my co-counsel (or Direct Energy) about her purported criminal history. I believe this to be the case because Ms. Burk was embarrassed about her past criminal history.

9. Ms. Burk testified that she no longer has the cell phone on which she received the phone calls at issue in the Complaint. Ms. Burk also testified she no longer has her personal laptop

that she was using at or around the time she received the phone calls at issue in the Complaint. However, to the best of my knowledge, Ms. Burk disposed of these items after answering all of Direct Energy's discovery requests, including interrogatory responses confirming that the IP addresses for each device did not match the IP address that Direct Energy claims accessed a third-party website.

10. In addition, in May of 2019, I spoke with Ms. Burk to convey an individual settlement offer that had been made by Direct Energy's counsel to my co-counsel. Ms. Burk rejected the individual settlement offer because she was (and still is) only interested in class-wide resolution. In my opinion, Ms. Burk's refusal to accept an individual settlement offer demonstrates her commitment to the interest of the class by refusing Direct Energy's early effort to "pick her off" with a substantial individual settlement offer.

11. It was not until after Ms. Burk's deposition on November 17, 2020, that proposed class representative Ellen Young first spoke with a paralegal at my new law firm, Mason Lietz & Klinger, LLP. This conversation took place on or about November 19, 2020 and Ms. Young signed a retainer soon after, according to my firm's records.

12. Since the inception of this case, my firm, along with LCHB (collectively, "Plaintiff's Counsel"), has diligently and zealously prosecuted this case on behalf of Ms. Burk and the proposed class, spending hundreds of uncompensated hours in the process.

13. I, along with my co-counsel flew to Houston, Texas for an initial status conference (before the pandemic) on discovery.

14. Plaintiff's Counsel has also engaged in significant discovery efforts regarding Plaintiff's allegations and Defendant's defenses. In particular, we served two sets of requests for production and propounded fourteen (14) interrogatories.

15. Following a series of meet and confers, Direct Energy produced, and Plaintiff's Counsel reviewed, more than 31,000 pages of documents from Direct Energy and more than 128,000 pages of documents from Total Marketing Concepts ("TMC").

16. Plaintiff's Counsel deposed corporate representatives from Direct Energy and TMC.

17. Plaintiff's Counsel also pursued discovery from third parties, government agencies and class members with relevant information. In particular, Plaintiff's Counsel issued subpoenas to at least the following individuals or entities: (i) Teledrip; (ii) Britebox; (iii) Tyson Chavarie; and (iv) George Lonabaugh.

18. Plaintiff's Counsel obtained written documents from Teledrip.

19. In addition, Plaintiff's Counsel obtained declarations from third-party vendors Britebox and Squeeze.

20. Plaintiff's Counsel continues to vigorously pursue third-party discovery. Indeed, Plaintiff's Counsel deposed third-party witness Tyson Chavarie on March 26, 2021.

21. In addition, Plaintiff's Counsel engaged, at their own expense, two experts to analyze the data produced in discovery.

22. Plaintiff's Counsel have also engaged in extensive motion practice, including a motion to dismiss, a motion for class certification and this motion for substitution of a class representative.

23. Through Plaintiff's Counsel's research, we have been able to identify at least 13 separate TCPA lawsuits filed against Direct Energy before this case, including the following: *Mathias v. Direct Energy, LP*, Case No. 1:14-cv-00999 (D. Colo. filed Apr. 8, 2014); *Badillo v. Direct Energy, LP*, Case No. 4:16-cv-01441 (S.D. Tex. filed May 23, 2016); *Groves v. Direct Energy, LP*, Case No. 4:16-cv-02143 (S.D. Tex. filed July 19, 2016); *Getso v. Direct Energy, LP*,

Case No. 3:16-cv-02142 (N.D. Tex. filed July 25, 2016); *Velar v. Direct Energy Services, LLC*, Case No. 1:17-cv-00176 (N.D. Ind. Filed Apr. 24, 2017); *Aronson v. Direct Energy*, Case No. GD-17-016675 (Allegheny County C.P. filed Dec. 6, 2017); *Dickson v. Direct Energy, LP*, Case No. 5:18-cv-00182 (N.D. Ohio filed Jan. 24, 2018); *Gomez v. Direct Energy, LP*, Case No. 1:18-cv-00301 (M.D. Pa. filed Feb. 6, 2018); *Shackelford v. Direct Energy LP*, Case No. 4:18-cv-02727 (S.D. Tex. filed Aug. 8, 2018); *Hunter v. Direct Energy Services, LLC*, Case No. 4:18-cv- 00612 (E.D. Tex. filed Aug. 24, 2018); *Shelton v. Direct Energy, LP*, Case No. 2:18-cv- 04375 (E.D. Pa. filed Oct. 9, 2018); *Causevic v. Direct Energy Services, LLC*, Case No. 1:18-cv-07176 (N.D. Ill. filed Oct. 26, 2018).

24. To the best of my recollection, during various meet and confers with Direct Energy's counsel in this case (Matt Matthews and Will Thomas), Direct Energy's counsel represented that third-party vendor "Silverman" had no involvement in the call campaign at issue in this case and Direct Energy would therefore not produce discovery related to "Silverman". I was able to confirm my recollection after speaking with my co-counsel who also had a similar recollection. Consistent with this recollection, I found a draft joint status report prepared in December 2019 wherein Direct Energy's counsel indicated that the sub-vendors TMC used in the *Dickson* case[1], which primarily involves "Silverman," "were not used in connection with calls made to Ms. Burk or others like her[] who were contacted about Direct Energy's services in Texas," according to Direct Energy's counsel. Relatedly, Direct Energy's counsel emailed Plaintiff's Counsel in May of 2020 further indicating that "Silverman" no involvement in this case when Mr. Thomas refused to produce discovery related to same stating:

> I did not agree to procure all call data beyond TMC and TMC's vendors. As I discussed, **Direct Energy is working to procure call data and related documents from TMC's vendors, specifically Britebox and Teledrips because those are the two TMC vendors that appear immediately relevant to the Burk campaign**.

---

[1] *Dickson v. Direct Energy, LP*, Case No. 5:18-cv-00182 (N.D. Ohio filed Jan. 24, 2018).

5

> As we understand from TMC, TMC contracted with Britebox to procure leads, which generated the Burk lead from the website www.simplycellphonesforyou.com, and then contracted with Teledrips to place the calls/texts to Burk. (emphasis added).

25. Because of Direct Energy's counsel's repeated representations which, to the best of my and my co-counsel's recollection, occurred both orally in meet and confers and in the above referenced correspondence, it was therefore quite shocking to see Direct Energy claim—for the first time—that some of the leads may have come from "Silverman". *See* Direct Energy's Opposition at 5. This appears to flatly contradict what was represented in discovery.

26. In Direct Energy's opposition papers to Plaintiff's Motion for Class Certification, Direct Energy purports to provide proof of "consent" for five class members who supposedly consented to be robocalled by opting-in to a third-party website like Direct Energy claims Ms. Burk did. *See* Opp. at 8 citing Kostyun Rpt., ¶¶ 92–99; Exs. 2-F through 2-K. The five class members identified are: (i) Yvette Ashford; (ii) Clemente Patrina; (iii) Shannon Murray; (iv) William Spomer; and (v) Sheila Livingston. Notably, Direct Energy provides no actual proof of consent such as a Trusted Form Certificate for any of these five class members. I therefore attempted to contact each of the five class members to determine whether they consented to be called. I was only able to reach three of the five class members – Mr. Spomer, Ms. Murray and Ms. Ashford. All three of those class members unequivocally denied ever giving consent to receive Direct Energy robocalls or ever visiting any third-party website where they would have "opted-in" to be robocalled by Direct Energy. Although I attempted to reach the other two class members—Mr. Patrina and Ms. Livingston—neither one of them returned my calls or emails and I was not able to reach them.

27. Direct Energy and its counsel have suggested Plaintiff's Counsel conducted an inadequate investigation into Ms. Burk's claims prior to filing this lawsuit and have otherwise been

6

inadequate. This is a reckless accusation without any merit but one that I take seriously. I have been appointed to serve as class counsel in dozens of class actions in both state and federal courts across the country and have never once been found to be inadequate. I have recovered tens of millions of dollars on behalf of consumers. Indeed, in a recent TCPA class settlement hearing in the U.S. District Court for the Northern District of California, Judge Richard Seeborg personally commended me for "quite a substantial recovery for class members." See Exhibit 1 attached hereto at 3. Judge Seeborg further stated "I've had my share of [TCPA] cases and this is definitely on the high side." *Id*. Judge Seeborg went on to state he could not recall any class action case where "the amounts going to each class member were as substantial" as that obtained by myself (and my co-counsel). *Id.* at 6.

28. Unfortunately, meritless adequacy accusations like the one Direct Energy's counsel has launched here have become all too common among the defense bar as just another way to challenge class certification. As described herein, prior to filing this lawsuit and throughout, my law firm thoroughly investigated Ms. Burk's claims and her potential adequacy as class representative.

29. Indeed, before filing any lawsuit, it is my law firm's custom and practice to conduct an interview with each client (including Ms. Burk) to, among other things, (i) explore potential adequacy issues such as criminal convictions; and (ii) inform them of what it means to serve as a class representative, including their duties and responsibilities such as testifying at deposition and trial, answering written interrogatories, and by keeping generally aware of the status and progress of the lawsuit. In addition, and where applicable, we also gather any relevant paperwork from the potential client to support their claims. This case was no different as we went through the same process with Ms. Burk.

30. Having been appointed class counsel for millions of consumers over my career, I take my duties as class counsel seriously. It was offensive to see Direct Energy's counsel suggest Plaintiff's Counsel have been inadequate in this case to score "litigation points". I hope this declaration clears the air.

*   *   *

I declare under penalty of perjury of the laws of Illinois and the United States that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration was executed in Chicago, Illinois on this 9th day of April, 2021.

*/s/ Gary M. Klinger*
Gary M. Klinger

*Counsel for Plaintiff*

# **EXHIBIT 1**

**Pages 1 - 8**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

| | |
|---|---|
| VIANN BONOAN, individually and on behalf of others similarly situated, ) ) ) ) | |
| Plaintiff, ) ) | |
| VS.      ) | **NO. C 19-01068 RS** |
| ) | |
| ADOBE, INC.,      ) ) | |
| Defendant. ) ) | |

San Francisco, California
Thursday, February 18, 2021

**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**

**APPEARANCES BY ZOOM WEBINAR:**

For Plaintiff:
        MASON, LIETZ & KLINGER LLP
        227 W. Monroe Street - Suite 2100
        Chicago, Illinois  60606
   **BY:  GARY M. KLINGER, ATTORNEY AT LAW**

For Defendant:
        PERKINS COIE LLP
        505 Howard Street - Suite 1000
        San Francisco, California  94105
   **BY:  MARIA A. NUGENT, ATTORNEY AT LAW**

Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
        Official Reporter

```
 1   Thursday - February 18, 2021                         1:33 p.m.
 2                     P R O C E E D I N G S
 3                           ---oOo---
 4        THE CLERK:  Calling case 19-cv-1068, Bonoan vs. Adobe.
 5   Counsel, please state your appearances.
 6        MR. KLINGER:  Good morning.  This is Gary Klinger on
 7   behalf of plaintiff and the class.
 8        THE COURT:  Good afternoon.
 9        MS. NUGENT:  Good afternoon.  This is Maria Nugent on
10   behalf of defendant Adobe, Inc.
11        THE COURT:  Good afternoon.
12     So this matter is on for consideration of final approval
13   of this putative class action; and as we all know, the mission
14   is to determine if the proposed disposition is fair,
15   reasonable, and adequate.
16     I have looked through what you've submitted to me, and I'm
17   generally comfortable with it.  I had a few just questions,
18   some simply curious rather than a particular concern.
19     Just to confirm, as I understand it, there are no
20   objectors; is that right?
21        MR. KLINGER:  That is correct, Your Honor.  There are
22   no objectors and only one opt-out.
23        THE COURT:  Okay.  And as I look through it again, the
24   release is tied to the claims that were advanced in the action.
25     And as a small issue, you talked about some of the late
```

```
 1   claims that you got.  I think there's 70 of them, and I'm
 2   certainly inclined to accept those claims, which I think we
 3   should do.
 4        I suppose my first question, it's quite a substantial
 5   recovery for class members.  I've had my share of these cases
 6   and this is definitely on the high side.  So you're not going
 7   to have me asking you, you know, "Could you have gotten more"
 8   kind of thing.
 9        I suppose, though, it does lead me to the question of
10   whether or not the outreach -- the notice outreach, was
11   sufficient.  I know I reviewed the notice proposal and I
12   approved it.  I think you said you sent out 12,000 initial
13   cards and then there were some publication notice.
14        I'm just wondering if, you know, because it's significant
15   per-class member recovery, if we should do more.  Mr. Klinger,
16   do you want to just give me your perspective on this?
17        **MR. KLINGER:**  Sure, Your Honor. And you're correct,
18   we do believe it is a significant recovery.  We think it is far
19   above what is typically recovered in these cases and so for
20   that reason we are quite proud to present the settlement to the
21   Court.
22        I do not believe additional notice would benefit the class
23   at this point given the potential costs.  You're correct that
24   we did notice directly folks for all class members who we had
25   physical addresses.  And on top of that outreach, we did a
```

1  robust publication plan which resulted in I believe 41 million
2  impressions, and that was through online, digital media.
3       But also in addition to that, and obviously having the
4  settlement website and the toll-free phone number, we did do
5  follow-up notice, Your Honor, as we put in our papers.  We did
6  reminder notices.
7       One set of reminder notices was by way of postcard, and
8  then we did a reminder notice to folks via e-mail for whose
9  e-mails we reasonably believed based on the settlement
10 administrator's guidance who we had e-mail addresses available
11 for.
12      So we did do a robust outreach to potential class members.
13 I wish more folks would make a claim here.  I mean, we think
14 it's significant money to class members, particularly in, you
15 know, difficult times with what's going on and the pandemic and
16 everything.
17      But for those reasons, because of the robust notice
18 program we did and the response that we had, I don't believe
19 the class would benefit from additional notice and, in fact, it
20 might just take away from those folks who are participating.
21           **THE COURT:**  In the outreach, in the notice that you
22 did do, was there an estimate of potential -- I remember when
23 we were at preliminary approval hearing, this stage, there was
24 an estimate of 400 to $800.  Was the per-class-member
25 assessment premised on I don't -- you had identified 12,000

1  class members.  I don't know how much that -- what that
2  translated into -- I do my math quickly -- as to how many you
3  were anticipating making a claim; but was there some -- did the
4  class members know what the potential recovery was?
5          **MR. KLINGER:**  Well, we think so, Your Honor, because
6  we put that in our fee petition, which of course is filed
7  before the objection and exclusion deadline, and so folks
8  should have been aware of it.  In our fee petition I think we
9  might have even estimated a little bit higher than what class
10 members are getting here now in the 2,000 range.  So they would
11 have been on notice if they had went to the settlement website
12 and looked at the applicable documents because we had put that
13 in our papers.
14         **THE COURT:**  Okay.  I mean, it may just be a sign of
15 the general attitude towards receiving some of these that the
16 public throws it aside when for understandable reasons if the
17 recovery is 10 cents or something, they don't want to be
18 bothered.
19    I mean, I suppose if the putative class had been aware,
20 I'm not suggesting there's any more you could have done to make
21 them aware, but if they'd been aware of the amounts here, I
22 would be -- I am surprised you didn't get a more response
23 because, you know, that's a healthy amount of money.  So okay.
24         **MR. KLINGER:**  And of course we wanted to get as much
25 to everybody as we could, which is why we implemented this

1  robust program; and, as I mentioned, we're pleased to get
2  folks, you know, 2,000 bucks in their pocket, but we think it's
3  real money.
4       **THE COURT:**  It is.  It is.  No, as I said at the
5  outset, I can't recall a class action disposition where my
6  reaction was that the amounts going to each class member were
7  as substantial as this.
8       So, anyway, okay.  Let me ask you just a couple of other
9  questions.
10       With respect to the claims administrator, who is the
11  claims administrator?
12       **MR. KLINGER:**  The claims administrator is KCC,
13  Your Honor.
14       **THE COURT:**  Right.  I'm familiar with them.
15       **MR. KLINGER:**  As Your Honor likely knows, they've
16  implemented a number of TCPA class actions.
17       **THE COURT:**  Yes.  No, I'm familiar with them.
18       You propose a $5,000 incentive fee award, and that's
19  certainly within the parameters of standard incentive awards.
20       Costs of a little over $14,000, fine.  And does that
21  include the -- what are the fees for the administrator?
22       **MR. KLINGER:**  Your Honor, I believe the fees for the
23  administrator are deducted out of the common fund, and so the
24  proposed recovery contemplates, you know, this is after
25  deduction of fee, requested fees and costs.

1          **THE COURT:**  Yeah.
2          **MR. KLINGER:**  I don't have the exact number in front
3   of me right now, but I'm sure we could track that down.  I
4   think we had a cap of 125,000 if I recall correctly,
5   Your Honor.
6          **MS. NUGENT:**  That's correct.  That's correct.
7          **THE COURT:**  Okay.  That's what I need to know.  That's
8   fine.
9          Your proposal for fees, you're seeking a third and you
10  have explained to me why we should depart from the 25 percent
11  starting point, which we start with in the Ninth Circuit, and I
12  think it's certainly justified in this case so I'm comfortable
13  with the fee amount.
14         And your structure for second round of payments, if it's
15  over $5, if it hasn't been cashed, is fine; and then the
16  residual going to the *cy pres* designated recipient who also
17  that recipient seems consistent with what is appropriate.
18         So as I say, I'll accept your representation that you've
19  done as much as you can do with respect to outreach to the
20  putative class members, and the lucky ones who have made a
21  claim will get a substantial recovery.
22         Ms. Nugent, anything you want to add to the discussion?
23         **MS. NUGENT:**  No, Your Honor.
24         **THE COURT:**  Okay.  I do have your proposed order and I
25  looked through it.  I think it looks fine to me.  I may tweak

| | |
|---|---|
| 1 | it in some, you know, stylistic ways, but otherwise I think |
| 2 | it's fine. |
| 3 | So very well.  So I will approve the settlement, give |
| 4 | final approval to the class action settlement, and shortly sign |
| 5 | off on your proposed order and congratulate you on resolving |
| 6 | the matter. |
| 7 | **MR. KLINGER:**  Thank you, Your Honor.  It was a |
| 8 | pleasure and, you know, we want to thank you and it's always a |
| 9 | privilege to appear before you and before this court, and so we |
| 10 | just want to say thank you for your time and attention to this |
| 11 | case and I very much look forward to appearing before you |
| 12 | again. |
| 13 | **THE COURT:**  Very good.  Thank you. |
| 14 | **MS. NUGENT:**  Yes.  Thank you, Your Honor. |
| 15 | **THE COURT:**  You're always welcome back.  Thank you |
| 16 | very much. |
| 17 | **MR. KLINGER:**  Thank you. |
| 18 | **THE COURT:**  Very good.  Thank you. |
| 19 | **MS. NUGENT:**  Thank you, Your Honor.  Have a good |
| 20 | afternoon. |
| 21 | **THE COURT:**  You too. |
| 22 | (Proceedings adjourned at 1:44 p.m.) |
| 23 | ---oOo--- |
| 24 | |
| 25 | |

### CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, March 12, 2021

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter