United States District Court
Southern District of Texas
**ENTERED**
September 20, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| BRITTANY BURK, § | |
| § | |
| Plaintiff, § | |
| VS. § | CIVIL ACTION NO. 4:19-CV-663 |
| § | |
| DIRECT ENERGY, LP, § | |
| § | |
| Defendant. § | |

## MEMORANDUM OPINION AND ORDER

This lawsuit is a putative class action brought by Plaintiff Brittany Burk ("Burk") under the Telephone Consumer Protection Act ("TCPA") and accompanying regulations. *See* 47 U.S.C. § 227; 47 C.F.R. § 64.1200. (Dkt. 1 at p. 1). Before the Court are several motions, foremost among them Burk's motion for class certification. After careful consideration of the pleadings, the motions and responses, the entire record, the parties' submissions, and the applicable law, the Court **DENIES** Burk's motion for class certification. (Dkt. 84). Burk's motion to substitute a different class representative for herself (Dkt. 97) is **DENIED** as moot. Defendant/Third-Party Plaintiff Direct Energy, LP's ("Direct Energy") motions to strike Burk's rebuttal expert reports and to exclude the expert testimony of Jeffrey Hansen ("Hansen") (Dkt. 127 and Dkt. 133) are **DENIED** for the purposes of Burk's class certification motion but may be reasserted when the Court and parties address the merits of Burk's individual claim.

## FACTUAL AND PROCEDURAL BACKGROUND

The TCPA bars "any person within the United States" from making a call to a cell phone "using any automatic telephone dialing system or an artificial or prerecorded voice" without the "prior express consent of the called party[.]" 47 U.S.C. § 227(b)(1)(A). The statute allows people who receive prohibited calls to sue for injunctive relief and the greater of actual monetary loss or statutory damages. 47 U.S.C. § 227(b)(3).

Burk alleges that she "began receiving numerous prerecorded messages, autodialed calls, and text messages" from Direct Energy on her cell phone in December of 2018. (Dkt. 1 at p. 6). Burk further alleges that the communications from Direct Energy violated the TCPA because Direct Energy "utiliz[ed] an 'automatic dialing system' and/or prerecorded messages within the meaning of 47 U.S.C. § 227(b)(1)(A)" and Burk did not provide consent to be contacted. (Dkt. 1 at p. 8). In addition to suing on her own behalf, Burk seeks to certify a class consisting of:

> All persons in the United States who, between December 1, 2018 and April 30, 2019, (1) received a non-emergency Direct Energy call; (2) to their cellular telephone numbers; (3) through the Teledrip dialing platform[1] and/or a prerecorded voice.
> Dkt. 84-1 at p. 2.

According to Burk, "[t]he proposed class here consists of a discrete set of 142,806 recipients of Direct Energy telemarketing calls who were *not* Direct Energy customers. Such non-customers never consented to receive Direct Energy telemarketing calls." (Dkt. 84 at p. 10) (emphasis in Burk's brief).

---

[1] Both parties refer to the dialing system at issue as the "Teledrip Platform." (Dkt. 84 at p. 13; Dkt. 110 at p. 11).

In addition to denying liability, Direct Energy challenges the propriety of certifying a class. Direct Energy lists many grounds for opposing class certification, but the pivotal issue highlighted by the record accompanying the parties' class certification briefs is the feasibility of determining the existence or absence of consent with class-wide proof. The marketing calls about which Burk complains were made by Third-Party Defendant Total Marketing Concepts, Inc. ("TMC"), a now-defunct telemarketing contractor that Direct Energy hired to run telemarketing campaigns (and that Direct Energy sued in this case for breach of contract and indemnification). (Dkt. 24 at pp. 11–12). To satisfy the TCPA compliance clauses in its contracts with Direct Energy, TMC "relied on a number of sources for 'leads'—contact information for people who had given valid written consent" to be called. (Dkt. 110 at p. 11; Dkt. 111 at pp. 33–70). Some companies on which TMC relied for leads operated "landing pages—websites that ask consumers to give express written consent to be contacted, often in exchange for a prize entry or discount." (Dkt. 110 at p. 12). In his report, Direct Energy's expert on telecommunications and information technology, Jan Kostyun ("Kostyun"), includes a nonexclusive list of three different companies and nine different landing pages that TMC used to obtain leads. (Dkt. 110 at pp. 11–12; Dkt. 111 at pp. 353–55).

One of TMC's "landing page" leads, Direct Energy claims, was Burk herself. Direct Energy contends that "[t]he documentary evidence shows Ms. Burk gave express written consent [to be called] when she registered at simplycellphonesforyou.com on December 22, 2018." (Dkt. 110 at p. 17). Direct Energy has attached to its briefing screenshots of a registration in Burk's name from simplycellphonesforyou.com. (Dkt.

111 at pp. 453–62). Burk, though, denies giving consent; in her deposition, she testified that she did not register at simplycellphonesforyou.com and that the registration under her name was an instance of identity theft. (Dkt. 111 at pp. 162–63).

The dispute over whether Burk gave consent to be called recurs in the record with other members of the putative class. In his report, Kostyun identifies five members of the putative class (apart from Burk) who registered on landing pages and thereby provided consent to be contacted; Direct Energy has provided screenshots of those registrations. (Dkt. 111 at pp. 355–59, 464–527). Burk claims that TMC faked all five leads, and Burk has included in the record unsworn declarations in which three of the five people[2] aver that they did not visit the landing pages and did not provide Direct Energy with consent to be contacted. (Dkt. 120 at pp. 19–20; Dkt. 121 at pp. 132–44).

As one might expect, Burk and Direct Energy vigorously impugn the veracity of each other's evidence on consent. Both of them correctly observe, however, that for the purposes of class certification the issue of whose evidence regarding consent should be credited is less important than the issue of whether consent, or the lack thereof, can be established with class-wide proof. Direct Energy's argument that the consent issue precludes class certification has three steps: (1) evidence in the record shows that several putative class members, including Burk, provided consent; (2) the consent issue, as demonstrated by the conflicting evidence regarding the sample of putative class members, "defies generalized proof[;]" and (3) the factfinder will accordingly only be

---

[2] Burk says that she was unable to contact the other two people identified by Kostyun. (Dkt. 120 at p. 20).

able to assess the consent issue "with a series of lead-by-lead, source-by-source mini-trials." (Dkt. 110 at pp. 37–39). Direct Energy analogizes this case to *Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318 (5th Cir. 2008), in which the Fifth Circuit reversed the certification of a class in a TCPA case when the record supported the defendant's argument that "there [wa]s no class-wide proof available to decide consent and only mini-trials c[ould] determine th[e] issue." *Gene*, 541 F.3d at 328–29; *see also Hirsch v. USHealth Advisors, LLC*, 337 F.R.D. 118, 130 (N.D. Tex. 2020) (discussing *Gene*) ("Consent often creates an obstacle to TCPA class certification."). Burk argues that this case is distinguishable from *Gene* because "common evidence will show that Direct Energy never obtained prior express written consent[.]" (Dkt. 120 at p. 28).

## ANALYSIS

### Class Actions

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotation marks omitted). To avail themselves of this exception, parties must satisfy the requirements of Federal Rule of Civil Procedure 23. *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012). More specifically, "[t]o obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *Id.* (quotation marks omitted). Rule 23(a), entitled "Prerequisites," sets out requirements applicable to all class actions, while Rule 23(b) outlines three "[t]ypes" of class actions with their own individual requirements. *See* Fed. R. Civ. P. 23.

>The requirements of Rule 23(a) are:
>
>>(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
>
>*Stukenberg*, 675 F.3d at 837.

As for the Rule 23(b) requirements, Burk argues that class certification is appropriate under Rule 23(b)(3). (Dkt. 84-1 at p. 2). Rule 23(b)(3) "embodies two requirements: (1) common questions must predominate over any questions affecting only individual members; and (2) class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy." *Cruson v. Jackson National Life Insurance Co.*, 954 F.3d 240, 252 (5th Cir. 2020) (quotation marks and brackets omitted).

"Where the plaintiff seeks to certify a class under Rule 23(b)(3), the Rules demand a close look at the case before it is accepted as a class action." *Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 554 (5th Cir. 2011) (quotation marks omitted). And, regardless of which type of class the plaintiff chooses under Rule 23(b), a district court must conduct a "rigorous analysis" of the Rule 23 prerequisites before certifying a class. *Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996). Although "the strength of a plaintiff's claim should not affect the certification decision," the district court must go "beyond the pleadings . . . , as [the] court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Id.* at 744. Furthermore, "[t]he plain text

of Rule 23 requires the court to 'find,' not merely assume, the facts favoring class certification." *Unger v. Amedisys, Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). The party seeking certification bears the burden of establishing that the requirements of Rule 23 have been met. *Cruson*, 954 F.3d 253.

> *A. The Fifth Circuit's* Gene *opinion and Rule 23(b)(3)'s predominance requirement*

In *Gene*, the Fifth Circuit reversed the certification of a class in a TCPA case. *Gene*, 541 F.3d at 329. The Fifth Circuit held that the proposed class did not meet Rule 23(b)(3)'s predominance requirement because the question of which individual members of the proposed class had given consent to be contacted was not susceptible to common class-wide proof. *Id*. at 327–29 ("Gene has failed to advance a viable theory of generalized proof to identify those persons, if any, to whom BioPay may be liable under the TCPA."). In explaining its holding, the *Gene* panel highlighted three points: (1) the defendant had produced evidence showing that it had obtained consent to send at least some of the faxes at issue and that there was no single database or record with which one could distinguish class members who had consented to receiving faxes from class members who had not; (2) the defendant had "culled fax numbers from a variety of sources over a period of time" and not from a single source; and (3) "perhaps most importantly," the plaintiff had not met its burden to provide a "sensible method of establishing consent or the lack thereof via class-wide proof" and to present "facts or arguments to support that this type of dispute [over consent] w[ould] not exist as to a significant number of class members." *Id*. at 323, 329. Since the plaintiff had "failed to

advance any viable theory employing generalized proof concerning the lack of consent with respect to the class[,]" the panel concluded "that myriad mini-trials [could not] be avoided" and that certification of the class was improper. *Id*. at 329.

By way of illustration, the *Gene* Court also distinguished a district court opinion out of the Western District of Washington, *Kavu v. Omnipak Corp.*, 246 F.R.D. 642 (W.D. Wash. 2007). The discussion is instructive. In *Kavu*, the plaintiff successfully established that the question of consent was susceptible to common class-wide proof. *Kavu*, 246 F.R.D. at 647. The *Kavu* defendant had obtained the class members' contact information from a single commercial database, and the *Kavu* defendant argued that inclusion in the database itself constituted consent to be contacted. *Id*. The *Kavu* plaintiff contended that inclusion in the database only proved consent if the defendant took reasonable steps to verify, in accordance with federal regulations, whether the businesses on the list had consented to have their numbers included. *Id*. The *Kavu* parties focused broadly and singularly on the list, not granularly on the individually listed businesses. *Id*. "The common question in *Kavu* was thus whether the inclusion of the recipients' fax numbers in the purchased database indicated their consent to receive fax advertisements, and there were therefore no questions of individual consent." *Gene*, 541 F.3d at 328.

### B. Burk has not met her burden under Rule 23.

The Court concludes that *Gene* governs this case and that, on this record, Burk has not met her burden under Rule 23. No argument akin to that used by the *Kavu* plaintiff is available to Burk. To the contrary, the points highlighted by the Fifth Circuit in *Gene* apply with equal force in this case. First, Direct Energy has presented evidence showing

that at least six putative class members, including Burk, provided consent and that TMC obtained contact information and opt-in consent information for members of the putative class from at least three different companies and nine different internet landing pages. (Dkt. 110 at pp. 11–12; Dkt. 111 at pp. 353–59, 453–527). *Cf. Gene*, 541 F.3d at 323, 329. Second, TMC kept poor records and is no longer in business. (Dkt. 110 at pp. 15–16). *Cf. id.* And third, each side's evidence regarding consent is extremely individualized, vehemently contested, and complex enough to require expert testimony. *Cf. id.* As a result, by all indications, "myriad mini-trials cannot be avoided[.]" *Id.*

In fact, the parties' discussion of the six individual class members already resembles a series of mini-trials. Begin with Burk herself. On this record, the Court would have to deny a motion for summary judgment by either side on the merits of Burk's claim. Direct Energy has attached to its briefing screenshots of a registration in Burk's name from a landing page called simplycellphonesforyou.com. (Dkt. 111 at pp. 453–62). The registration includes Burk's name, address, and phone number, as well as an email address and an IP address. (Dkt. 111 at pp. 453–56). Burk denies giving consent; in her deposition, she testified that she did not register at simplycellphonesforyou.com, that the email address on the registration was not hers, and that the registration under her name was an instance of identity theft. (Dkt. 111 at pp. 162–64). Direct Energy challenges the credibility of Burk's denial by pointing to testimony and documents showing that Burk disposed of her phone and laptop, preventing forensic analysis of those items; that Burk refused to provide the IP address of the computer that she used to access Zoom during her deposition; and that Burk was not

forthcoming in her deposition about her pending criminal charges and prior arrests. (Dkt. 110 at pp. 18–20; Dkt. 111 at pp. 144, 155–58, 167, 172, 180, 190–95, 219–94). Burk counters by noting that Direct Energy is relying for its evidence of consent in part on the recordkeeping practices of now-defunct TMC, a company that Direct Energy itself has accused in the Northern District of Ohio of fabricating evidence of consent. (Dkt. 85-1 at pp. 81–101; Dkt. 120 at pp. 11–12, 17–18).

In short, Burk accuses Direct Energy of knowingly using a company (TMC) that "faked" evidence of consent, while Direct Energy accuses Burk of "destroy[ing] key evidence" and "t[elling] several demonstrable lies at her depositions[.]" (Dkt. 110 at p. 8; Dkt. 120 at p. 12). Both parties have retained indisputably qualified experts to prove their cases scientifically, but the expert testimony seems no less a swearing match than the lay testimony. Burk and Direct Energy have presented dueling expert reports that contain intricate and highly technical discussions of IP addresses, phone number pooling, phone number portability, and the interplay between them (Dkt. 85-1 at pp. 275–76; Dkt. 111 at pp. 349–53; Dkt. 121-1 at pp. 32–37), and in the end the issue of whether Burk gave consent to be contacted is nowhere near definitively settled.

The evidence on consent regarding the other five putative class members discussed in the parties' briefing is equally fact-intensive. Tellingly, and perhaps inevitably, Burk's evidence allegedly showing that TMC faked consent information differs depending on the class member. For example, there is a rather large collection of consent evidence for a putative class member named William Spomer ("Spomer"). Direct Energy claims that Spomer consented to be contacted by registering on a website called

yournewcreditchoice.com. (Dkt. 111 at pp. 358, 496–515). Direct Energy has presented expert testimony opining that the yournewcreditchoice.com site, which apparently no longer exists, collected the contact information and consent information for Spomer when it was online. (Dkt. 111 at p. 358). Direct Energy's evidence also includes a consent verification number for Spomer from a third-party sales lead verification company. (Dkt. 111 at p. 512). Burk argues that the consent information is fake and has included in the record a declaration from Spomer in which Spomer avers that he never visited yournewcreditchoice.com. (Dkt. 121 at pp. 140–41). Burk has also presented expert testimony of her own opining that the yournewcreditchoice.com site did not collect the contact information and consent information for Spomer when it was online and that the IP address provided in Spomer's consent information is assigned to a carrier that does not "offer service for . . . Spomer's area." (Dkt. 121-1 at p. 38). Because Direct Energy has presented third-party consent verification information for Spomer, however, Burk's experts concede the possibility that Spomer "generated . . . a prior consent event" at some point in the past—an admission that is unique to Spomer. (Dkt. 121-1 at p. 903).

Contrast Spomer with Sheila Levingston ("Levingston"), for whom there is comparatively little consent evidence. Direct Energy claims that Levingston consented to be contacted by registering on a website called mysavingsalliance.com. (Dkt. 111 at pp. 358–59, 517–27). Direct Energy has presented evidence showing that the mysavingsalliance.com site collected the contact information and consent information for Levingston. (Dkt. 111 at pp. 358–59, 567–75). The only contrary evidence in the record is a brief mention in one of Burk's expert reports of email communications between

Direct Energy and TMC discussing Levingston's consent information. (Dkt. 121-1 at p. 38). Burk's experts opine that Levingston's consent information was faked because "the data points collected [regarding Levingston] and those produced do not match" and "no IP address was given" in the emails. (Dkt. 121-1 at p. 38). Levingston herself has neither been deposed nor provided an affidavit.

In light of the individualized, fact-intensive disputes about consent that already permeate the record, the Court concludes that this case is governed by the Fifth Circuit's *Gene* opinion. In trying to avoid the outcome required by *Gene*, Burk repeatedly attacks the credibility of Direct Energy's evidence showing that individual class members gave consent to be contacted. But she does not show how the Court can use *class-wide* proof to determine the existence or absence of consent, and her attempts to do so rely on arguments that conflict with *Gene*, utilize distinguishable cases, or both.

For instance, Burk cites district court opinions from California and New York for the proposition that Direct Energy cannot use TMC's poor recordkeeping to defeat class certification by claiming that there is no class-wide evidence on the consent issue. (Dkt. 120 at p. 28). *See Del Valle v. Global Exchange Vacation Club*, 320 F.R.D. 50, 61 (C.D. Cal. 2017) ("Class certification cannot be defeated by Defendants' poor record-keeping or failure to establish performance data reporting mechanisms with their third-party vendors. This would incentivize companies to not keep records, or not require that their vendors keep records, in an attempt to circumvent TCPA liability."); *Zyburo v. NCSPlus, Inc.*, 44 F. Supp. 3d 500, 503 (S.D.N.Y. 2014) ("[B]y its own admission, the defendant keeps poor or nonexistent records of which class members have given consent to the

underlying creditor. Defendant is in effect asking the Court to reward its imperfect record-keeping practices by precluding class certification."). This argument is foreclosed by *Gene*, in which the defendant defeated class certification in part by presenting evidence showing "that its database entries d[id] not consistently or accurately reflect whether a given recipient had consented to receive fax advertisements . . . because [the defendant] did not begin to record this information until [three years into the class period], and then only with sporadic and therefore unreliable consistency." *Gene*, 541 F.3d at 323, 329. The *Gene* panel rejected the plaintiff's argument that class certification was proper because the defendant "b[ore] the burden of proving consent and ha[d] not retained the necessary documents or records to meet th[at] burden." *Id.* at 323, 328–29. The Fifth Circuit "emphasize[d] that it is the party seeking certification that bears the burden of establishing that the requirements of Rule 23 have been met." *Id.* at 325. Under *Gene*, the mere fact that consent is an affirmative defense does not shift the evidentiary burden to Direct Energy at the class certification stage; the burden remains with Burk to show that the existence or absence of consent can be established with class-wide proof. *Id.* at 323, 328–29. The California and New York cases are inapposite.

So it is with the *All Web Leads* litigation. Burk has cited two opinions from a TCPA class action prosecuted in the Northern District of Illinois against a company called All Web Leads, Inc. *See Sullivan v. All Web Leads, Inc.*, No. 17 C 1307, 2017 WL 2378079 (N.D. Ill. June 1, 2017); *Karpilovsky v. All Web Leads, Inc.*, No. 17 C 1307, 2018 WL 3108884 (N.D. Ill. June 25, 2018). Burk argues that the *All Web Leads* opinions establish "as a matter of law" that none of the landing page websites used by TMC in its

telemarketing campaign for Direct Energy "gave reasonable notice sufficient" to show prior express written consent. (Dkt. 120 at p. 30). In the *All Web Leads* litigation, the website used by the defendant to obtain purported consent placed its consent language below the "Submit" button, and the plaintiffs contended that the consent language was therefore invisible to users unless they scrolled down to view it. *Karpilovsky*, 2018 WL 3108884 at *2. Crucial to the *All Web Leads* litigation was the question of whether placing the consent language below the "Submit" button sufficiently conveyed, under the objective "reasonable consumer" standard set out in 47 C.F.R. § 64.1200(f)(3), that clicking "Submit" equated to providing written consent to be contacted. *Id*. at *5. The plaintiffs' expert provided unrebutted testimony stating that a typical user of a generic website will stop scrolling upon seeing the "Submit" button. *Id*. at *3–4. The expert further testified that the industry standard for website design required the defendant to either make the consent language visible ahead of the "Submit" button or require users to click a box signifying recognition and acknowledgment of the consent language before they could click "Submit." *Id*.

The Court finds the *All Web Leads* cases distinguishable. The *All Web Leads* litigation dealt with one website, while the record in this case contains screenshots from nine different landing pages that TMC's lead sources used to obtain consent. (Dkt. 111 at pp. 353–54, 529–75). Only one of those sites, which is scarcely mentioned in the parties' briefing and is apparently called whoafreesamples.com, features consent language that appears below the button with which the user submits information. (Dkt. 111 at p. 556). Even if whoafreesamples.com fails to satisfy the reasonable consumer standard, that

failure does not constitute class-wide proof; the placement of the consent language on whoafreesamples.com is very different from the placement of the consent language on the other landing pages. Moreover, unlike the *All Web Leads* plaintiff, Burk does not cite to expert testimony, let alone unrebutted expert testimony, opining that the whoafreesamples.com consent language, or that of any other landing page site, falls short of the reasonable consumer standard in the first place. Accordingly, Burk cannot rely on the *All Web Leads* cases to meet her burden.

## CONCLUSION

The Court finds that, under the principles articulated by the Fifth Circuit in *Gene*, Burk has failed to carry her burden of establishing that the requirements of Federal Rule of Civil Procedure 23 have been met. Burk's motion for class certification (Dkt. 84) is **DENIED**. Burk's motion to substitute a different class representative for herself (Dkt. 97) is **DENIED** as moot. Direct Energy's motions to strike Burk's rebuttal expert reports and to exclude the expert testimony of Hansen (Dkt. 127 and Dkt. 133) are **DENIED** without prejudice to being reasserted when the Court and parties address the merits of Burk's individual claim.

SIGNED at Houston, Texas, this 20th day of September, 2021.

_____
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE